IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 5:09-cv-00272 |
| v. | ) | |
| | ) | JUDGE JOHN R. ADAMS |
| THE CITY OF AKRON, OHIO | ) | MAGISTRATE PEARSON |
| | ) | |
| and | ) | |
| | ) | |
| THE STATE OF OHIO, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**CONSENT DECREE**

## TABLE OF CONTENTS

I.      Purpose…………………………………….……………..…....5

II.     Jurisdiction and Venue……………………………………...….5

III.    Parties Bound………………………….…………………...6

IV.     Definitions…………………………………….…..…......... 8

V.      Specific Action Projects…………………….…………....…..........14

VI.     Combined Sewer Overflow and Water Pollution
        Control Station Control Measures…..…….…………...……….......... 16

VII.    Capacity, Management, Operations, and Maintenance,
        Grease Control, and Emergency Response Programs…………………... 20

VIII.   Mud Run Pump Station Program……………….…………….......20

IX.     Civil Penalties………………………………….…………..........22

X.      Supplemental Environmental Project………………….……………... 23

XI.     Stipulated Penalties……………………………….…………........25

XII.    Force Majeure (United States)……………….……………….......... 36

XIII.   Potential Force Majeure (Ohio)……………………………........ 38

XIV.    Dispute Resolution…………………………………………........41

XV.     Reporting Requirements…..……………………………................ 44

XVI.    Notices and Submissions……………………………………45

XVII.   Review and Approval Procedures………………………….............48

XVIII.  Access to Information and Document Retention………..………..……50

XIX.    Failure of Compliance……………………………………………52

XX.     Effect of Settlement and Reservation of Rights…….……….…........... 53

XXI.       Costs………………………………………….………...…........55

XXII.      Effective Date………………………………………………........ 55

XXIII.     Retention of Jurisdiction…………………………………...………..55

XXIV.      Modifications…………………………………………........................ 55

XXV.       Termination…...………………………………………….…….............56

XXVI.      Public Comment……………………………………………….............57

XXVII.     Signatories/Service…………………………………...……….............57

XXVIII.    Integration/Attachments……………………………..…………...........58

XXIX.      Final Judgment……………………………………………….....................59

## LIST OF ATTACHMENTS

ATTACHMENT A:     Long Term Control Plan Update Work Plan

        Appendix 1:     Typical Year Data

        Appendix 2:     CSO Cost/Benefit Tables

        Appendix 3:     Long Term Control Plan Update

        Appendix 4:     Public Participation Program

ATTACHMENT B:     Post Construction Monitoring Program

ATTACHMENT C:     Measures to Maximize Sewer System Performance and

                  Eliminate SSOs and CSS Releases

ATTACHMENT D:     Semi-Annual Report and Statement of Certification

ATTACHMENT E:     State Supplemental Environmental Project

WHEREAS, Plaintiff United States of America ("United States"), on behalf of the United States Environmental Protection Agency ("U.S. EPA"), filed a First Amended Complaint on March 20, 2009, against the Defendant City of Akron, Ohio ("Akron" or "City") seeking injunctive relief and civil penalties pursuant to Section 309(b) and (d) of the Clean Water Act ("CWA" or "Act"), 33 U.S.C. § 1319(b) and (d), for violations of Sections 301(a) of the CWA, 33 U.S.C. § 1311(a), and Akron's National Pollutant Discharge Elimination System Permit ("NPDES Permit").

WHEREAS, in the First Amended Complaint, the United States named the State of Ohio ("State") as a Defendant pursuant to Section 309(e) of the CWA, 33 U.S.C. § 1319(e).

WHEREAS, on May 11, 2009, the State, on behalf of the Ohio EPA ("OEPA"), filed an Answer and Cross Claim against Defendant City of Akron.

WHEREAS, in their complaints, the United States and the State specifically allege that Akron violated the CWA by, *inter alia*: (i) discharging pollutants from Combined Sewer Overflow ("CSO") points to navigable waters and waters of the State during wet weather in a manner that violates the general effluent limitations of the NPDES Permit; (ii) discharging pollutants from CSO points to navigable waters and waters of the State during dry weather, in violation of the NPDES Permit; (iii) discharging pollutants from point sources not identified in or authorized by any NPDES Permit issued by U.S. EPA or the State pursuant to Section 402 of the CWA, 33 U.S.C. § 1342; (iv) diverting wastewater from secondary treatment at the Water Pollution Control Station when the plant peak flows did not exceed 110 MGD and/or the flow equalization pumping station capacity was not being maximized, in violation of the Permit; and (v) failing to monitor or report the results of its monitoring, in violation of the NPDES Permit. The United States' First Amended Complaint further sought relief from the Court to address the

3

endangerment to human health and the environment caused by Akron's release of untreated sewage from its Sewer System into buildings and onto public and private property.

WHEREAS, it is Akron's position that Akron has made substantial investments in excess of $53 million in upgrading its sewer system since 1993 including but not limited to construction of the Cuyahoga Street Storage Facility ("CSO Rack 40") that captures over one third of the CSO volume from the system.

WHEREAS, by entering into this Consent Decree, Akron does not admit that it committed the violations alleged by the United States and/or the State, and Akron further asserts that it is in compliance with the CSO Control Policy and its NPDES Permit. However, in order to settle this case and avoid complicated, protracted and expensive litigation, Akron has entered into this Consent Decree and agreed to pay a civil penalty as set forth in Section IX. Nothing in this Consent Decree constitutes an admission or evidence of, or shall be treated as an admission or evidence of, any violation of the law in any other litigation or forum.

WHEREAS, Akron asserts that the Akron sewage treatment plant was constructed in 1917, and the CSOs were legally permitted and constructed in Akron from 1918 through 1938, both prior to the tenure of any present Akron officials.

WHEREAS, Akron owns, operates and maintains the City of Akron Water Pollution Control Station, a publicly owned treatment works ("POTW") plant located at 2460 Akron-Peninsula Rd., Akron, Ohio 44313. Akron also owns, operates and maintains a combined sewer collection system designed to convey wastewater produced in and around Akron to the Water Pollution Control Station for treatment, and, when capacity in the system is reached, to discharge through CSO points into receiving waters including the Cuyahoga River, the Little Cuyahoga River and the Ohio Canal.

4

WHEREAS, Akron has developed a Long Term Control Plan and a flow and pollutant characterization study, a water quality study, a water quality model and a hydraulic model.

WHEREAS, the United States, the State and Akron recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid prolonged, complicated and expensive litigation among the Parties, and that this Consent Decree is fair, reasonable and in the public interest.

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section II (Jurisdiction and Venue), below, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED AND DECREED as follows:

## I. PURPOSE

1.      It is the express purpose of the Parties in entering this Consent Decree to further the objectives of the Act, as enunciated in Section 101 of the Act, 33 U.S.C. § 1251 et seq., and the objectives of Chapter 6111 of the Ohio Revised Code. All plans, reports, construction, remedial maintenance, and other obligations in this Consent Decree or resulting from the activities required by this Consent Decree shall have the objective of causing Akron to come into and remain in full compliance with the terms and conditions of Akron's Current NPDES Permit and to meet the objectives of the Combined Sewer Overflow Control Policy, with the goal of eliminating sanitary sewer discharges, as these terms are defined in Section IV of this Consent Decree.

## II. JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action, and over the Parties hereto, pursuant to 28 U.S.C. §§ 1331, 1335 and 1355 and Section 309(b) of the Act, 33 U.S.C.

§1319(b). The State's claims are also properly before the Court under the Court's supplemental

jurisdiction pursuant to 28 U.S.C. § 1367. Venue is proper in the Northern District of Ohio,

pursuant to 28 U.S.C. §§ 1391(b) and (c), 1395(a) and Section 309(b) of the Act, 33 U.S.C. §

1319(b), because the City and the POTW operated by the City are located in this judicial district

and the violations alleged in the Complaint are alleged to have occurred in this judicial district.

For the purposes of this Consent Decree, the City does not contest the Court's jurisdiction over

this action or over the City, and does not contest venue in this judicial district.

3.      For purposes of this Consent Decree, the Parties agree that the United States' Complaint

states claims upon which relief may be granted pursuant to Sections 301(a), 309(b) and (d) and

504 of the CWA, 33 U.S.C. §§ 1311(a), 1319(b) and (d), and 1364, and the regulations

implementing these Sections of the Act.

4.      For purposes of this Consent Decree, the Parties agree that the State's Complaint states

claims upon which relief may be granted pursuant to Sections 301(a), 309(b) and (d) of the CWA,

33 U.S.C. §§ 1311(a), 1319(b) and (d), and the regulations implementing these Sections of the

Act, and R.C. 6111 and the Ohio Administrative Code ("O.A.C.") provisions implementing R.C.

6111.

5.      Notice of the commencement of this action has been given to the State as required by

Section 309(b) of the Act, 33 U.S.C. § 1319(b), and the State has been joined as a Party to this

action as required by Section 309(e) of the Act, 33 U.S.C. § 1319(e).

### III. <u>PARTIES BOUND</u>

6.      This Consent Decree applies to and is binding upon the United States, the State and

Akron, acting through its officers, directors, employees and agents, and upon Akron's successors

6

and assigns. To the extent allowed by Fed. R Civ. P. 65(d), the injunctive relief provisions of this

Consent Decree are binding upon Akron's officers, agents, servants and employees, and are

binding upon those Parties in active concert or participation with them and their officers, agents,

or employees who receive actual notice of this Consent Decree with respect to all matters related

to the performance of this Consent Decree. In any action to enforce the terms of this Consent

Decree, Akron shall not raise as a defense the failure of any person or entity provided for in Fed.

R. Civ. P. 65(d) to take any actions necessary to comply with the terms of the Consent Decree.

7.        <u>Transfer of Ownership and Operation</u>. From the Date of Lodging of this Consent Decree

until its termination, and recognizing that Akron has no plans to transfer ownership, Akron shall

give written notice and provide a copy of this Consent Decree to any person or entity to which it

has or may transfer ownership and/or operation of the Water Pollution Control Station and/or any

portion of the Sewer System. If the ownership and operation of the Water Pollution Control

Station, and/or Sewer System, in whole or in part, is ever to be transferred, Akron shall condition

the transfer upon the transferee's agreement 1) to enter into a modification to this Consent Decree

that makes the terms and conditions of the Consent Decree  that apply to the ownership of the

transferred assets apply to the transferee, and 2) to apply to OEPA for an appropriate NPDES

Permit modification or transfer. Akron shall notify the United States and the State at least sixty

(60) days prior to the transfer of ownership and separation and shall provide them with 1) a copy

of the draft motion to modify the Consent Decree to transfer obligations; 2) the request for an

NPDES Permit modification or transfer; and 3) information sufficient to demonstrate that the

prospective transferee has the technical and financial qualifications to fulfill Akron's obligations

and liabilities under this Consent Decree. If the United States and/or the State oppose the motion

and the Court finds that the transferee does not have the financial and/or technical ability to

assume Akron's obligations and liabilities of this Decree, Akron shall not be released from its

obligations and liabilities of this Decree despite the transfer of ownership and operation.

8.      Following the Date of Entry of this Consent Decree, upon approval by Akron of any

contract relating to work to be performed pursuant to this Consent Decree, Akron shall provide a

copy of this Consent Decree to each firm retained to perform that work. For firms already retained

by Akron to perform work under this Decree prior to the Date of Lodging, Akron shall provide a

copy of this Consent Decree no later than 30 days after the Date of Entry. Subject to the

provisions of this Consent Decree, including but not limited to Paragraphs 105-107, an action

taken by the contractor or consultant retained to fulfill any of the responsibilities under this

Consent Decree shall be considered an action of Akron for purposes of determining compliance

with this Consent Decree.


IV. <u>DEFINITIONS</u>

9.      Unless otherwise defined herein, the terms used in this Consent Decree (and any

attachments thereto) shall have the meaning given to those terms in the CWA, 33 U.S.C. § 1251,

*et seq.*, the regulations promulgated at 40 C.F.R. Part 122 (if the term is not defined in the CWA

but is defined in 40 C.F.R. Part 122), and in Akron's Current NPDES Permit (if the term is not

defined in either the CWA or 40 C.F.R. Part 122, but the term is defined in Akron's Current

Permit). Whenever the following terms are used in this Consent Decree, the following definitions

shall apply:

      A.      "Akron" means the City of Akron, Ohio.

      B.      "Achievement of Full Operation" shall mean completion of construction and

         installation of equipment or infrastructure such that the equipment or infrastructure has

been placed in full operation, and is expected to both function and perform as designed, plus completion of modified operations and maintenance manuals. This specifically includes all control systems and instrumentation necessary for normal operations and all residual handling systems. Certain specified CSO and WPCS Control Measures set forth in Akron's LTCP Update may consist of separate components. For those specified CSO and WPCS Control Measures, "Achievement of Full Operation" shall not be achieved until the last component is completed.

C.      "Bidding of Control Measures" means completion of contract documents including plans and specifications, and advertisement of bids by Akron for a specific CSO or WPCS Control Measure specified in the LTCP Update (or portion thereof).

D.      "Building/Property Backup" means a Sanitary Sewer Overflow or CSS Release in the form of wastewater release or backup into a building or onto private property that is caused by blockages, flow conditions, or other malfunctions in the Sewer System. A wastewater backup or release that is caused by blockages, flow conditions, or other malfunctions of a Private Service Connection Lateral is not a Building/Property Backup for purposes of this Decree.

E.      "Bypass" as that term is defined in 40 C.F.R. § 122.41(m) means the intentional diversion of waste streams from any portion of the WPCS.

F.      "Combined Sewer Overflow" or "CSO" means any Discharge from any Outfall identified as a CSO Outfall in Akron's Current NPDES Permit.

G.      "Combined Sewer Overflow Control Policy" or "CSO Control Policy" means the U.S. EPA policy found at 59 Fed. Reg. 18688 (April 19, 1994).

9

H.      "Control Measure" means the control measure(s), action and other activities set forth in the LTCP Update or any Approved Report on Revising WPCS Control Measure(s) provided for under Attachment A of this Consent Decree.

I.      "CMOM Program" means Akron's Capacity, Management, Operations and Maintenance Program set forth in Section VII and Attachment C of this Consent Decree.

J.      "Combined Sewer System" or "CSS" means the portion of Akron's Sewer System designed to convey municipal sewage (domestic, commercial and industrial wastewaters) and stormwater through a single-pipe system to Akron's WPCS or to CSO Outfalls.

K.      "Combined Sewer System Release" or "CSS Release" means a release of wastewater from the CSS at a point source not specifically identified in Akron's Current NPDES Permit.

L.      "Complaint" means the Complaint and First Amended Complaint filed by the United States in this action and the State's Cross-claim.

M.      "Consent Decree" or "Decree" means this Consent Decree and all attachments and appendices herein and listed in Section XXVIII.

N.      "Critical Response Time" means the time interval between activation of the high wet well level alarm in a Pump Station and the SSO or CSS Release under peak flow conditions.

O.      "Current NPDES Permit" means Akron's National Pollutant Discharge Elimination System permit issued in 1994 as Permit Number 3PF00000*GD, and last modified in 1998 as Permit Number 3PF00000*JD, or such permits that succeed this permit issued and in effect at a relevant time.

10

P.       "Date of Entry" means the date of entry of this Decree by the Court after

satisfaction of the public notice and comment procedures of 28 C.F.R. § 50.7.

Q.       "Date of Lodging" means the date the Consent Decree is filed for lodging with the

Clerk of the Court for the United States District Court for the Northern District of Ohio.

R.       "Day" means a calendar day, unless otherwise indicated.  When the day a report or

other deliverable is due under this Consent Decree falls on a Saturday, Sunday, Federal

holiday, or a legal holiday for Akron, Akron shall have until the next calendar day that is

not one of the aforementioned days for submittal of such report or other deliverable.

S.       "Design Criteria" means the Design Criteria specified in the LTCP Update or any

Approved Report on Revising WPCS Control Measure(s) provided for under Attachment

A of this Consent Decree.

T.       "Discharge" means any 'discharge of a pollutant' as defined in 40 C.F.R. § 122.2

and OAC 3745-33-01(O).

U.       "Excessive I/I" is defined by 40 C.F.R. § 35.2005(b) (16).

V.       "Food Establishment" means any building, room, basement, cellar, or open or

enclosed area occupied or used for the commercial handling of food.

W.       "Force Main" means any pipe that receives and conveys wastewater under pressure

from the discharge side of a pump.

X.       "OEPA" means the Ohio Environmental Protection Agency and any successor

departments or agencies of the State.

Y.       "Infiltration" is defined by 40 C.F.R. § 35.2005(b)(20).

Z.       "Inflow" is defined by 40 C.F.R. § 35.2005(b)(21).

AA.    "I/I" means the total quantity of water from Inflow, Infiltration and rain-induced infiltration without distinguishing the source.

BB.    "Long Term Control Plan Update" or "LTCP Update" means the plan that Akron shall develop in accordance with Attachment A of this Consent Decree, using the format in Appendix 3 of Attachment A.

CC.    "Long Term Control Plan Update Report" or "LTCP Update Report" means the report that Akron shall develop in accordance with Attachment A of this Consent Decree.

DD.    "Outfall" means a type of "point source" (as that term is defined in Section 501(14) of the CWA, 33 U.S.C. § 1361(14)) that serves as a Discharge point from Akron's Sewer System. "Outfall" followed by an Arabic numeral means the Outfall assigned that number in Akron's NPDES Permit.

EE.    "Paragraph" means a portion of this Decree identified by an Arabic numeral.

FF.    "Parties" means the United States, the State, and Akron.

GG.    "Performance Criteria" means the Performance Criteria specified in the LTCP Update or any Approved Revised WPCS Control Measure Plan.

HH.    "Post-Construction Monitoring Program" means the Post-Construction Monitoring Program set forth in Attachment B, as well as any additional post-construction monitoring or modeling activities included in the Supplemental Compliance Plan.

II.    "Private Service Connection Lateral" means a portion of  the Sewer System, not owned by Akron, used to convey wastewater from a building or buildings to that portion of the Sewer System owned by Akron.

12

JJ.     "Pump Station" means a facility comprised of pumps that lift wastewater to a higher hydraulic elevation, including all related electrical, mechanical, and structural systems necessary to the operation of that Pump Station.

KK.     "Sanitary Sewer Overflow" or "SSO" means an overflow, spill, diversion, or release of wastewater from or caused by Akron's Sanitary Sewer System. This term shall include: 1) discharges to waters of the State or United States from Akron's Sanitary Sewer System; and 2) any release of wastewater from Akron's Sanitary Sewer System to public or private property that does not reach waters of the State or the United States, including Building/Property Backups.

LL.     "Sanitary Sewer System" or "SSS" means the portion of Akron's Sewer System designed to convey only sewage, and not storm water, from residences, commercial buildings, industrial plants and institutions for treatment at Akron's WPCS.

MM.     "Section" means a portion of this Decree identified by an upper case Roman numeral.

NN.     "Sewer System" means the wastewater collection and conveyance system owned or operated by Akron (including all pipes, Force Mains, gravity sewer segments, Pump Stations, manholes, and appurtenances thereto) that is designed to collect and convey municipal sewage (domestic, commercial, or industrial) to the WPCS or to a CSO Outfall. "Sewer System" does not include any Private Service Connection Lateral.

OO.     "State" means the State of Ohio, acting on behalf of OEPA.

PP.     "United States" means the United States of America, acting on behalf of U.S. EPA, or any successor to U.S. EPA.

13

QQ.     "U.S. EPA" means the United States Environmental Protection Agency and any

successor departments or agencies of the United States.

RR.     "Water Pollution Control Station" or "WPCS" means Akron's wastewater

treatment works plant located at 2460 Akron-Peninsula Road, Akron, Ohio 44313,

identified in Akron's Current NPDES Permit.


V. SPECIFIC ACTION PROJECTS

10.     Upgrade WPCS to 130 MGD.

A.      Akron shall upgrade the WPCS to achieve a minimum secondary treatment

capacity of 130 million gallons per day ("MGD").  It is the expectation that Akron shall

achieve this upgrade by modifying Train 6 to include a step feed mode. Akron shall

construct this upgrade by modifying secondary treatment Train 6 to include a step feed

mode, replacing/modifying and covering the Train 6 final settling tanks launders,

modifying all final settling tanks by removing the domed covers, and reconstructing the

aeration influent flume as described in Section 4.2.1 of Akron's June 8, 2009 No Feasible

Alternative ("NFA") Addendum as may be modified after the Updated NFA and NFA

Supplement required in Attachment A. After modifying Train 6 to include a step feed

mode and optimizing performance of this train, Akron shall conduct a stress test (s) of

Train 6 in step feed mode to determine the maximum capacity of this train, and shall use

the results of the stress test(s) to prepare a report summarizing the performance of Train 6

in step feed mode.

B.      Within 3 months from the lodging of this Decree, Akron shall submit a work plan

for completing the projects identified in this Paragraph 10. The work plan shall describe

14

the major construction activities required to implement step feed in Train 6, and shall present a schedule to:

    (i)     Complete the construction activities described in subparagraph A above;

    (ii)    Prepare and submit to U.S. EPA and OEPA a stress test protocol for Train 6;

    (iii)   Conduct a stress test for Train 6 operated in step feed mode; and

    (iv)   Implement the capital improvements identified in subparagraph C below.

C.     If the modifications identified in subparagraph A above are unable to achieve 130 MGD through secondary treatment, Akron shall implement the following capital improvements ("WPCS Contingency Project") as necessary to achieve 130 MGD through secondary treatment:

    (i)     Replace /modify and cover final settling tanks launders for trains 1-5;

    (ii)    Construct improvements to the aeration basin blowers; and

    (iii)   Raise the aeration basin walls.

D.     The work plan, described in subparagraph B above, shall include a schedule for implementation such that the items described in subparagraph B (i) and (ii) are completed no later than October 15, 2013; the items described in subparagraph B (iii) are completed no later than October 15, 2015; and the items described in subparagraph B (iv), if necessary, are constructed no later than October 15, 2016 and attain Achievement of Full Operation no later than October 15, 2017.

11.    <u>Separation Projects</u>. Akron shall separate the sewers ("separation projects") for the following CSO outfalls: Rack 8; Rack 25; Rack 21; Rack 30; and Rack 13. Akron shall complete the separation projects as follows: (i) complete separation of two of these racks within 4 years of

the Date of Lodging; (ii) begin construction on the separation of one of the remaining racks within 6 years of the Date of Lodging; and (iii) complete separation of the remaining three racks within 8 years of the Date of Lodging.

## VI. CSO AND WPCS CONTROL MEASURES

12.     Final Long Term Control Plan Update. Akron shall develop and provide to U.S. EPA and OEPA a Final Long Term Control Plan Update in accordance with the provisions set forth in Attachment A ("Final Long Term Control Plan Workplan"), within the timeframe set forth in Paragraph 17, below. The Final Long Term Control Plan Update shall specify (a) all CSO and WPCS Control Measures that must be constructed to ensure that Akron complies with the CSO Control Policy, and any requirements of the CWA, R.C. Chapter 6111 and the Current NPDES Permit (including any specific or general water quality or technology-based effluent limitations and conditions in the Current NPDES Permit) that are applicable to Akron's CSOs and secondary treatment bypasses, subject to the provisions of Section XX (Effect of Settlement and Reservation of Rights); (b) all Design Criteria and Performance Criteria developed for the CSO and WPCS Control Measures in accordance with Attachment A; and (c) the schedule for the construction of the CSO and WPCS Control Measures developed in accordance with Attachment A. Such schedule shall include a deadline that is as soon as possible but in no event later than October 15, 2028 for Achievement of Full Operation of all CSO Control Measures.

13.     Final Long Term Control Plan Update Report. Akron shall develop and provide to U.S. EPA and OEPA the Final Long Term Control Plan Update Report in accordance with Attachment A, within the timeframe set forth in Paragraph 17, below. The Final Long Term Control Plan

16

Update Report shall provide the results of all analysis, evaluations and assessments Akron performed under Attachment A.

14.     <u>Implementation of CSO and WPCS Control Measures</u>. Upon approval of the Long Term Control Plan Update by U.S. EPA and OEPA under Section XVII (Review and Approval Procedure), or upon decision by the Court under Section XIV (Dispute Resolution) pertaining to the Final Long Term Control Plan Update provided to U.S. EPA and OEPA under Paragraph 12, above and, as may be amended under Section V of Attachment A, Akron shall perform the activities and construct the CSO and WPCS Control Measures identified in the approved Final Long Term Control Update in accordance with the descriptions, design criteria and dates for Bidding of Control Measures and Achievement of Full Operation for each CSO and WPCS Control Measure identified in the approved Final Long Term Control Plan Update. Except for Force Majeure under Sections XII and XIII, a delay in the bidding process shall not extend the date for Achievement of Full Operation.

15.     <u>Development of Post-Construction Monitoring Program</u>. Akron shall develop and provide to U.S. EPA and OEPA a Post-Construction Monitoring Program in accordance with Attachment B, within the timeframe set forth in Paragraph 17, below.

16.     <u>Implementation of Post-Construction Monitoring Program</u>. Upon approval by U.S. EPA and OEPA, under Section XVII (Review and Approval Procedures), or upon decision by the Court under Section XIV (Dispute Resolution) pertaining to the Post-Construction Monitoring Program provided to U.S. EPA and OEPA under Paragraph 15, Akron shall perform the Post-Construction Monitoring Program in accordance with the provisions and schedule set forth therein.

17.     Akron shall submit the documents required under this Section VI and Attachment A of the

Consent Decree to U.S. EPA and OEPA in accordance with the schedule set forth below:

**Table 1 - Schedule of Submissions**

| Documents | Dates |
|---|---|
| Updated NFA and supplement | November 30, 2009 |
| Preliminary Report on Modeling to Predict Size and Number of Overflows | January 15, 2010 |
| Preliminary Report on Cost/Benefit Comparison to Predict Sizes and Number of Overflows | March 15, 2010 |
| CSO Control Measure Cost/Benefit Tables at Appendix 2 of Attachment A | May 15, 2010 |
| Updated Financial Capability Information | May 15, 2010 |
| Post-Construction Monitoring Program | August 15, 2010 |
| Proposed Long Term Control Plan Update | August 15, 2010 |
| Proposed Long Term Control Plan Update Report | August 15, 2010 |
| Final Long Term Control Plan Update | October 15, 2010 |
| Final Long Term Control Plan Update Report | October 15, 2010 |
| Report on Revising WPCS Control Measure(s) if Akron achieves 130 MGD through secondary treatment using step feed | October 15, 2016 |
| Report on Revising WPCS Control Measure(s) if Akron constructs the WPCS Contingency Project | October 15, 2017 |

18.     Achievement of Performance Criteria. By the specified date for Achievement of Full

Operation for the CSO and WPCS Control Measures set forth in the Final Long Term Control

Plan Update, Akron shall achieve the Performance Criteria specified in the Final Long Term

Control Plan Update. The procedures set forth in the approved Post-Construction Monitoring

Program shall be used to determine whether Akron has achieved the Performance Criteria

specified in the Final Long Term Control Plan Update and Report.

18

19.     <u>Achievement of Compliance with Current NPDES Permit</u>. By the specified date for

Achievement of Full Operation of the CSO and WPCS Control Measures set forth in the Final

Long Term Control Plan Update, Akron shall comply with all requirements of the Current

NPDES Permit (including any specific or general water quality or technology-based effluent

limitations and conditions in the Current NPDES Permit) that are applicable to Akron's CSOs and

secondary treatment bypasses, subject to the provisions of Section XX (Effect of Settlement and

Reservation of Rights).

20.     <u>Supplemental Compliance Plan</u>. If, after Achievement of Full Operation of the CSO and

WPCS Control Measures identified in the Final Long Term Control Plan Update, information

becomes available at any time before the Consent Decree terminates, including information

developed as a result of the Post-Construction Monitoring Program, that Akron:

      A.     Did not construct all CSO and WPCS Control Measures in accordance with the

      Design Criteria;

      B.     Has not achieved the Performance Criteria for the CSO and WPCS Control

      Measures identified in the Final Long Term Control Plan Update and Report; or

      C.     Is not complying with all requirements of its Current NPDES Permit pertaining to

      CSO discharges and secondary treatment bypasses;

then Akron shall, within 120 days of receipt of notice from either U.S. EPA or OEPA pursuant to

Section XVI of this Consent Decree (Notices and Submissions), submit to U.S. EPA and OEPA a

Supplemental Compliance Plan that includes the remedial measures that Akron shall take to

achieve compliance and a schedule that is as expeditious as possible for taking such actions. Upon

approval by the United States and the State pursuant to Section XVII of this Consent Decree

(Review and Approval Procedures), or upon decision by the Court under Section XIV (Dispute

19

Resolution) pertaining to the Supplemental Compliance Plan provided to U.S. EPA and OEPA under this paragraph, Akron shall implement the Supplemental Compliance Plan in accordance with the schedule specified in the approved Plan.

21.     <u>Public Participation Plan</u>. Akron shall implement the Public Participation Plan set forth in Appendix 4 to Attachment A in a manner consistent with Section II.C.2 of the CSO Control Policy, and shall consider public comments from that process in development of the Final Long Term Control Plan Update and Report.

## VII. <u>CMOM, GREASE CONTROL AND EMERGENCY RESPONSE PROGRAMS</u>

22.     Akron shall implement the Capacity, Management, Operation, and Maintenance ("CMOM") program, the Grease Control program, and the Emergency Response program in accordance with the provisions and schedule set forth in Attachment C.

## VIII. <u>MUD RUN PUMP STATION PROGRAM</u>

23.     No later than January 15, 2012, Akron shall conduct a study and submit to the U.S. EPA and OEPA a Report of Findings that identifies causes of overflows from the Mud Run Pump Station. Akron shall evaluate all Mud Run Pump Station facilities and equipment, including the force main, and shall also evaluate the sewer collection system tributary to the Mud Run Pump Station. The study shall include, but not be limited to, the following elements:

A.     Review pump station design and construction information;

B.     Quantify current pumping volumes and rates, including the influent flow rates and storm pump volumes;

C.     Quantify current pump station performance;

D.     Characterize the sewer collection system tributary to the Mud Run Pump Station;

E.      Perform flow monitoring throughout the drainage area to estimate infiltration and inflow rates and to identify areas with Excessive I/I, and to identify areas with insufficient conveyance capacity; and

F.      Collect rainfall data throughout the drainage area to evaluate the response of the system to precipitation events.

24.      No later than October 15, 2012, Akron shall submit to the U.S. EPA and OEPA for review and approval pursuant to Section XVII of the Consent Decree (Review and Approval Procedures) a report that proposes Akron's selected remedies to eliminate overflows from the Mud Run Pump Station ("Mud Run Pump Station Remedial Report"). This report shall include, but not be limited to:

A.      An assessment of the pump station performance as compared to the pump station design;

B.      An assessment of the adequacy of the original pump station based on current conditions of the sewer drainage area contributing to the Mud Run Pump Station;

C.      Identification of possible pump station alternatives to eliminate overflows, including Total Present Worth cost estimates, noting that recommended alternatives should not negatively impact downstream CSOs or CSO control options;

D.      Identification of alternatives to reduce infiltration and inflow rates to the collection system served by the Mud Run Pump Station, including Total Present Worth cost estimates;

E.      Identification of other possible sewer system alternatives, such as flow equalization in the collection system or at the pump station, including Total Present Worth costs;

21

F.      A selected alternative or combination of alternatives to eliminate overflows from the Mud Run Pump Station; and

G.      A proposed schedule for completion of the selected alternative(s).

25.     Akron shall complete construction and attain Achievement of Full Operation of the alternative(s) selected in the approved Mud Run Pump Station Remedial Report as expeditiously as possible, but in no event later than October 15, 2015.

## IX. CIVIL PENALTIES

26.     <u>Civil Penalty</u>. As part of the resolution of this action, Akron agrees to pay a civil penalty in the total amount of $500,000, as follows:

A.      No later than 30 Days after the Date of Entry, Akron shall pay $150,000, together with interest accruing from the Date of Entry, at a rate specified in 28 U.S.C. § 1961 as of the Date of Entry. No later than 180 Days after the date of the first installment, Akron shall pay the second installment of $150,000, together with interest accruing from the Date of Entry.  No later than 180 Days after the date of the second installment, Akron shall pay the third installment of $200,000, together with interest accruing from the Date of Entry. Interest shall continue to accrue on any unpaid balance until all amounts owed to the United States are paid.

B.      Of the total civil penalty amount of $500,000, Akron shall pay the United States the sum of $300,000 and the State the sum of $200,000. The payments shall be divided as follows: Of the first payment of $150,000, $75,000 shall be paid to the United States and $75,000 shall be paid to the State.  Of the second payment of $150,000, $75,000 shall be paid to the United States and $75,000 shall be paid to the State.  Of the third payment of

$200,000, $150,000 shall be paid to the United States and $50,000 shall be paid to the State.

C.      The payments of the United States' share shall be made by FedWire Electronic Funds Transfer ("EFT") to U. S. Department of Justice in accordance with instructions to be provided to Akron, following the Entry of the Consent Decree, by the Financial Management Unit of the U. S. Attorney's Office for the Northern District of Ohio. At the time of payment, Akron shall send a copy of the EFT authorization form and the EFT transaction record, together with transmittal letter, which shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in this case, and shall reference a civil action number and DOJ case number 90-5-1-1-3144/2, to the United States and the State in accordance with Section XVI of this Decree (Notices and Submissions), by e-mail to and by mail to:

> EPA Cincinnati Finance Office
> 26 Martin Luther King Drive
> Cincinnati, OH 45268

D.      The payments of the State's share shall be made by check made payable to "Treasurer, State of Ohio" and mailed or otherwise delivered to:

Karen Pierson (Paralegal), or her successor
Ohio Attorney General's Office
Environmental Enforcement Section
30 E. Broad Street
25th Floor
Columbus, Ohio 43215-3400

E.      At the time of each payment, Akron shall simultaneously send a written notice of payment and a copy of any transmittal documentation (which should reference the above-captioned case name, civil action number 5:09-cv-00272 (JRA), DOJ case number 90-5-1-

1-3144/2) to the United States and the State in accordance with Section XVI of this Consent Decree (Notices and Submissions).

## X. STATE SUPPLEMENTAL ENVIRONMENTAL PROJECT

27.     In lieu of payment of additional civil penalty, and in furtherance of the parties' objectives to improve the environment and restore a segment of the Cuyahoga River to attainment of warmwater habitat, its designated aquatic life use, Akron shall, as a State Supplemental Environmental Project ("SEP"), provide funds to be used for the Canal Diversion Dam Removal Project in accordance with this Section of this Consent Decree.  Akron shall pay Nine Hundred Thousand Dollars ($900,000), in accordance with the schedule set forth in Paragraph 28.  The Canal Diversion Dam Removal Project, described in more detail in Attachment E,  is to be implemented with the SEP funds in accordance with Attachment E.

28.     Akron shall pay Nine Hundred Thousand Dollars ($900,000) in three equal payments. Akron shall make the first payment of $300,000 on June 30, 2010.  Akron shall make the second payment of $300,000 on January 30, 2011.  Akron shall make the third and final payment of $300,000 on June 30, 2011.  Payments shall be directed to The Friends of the Crooked River, Inc. or such other entity as Ohio EPA designates as undertaking the responsibility for the management of the funds and the satisfactory completion of the implementation of the Canal Diversion Dam Removal Project in accordance with Attachment E.  Akron shall provide notice of each such payment to the United States and the State.  Akron will have satisfied its SEP obligations under this Section of the Consent Decree by making timely payments and providing the required notice of payment in accordance with this paragraph.

29.     With regard to the SEP, Akron certifies the truth and accuracy of each of the following:

24

A.    that, as of the date of executing this Decree, Akron is not required to perform or

develop the SEP by any federal, state, or local law or regulation and is not required to

perform or develop the SEP by agreement, grant, or as injunctive relief awarded in any

other action in any forum;

B.    that the SEP is not a project that Akron is currently planning or intending to

construct, perform, or implement other than in settlement of the claims resolved in this

Decree;

C.    that Akron has not received and will not receive credit for the SEP in any other

enforcement action; and

D.    that Akron  will not receive any reimbursement for any portion of the SEP funds

from any other person or entity.

30.    After making the last SEP payment, the State will notify Akron whether or not Akron has

satisfactorily completed the funding of the SEP, in accordance with Paragraph 28 of this Consent

Decree. If Akron does not make the funding payments in accordance with this Consent Decree,

stipulated penalties may be assessed under Section XI of this Consent Decree (Stipulated

Penalties).

31.    Disputes concerning payments for funding of the SEP may be resolved under Section XIV

of this Decree (Dispute Resolution).  No other disputes arising under this Section shall be subject

to Dispute Resolution.

## XI. <u>STIPULATED PENALTIES</u>

32.    Akron shall be liable for stipulated penalties to the United States and the State in the

amounts set forth in this Section for violations of this Consent Decree as specified below, unless

25

excused under Section XII and XIII of this Consent Decree (Force Majeure). A violation includes failing to perform any obligation required by the terms of this Decree, including any work plan or schedule approved under this Decree and within the specified time schedules established by or under this Decree.

33.     Late Payment of Civil Penalty and Late Funding of SEP.

If Akron fails to pay the civil penalty required to be paid under Section IX of the Decree (Civil Penalty), or if Akron fails to make timely payments to fund the SEP in accordance with the schedule set forth in Section X (State Supplemental Environmental Project ), Akron shall pay a stipulated penalty of $10,000 per Day for each Day that the payment is late.

34.     Failure to Comply with Schedule of Submissions.

A.      The following stipulated penalties shall apply for any failure to timely develop and/or submit a LTCP Update and LTCP Update Report (proposed and final) and Report on Revising WPCS Control Measures in accordance with the requirements of Paragraphs 12, 13 and 17 and Attachment A to this Consent Decree:

| Period of noncompliance | Stipulated Penalty |
| --- | --- |
| 1st to 30th day of violation | $1,500 per day per violation |
| 31st to 60th day of violation | $3,000 per day per violation |
| After 60 days of violation | $5,000 per day per violation |

B.      Failure to timely submit any other required submission in Table 1, Paragraph 17.

| Period of noncompliance | Stipulated Penalty |
| --- | --- |
| 1st to 30th day of violation | $500 per day per violation |
| 31st to 60th day of violation | $1,000 per day per violation |
| After 60 days of violation | $1,500 per day per violation |

26

35.     Failure to Implement the Requirements of the Approved LTCP Update and Revised LTCP Update. The following stipulated penalties shall accrue for the failure to timely implement any requirement, including any deadline and milestone, in the approved LTCP Update and Revised LTCP Update, or failure to make the required changes to address any deficiencies in the LTCP Update or Revised LTCP Update, in accordance with Paragraph 14 of the Consent Decree and Attachment A:

| Period of noncompliance | Stipulated Penalty |
| --- | --- |
| 1st to 30th day of violation | $1,500 per day per violation |
| 31st to 60th day of violation | $3,000 per day per violation |
| After 60 days of violation | $5,000 per day per violation |

36.     Failure to Develop and/or Submit a Supplemental Compliance Plan. The following stipulated penalties shall accrue for the failure to timely develop and/or submit a Supplemental Compliance Plan, in accordance with Paragraph 20 of the Decree:

| Period of noncompliance | Stipulated Penalty |
| --- | --- |
| 1st to 30th day of violation | $500 per day per violation |
| 31st to 60th day of violation | $1,000 per day per violation |
| After 60 days of violation | $1,500 per day per violation |

37.     Failure to Implement the Requirements of the Post-Construction Monitoring Program. The following stipulated penalties shall accrue for the failure to timely implement any requirement, including any deadline and milestone, in the approved Post-Construction Monitoring Program, or failure to make the required changes to address any deficiencies in the Post-Construction Monitoring Program, in accordance with Paragraph 16 of the Consent Decree and Attachment B:

27

| Period of noncompliance | Stipulated Penalty |
|---|---|
| 1st to 30th day of violation | $1,000 per day per violation |
| 31st to 60th day of violation | $2,000 per day per violation |
| After 60 days of violation | $2,500 per day per violation |

38.     Failure to Monitor and Report under NPDES Permit. The following stipulated penalties shall accrue for failure to timely monitor and report under the Current NPDES Permit:

| Period of noncompliance | Stipulated Penalty |
|---|---|
| 1st to 30th day of violation | $500 per day per violation |
| 31st to 60th day of violation | $1,000 per day per violation |
| After 60 days of violation | $1,500 per day per violation |

39.     Failure to Comply with the CMOM. The following stipulated penalties shall apply for failure to comply with the CMOM in Attachment C, and in accordance with Paragraph 22, as follows:

A.     Failure to comply with the requirements for 24-hour and 5-day notification of SSO or CSS Release;

| Period of noncompliance | Stipulated Penalty |
|---|---|
| 1st to 30th day of violation | $500 per day per violation |
| 31st to 60th day of violation | $1,000 per day per violation |
| After 60 days of violation | $1,500 per day per violation |

B.     Based upon the approved CMOM Program: failure to maintain a complete Sewer System component and equipment inventory; failure to prepare condition assessment reports; failure to maintain a log listing all sewer line acute defects in need of expeditious repair or replacement; failure to maintain a schedule to address defective pipes; failure to

28

maintain a grease control program and a root control program; failure to maintain corrective maintenance response and reporting procedures; failure to perform a "root cause analysis" process;  failure to provide an annual update of the operation and maintenance manuals; failure to complete annual percentage of Closed Circuit TV (CCTV) inspection to the extent that the accumulated percentage is not met.

| Period of noncompliance | Stipulated Penalty |
|---|---|
| 1st to 30th day of violation | $500 per day per violation |
| 31st to 60th day of violation | $1,000 per day per violation |
| After 60 days of violation | $1,500 per day per violation |

C.     Failure to complete the CCTV inspection of all gravity sewer lines by December 31, 2014 [first five-year period], and failure at the end of each subsequent 5-year period to complete the CCTV inspection; failure to complete cleaning of all gravity sewer pipes by December 31, 2014 [first five-year period], and failure at the end of each subsequent 5-yar period to complete the cleaning of the gravity sewer pipes; failure to inspect all manholes in the Sewer System by December 31, 2014 [first five year period], and failure at the end of each subsequent 5-year period to complete inspection of all manholes; failure by October 15, 2011 [two-year period] to ensure that at least one member of each CCTV crew has attained Pipe Assessment Certification Program (PACP) certification; failure to repair acute defects in one year.

| Period of noncompliance | Stipulated Penalty |
|---|---|
| 1st to 30th day of violation | $1,500 per day per violation |
| 31st to 60th day of violation | $3,000 per day per violation |
| After 60 days of violation | $5,000 per day per violation |

29

40.     Mud Run Pump Station Controls. The following stipulated penalties shall accrue for failure to complete construction and attain Achievement of Full Operation of the approved alternative(s) in Section VIII for the Mud Run Pump Station by October 15, 2015.

| Period of noncompliance | Stipulated Penalty |
|---|---|
| 1st to 30th day of violation | $1,500 per day per violation |
| 31st to 60th day of violation | $3,000 per day per violation |
| After 60 days of violation | $5,000 per day per violation |

41.     Sanitary Sewer Overflows from Mud Run Pump Station. The following stipulated penalty shall accrue for each SSO from the Mud Run Pump Station for a storm less than or equivalent to a 10-year intensity storm, 24-hour duration, following the date for Achievement of Full Operation in Section VIII: $10,000

42.     Dry Weather CSOs from CSO Racks. The following stipulated penalties shall accrue for each Dry Weather CSO from CSO Racks.

A.      For each Dry Weather CSO from a CSO Rack, if Akron is not in compliance with the cleaning procedures in Akron's CSO Operations and Maintenance Manual or the CMOM, whichever is applicable: $5,000

B.      For each Dry Weather CSO from a CSO Rack, if Akron is in compliance with the cleaning procedures in Akron's CSO Operations and Maintenance Manual or the CMOM, whichever is applicable: $1,500

43.     SSOs, Dry Weather CSOs and CSS Releases from any location other than Mud Run Pump Station and the CSO Racks. The following stipulated penalties shall accrue for each SSO, Dry Weather CSO and CSS Release from any location, other than the Mud Run Pump Station and the CSO Racks.

30

A.      For SSOs, Dry Weather CSOs and CSS Releases occurring prior to the date of the first-time completion of the five-year CMOM cycle, as required in Paragraph 22 and Attachment C, if Akron is *not* in compliance with the schedule for completion of the CMOM: $2,500

B.      For SSOs, Dry Weather CSOs and CSS Releases occurring prior to the date of the first-time completion of the five-year CMOM cycle as required in Paragraph 22 and Attachment C, provided Akron is in compliance with the schedule for completion of the CMOM, the Emergency Response Plan and Reporting Requirements: $500

C.      For SSOs, Dry Weather CSOs, and CSS Releases occurring after the date of the first-time completion of the five-year CMOM cycle as required in Paragraph 22 and Attachment C, if Akron is not in compliance with the CMOM: $5,000

D.      For SSOs, Dry Weather CSOs, and CSS Releases occurring after the date of the first-time completion of the five-year CMOM cycle as required in Paragraph 22 and Attachment C, provided Akron is in compliance with the CMOM, Emergency Response Plan and Reporting Requirements: $1,000

44.     <u>Bypasses</u>. The following stipulated penalties shall accrue:

A.      From Date of Lodging through October 15, 2014, for each bypass occurring at the WPCS at such time as the WPCS is treating less than 110 MGD: $5,000

B.      From October 16, 2014 through October 15, 2017, for each bypass occurring at the WPCS at such time as the WPCS is treating less than 120 MGD: $5,000

C.      From October 16, 2014 through October 15, 2017, for each bypass occurring at the WPCS at such time as the WPCS is treating between 120 MGD and 130 MGD: $1,000

31

D.      From October 16, 2017 through the date of Achievement of Full Operation of Control Measures at the WPCS in the Final LTCP, for each bypass occurring at the WPCS at such time as the WPCS is treating less than 130 MGD: $5,000

E.      From the date established in the Final LTCP for Achievement of Full Operation of Control Measures at the WPCS, for each bypass occurring at the WPCS that does not meet the approved performance criteria in the Final LTCP: $10,000

45.   <u>Failure to Complete Specific Action Projects</u>. The following stipulated penalties shall accrue for failure to timely complete any Specific Action Project in Paragraphs 10 and 11, including failure to meet any deadlines and milestones:

| Period of noncompliance | Stipulated Penalty |
|---|---|
| 1st to 30th day of violation | $1,500 per day per violation |
| 31st to 60th day of violation | $3,000 per day per violation |
| After 60 days of violation | $5,000 per day per violation |

46.   <u>Failure to Submit the Semi-Annual Report</u>. The following stipulated penalties shall accrue for failure to timely submit complete Semi-Annual Reports in accordance with Section XV and Attachment D:

| Period of noncompliance | Stipulated Penalty |
|---|---|
| 1st to 30th day of violation | $500 per day per violation |
| 31st to 60th day of violation | $1,000 per day per violation |
| After 60 days of violation | $1,500 per day per violation |

32

47.     <u>Failure to Submit Work Plan for Upgrade to 130 MGD</u>. The following stipulated penalties

shall accrue for failure to timely submit the Work Plan for Upgrade to 130 MGD in accordance

with Paragraph 10 of the Decree:

| Period of noncompliance | Stipulated Penalty |
|---|---|
| 1st to 30th day of violation | $500 per day per violation |
| 31st to 60th day of violation | $1,000 per day per violation |
| After 60 days of violation | $1,500 per day per violation |

48.     Any construction or maintenance related bypass that is necessary to perform the injunctive

relief set forth in the Decree shall not be subject to stipulated penalties provided that (i) Akron:

submits to OEPA 14 days prior to commencement of the bypass event written notice specifying

the exact location(s) of the bypass, reason for the bypass, and the anticipated length of time the

bypass will exist; (ii) Akron obtains written approval for the bypass from OEPA; and (iii) the

bypass is consistent with the conditions of the OEPA approval.

49.     Akron shall pay any stipulated penalty within 60 days of receiving a written demand.

Either the United States, or the State, or both may elect to demand  stipulated penalties under this

Section; however, the United States and the State shall consult with each other before making any

demand. Where both sovereigns demand stipulated penalties, any such penalties determined to be

owing shall be paid 50% to the United States and 50% to the State. Where only the United States

or the State demands stipulated penalties, the entire amount of stipulated penalties determined to

be owing shall be payable to that sovereign. The sovereign making a demand for payment of a

stipulated penalty shall simultaneously send a copy of the demand to the other sovereign. In no

case shall the determination by one sovereign not to seek stipulated penalties preclude the other

sovereign from seeking stipulated penalties in accordance with this Consent Decree. A decision

33

by the United States or the State to waive, in whole or in part, penalties otherwise due under this

Section shall not be subject to judicial review.

50.     All stipulated penalties shall begin to accrue on the Day after the performance is due or on

the Day a violation occurs, whichever is applicable, and shall continue to accrue until

performance is satisfactorily completed or until the violation ceases.

51.     Penalty Accrual During Dispute Resolution. Stipulated penalties shall continue to accrue

during any dispute resolution with interest or accrued penalties payable and calculated at the rate

established by the Secretary of the Treasury, pursuant to 28 U.S.C. § 1961 (for penalties payable

to the United States) and at the rate established pursuant to the Ohio Revised Code (for penalties

payable to the State), but need not be paid until the following:

      A.      If the dispute is resolved by agreement or by a decision of the United States or the

      State that is not appealed to this Court, accrued penalties determined to be owing shall be

      paid within 30 days of the agreement or the receipt of the decision or order.

      B.      If the dispute is appealed to this Court and the United States and/or the State

      prevail in whole or in part, Akron shall, within 60 days of receipt of the District Court's

      decision or order, pay all accrued penalties determined by the Court to be owing, together

      with accrued interest, except as provided in Paragraph 51.C, below.

      C.      If the District Court's decision is appealed by any Party, Akron shall within 15

      Days of receipt of the Court of Appeals' decision pay all accrued penalties determined to

      be owing, together with accrued interest.

52.     Payment of Stipulated Penalties to the United States.

      A.      Payment. Stipulated penalties payable to the United States shall be paid by

      certified cashiers check in the amount due, payable to "Treasurer, United States of

America," referencing the above-captioned case name and civil action number and DOJ

No. 90-5-1-1-3144/2, and shall be delivered to the Financial Litigation Unit of the Office

of the United States Attorney for the Northern District of Ohio, at the address to be

provided by the United States.

B.      Late Payment. Should Akron fail to pay stipulated penalties and accrued interest

payable to the United States in accordance with the terms of this Consent Decree, Akron

shall be liable for interest on such penalties as provided for in 28 U.S.C. § 1961, accruing

as of the date payment became due, together with the costs (including attorneys fees)

incurred in any action necessary to collect any stipulated penalties, interest, or late

payment costs or fees.

53.     Payment of Stipulated Penalties Due to the State.

A.      Payment. Stipulated penalties payable to the State shall be paid by certified or

cashier's check in the amount due, payable to the "Treasurer, State of Ohio" and mailed or

otherwise delivered to:

Karen Pierson (Paralegal), or her successor
Ohio Attorney General's Office
Environmental Enforcement Section
30 E. Broad Street
25th Floor
Columbus, Ohio 43215-3400

B.      Late Payments. Should Akron fail to pay stipulated penalties and accrued interest

payable to the State in accordance with the terms of this Consent Decree, the State shall be

entitled to collect interest and late payment costs and fees, as provided for in the Ohio

Revised Code (for penalties payable to the State), together with the costs (including

attorneys fees) incurred in any action necessary to collect any such stipulated penalties, interests, or late payment costs or fees.

54.     Akron reserves all rights to assert that any SSO, Dry Weather Overflow, or CSS Release that is not the result of Akron's noncompliance of the CMOM are subject to the Force Majeure provisions of this Consent Decree.

55.     Subject to the provisions of Section XX of this Consent Decree (Effects of Settlement/Reservation of Rights), the stipulated penalties provided in this Consent Decree shall be in addition to any rights, remedies, or sanctions available to the United States and the State for Akron's violation of this Consent Decree, applicable laws or regulations, and applicable permits.

## XII. FORCE MAJEURE (UNITED STATES)

56.     "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Akron, its agents, consultants and contractors, or any entity controlled by Akron that delays or prevents the performance of any obligation under this Consent Decree despite Akron's best efforts to fulfill the obligation. The requirement that Akron exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any such event (a) as it is occurring and (b) after it has occurred to prevent or minimize any resulting delay to the greatest extent possible. Force majeure does not include Akron's financial inability to perform any obligation under this Consent Decree. In addition, failure to apply for a required permit or approval or to provide in a timely manner all information required to obtain a permit or approval that is necessary to meet the requirements of this Consent Decree, or failure of Akron to approve contracts, shall not, in any event, be considered a force majeure event.

36

57.     When Akron knows or if Akron should have known, by the exercise of reasonable

diligence, of an event that might delay completion of any requirement of this Consent Decree,

whether or not the event is a force majeure event, Akron shall provide notice to the United States

orally or by electronic or facsimile transmission seven (7) days after Akron first knew, or in the

exercise of reasonable diligence under the circumstances, should have known of such event.

Within seven (7) days thereafter, Akron shall provide in writing to the United States an

explanation and description of the reasons for the delay; the anticipated duration of the delay; all

actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of

any measures to be taken to prevent or mitigate the delay or the effect of the delay; Akron's

rationale for attributing such delay to a Force majeure event if it intends to assert such a claim;

and a statement as to whether, in its opinion, such events may cause or contribute to the

endangerment to public health, welfare, or the environment. Akron shall include with any notice

all available documentation supporting the claim that the delay was attributable to a Force

majeure event. Failure to comply with the above requirements shall preclude Akron from

asserting any claim of Force majeure for that event for the period of time for such failure to

comply, and for any additional delay caused by such failure. Akron shall be deemed to know any

circumstances of which Akron, any entity controlled by Akron, or Akron's contractors knew or

should have known.

58.     If the United States agrees that the delay or anticipated delay is attributable to a force

majeure event, the time for performance of the obligations under this Consent Decree that are

affected by the force majeure event will be extended by the United States for such time as it is

necessary to complete those obligations. An extension of the time for performance of the

obligations affected by the force majeure event shall not, of itself, extend the time for

performance of any other obligation. The United States will notify Akron in writing of the length

of the extension, if any, for performance of any obligations affected by the force majeure event.

59.     If the United States does not agree that the delay or anticipated delay has been or will be

caused by a force majeure event, the United States will notify Akron in writing of its decision.

60.     If Akron elects to invoke the Dispute Resolution procedures set forth in Section XIV

(Dispute Resolution), it shall do so no later than 15 Days after receipt of the United States' notice.

In any such proceeding, Akron shall have the burden of demonstrating by a preponderance of the

evidence that the delay or anticipated delay has been or will be caused by a force majeure event,

that the duration of the delay or the extension sought was or will be warranted under the

circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and

that Akron complied with the requirements of Paragraphs 56 and 57 above. If Akron carries this

burden, the delay at issue shall be deemed not to be a violation by Akron of the affected

obligation of this Consent Decree identified to the United States or the Court.

## XIII. POTENTIAL FORCE MAJEURE (OHIO)

61.     "Force majeure," for purposes of this Consent Decree, is defined as any event arising from

causes beyond the control of Akron, its agents, consultants and contractors, or any entity

controlled by Akron that delays or prevents the performance of any obligation under this Consent

Decree despite Akron's best efforts to fulfill the obligation. The requirement that Akron exercise

"best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force

majeure event and best efforts to address the effects of any such event (a) as it is occurring and (b)

after it has occurred to prevent or minimize any resulting delay to the greatest extent possible.

Force majeure does not include Akron's financial inability to perform any obligation under this

Consent Decree. In addition, failure to apply for a required permit or approval or to provide in a timely manner all information required to obtain a permit or approval that is necessary to meet the requirements of this Consent Decree, or failure of Akron to approve contracts, shall not, in any event, be considered a force majeure event.

62.     When Akron knows or if Akron should have known, by the exercise of reasonable diligence, of an event that might delay completion of any requirement of this Consent Decree, whether or not the event is claimed to be a force majeure event, Akron shall provide notice to the State orally or by electronic or facsimile transmission seven (7) days after Akron first knew, or in the exercise of reasonable diligence under the circumstances, should have known of such event. Within seven (7) days thereafter, Akron shall provide in writing to the State an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measure to be taken to prevent or mitigate the delay or the effect of the delay; Akron's rationale for attributing such delay to an event which it intends to assert or claim is a force majeure event; and a statement as to whether, in its opinion, such events may cause or contribute to the endangerment to public health, welfare, or the environment. Akron shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure event. Failure to comply with the above requirements shall preclude Akron from asserting any claim of force majeure for that event for the period of time for such failure to comply, and for any additional delay caused by such failure. Akron shall be deemed to know any circumstances which Akron, and entity controlled by Akron, or Akron's contractors knew or should have known.

63.     If Akron seeks to raise the issue that it is entitled to a defense that  its failure to timely comply with a provision of this Consent Decree was because of an event which was caused by

circumstances entirely beyond Akron's control, it shall do so in accordance with this Section of the Consent Decree.  Although the State does not agree that force majeure is a defense that exists and is available to Akron, it is, however, hereby agreed by Akron and the State that it is premature at this time to raise and adjudicate the existence of such a defense. The appropriate point at which to adjudicate the existence of such a defense is the time of the proceeding to enforce a requirement or determine whether a defense is available for the event/failure at issue.

64.     If the State  agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by the State for such time as it is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation. The State  will notify Akron in writing of the length of the extension, if any, for performance of any obligations affected by the force majeure event.

65.     If the State  does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, the State will notify Akron in writing of its decision.

66.     If Akron elects to invoke the Dispute Resolution procedures set forth in Section XIV (Dispute Resolution), it shall do so no later than 15 Days after receipt of the State's notice. In any such proceeding, Akron shall have the burden of demonstrating by a preponderance of the evidence that force majeure is an available defense, that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Akron complied with the requirements of Paragraphs 61 and 62 above.  If Akron carries this burden, the delay at issue shall be deemed not to be a

violation by Akron of the affected obligation of this Consent Decree identified to the State or the Court.

XIV. <u>DISPUTE RESOLUTION</u>

67.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree.  If a dispute is subject to this Section, Akron's failure to seek resolution of such dispute under this Section shall preclude it from raising any such issue as a defense to any action by the United States or State to enforce any obligation under this Consent Decree. If the United States and the State provide Akron with materially different or irreconcilable positions on the issue(s) in dispute, Akron's obligations to perform an action necessarily affected by the materially different or irreconcilable positions (and Akron's liability for stipulated penalties concerning such obligation) shall be stayed until the dispute is resolved.

68.     The issuance, renewal, modification, denial or revocation of a permit and the issuance of orders or other actions of the Director of Environmental Protection (OEPA), including but not limited to decisions with respect to revisions to water quality standards, are not subject to dispute resolution under this Decree but, rather, shall be subject to challenge under Chapter 3745, Ohio Revised Code. The term "actions of the Director of Environmental Protection" shall be consistent with the definitions set forth in Chapter 3745, Ohio Revised Code.

69.     U.S. EPA actions to approve, disapprove, or promulgate new or revised water quality standards pursuant to 33 U.S.C. § 1313(c), and to object, not object or issue NPDES permits pursuant to 33 U.S.C. § 1342, are not subject to dispute resolution under this Decree.

41

70.     A dispute over whether stipulated penalties are due and owing shall be subject to the provisions of this Section.

71.     <u>Informal Dispute Resolution</u>. Any dispute which arises under or with respect to this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when Akron sends the United States and the State a written Notice of Dispute in accordance with Section XVI (Notices and Submissions). Such Notice shall state clearly the matter in dispute. The period of informal negotiations shall not exceed 20 Days from the date the dispute arises, or such other period as the Parties so agree. If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States and the State shall be considered binding unless, within 30 Days after the conclusion of the informal negotiation period, Akron invokes formal dispute resolution procedures as set forth below.

72.     <u>Formal Dispute Resolution</u>.

A.      Akron shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States and the State, in accordance with Section XVI (Notices and Submissions) of this Decree, a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but not be limited to, any factual data, analysis, or opinion supporting Akron's position and any supporting documentation relied upon by Akron.

B.      The United States and the State shall serve their Statement of Position within 45 Days of receipt of Akron's Statement of Position. The United States' and State's Statement of Position shall include, but not be limited to, any factual data, analysis, opinion or supporting documentation relied upon by the United States and the State. The United States' and the State's Statement of Position shall be binding on Akron unless

42

Akron files a motion for judicial review of the dispute in accordance with the following subparagraph C.

C.     Akron may seek judicial review of the dispute by filing with the Court and serving on the United States and the State, in accordance with Section XVI (Notices and Submissions), a motion requesting judicial resolution of the dispute. The motion must be filed within 15 Days of receipt of the United States' and the State's Statement of Position pursuant to the preceding subparagraph B. The motion shall contain a written statement of Akron's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

D.     The United States and the State shall respond to Akron's motion within the time period allowed by the Local Rules of this Court. Akron may file a reply memorandum, to the extent permitted by the Local Rules.

73.   <u>Standard of Review</u>.

A.     <u>Disputes Concerning Matters Accorded Record Review</u>. Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 72 pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules under this Decree, the adequacy of the performance of work undertaken under this Decree and disputes regarding the stipulated penalties, Akron shall have the burden of demonstrating, based on the administrative record, that the position of the United States and State is arbitrary and capricious or otherwise not in accordance with law under applicable provisions of administrative law.

43

B.      Other Disputes. Except as otherwise provided in this Consent Decree, in any other

disputes brought under Paragraph 72 Akron shall bear the burden of demonstrating that its

position complies with this Consent Decree and better furthers the purposes of this

Consent Decree. Any judicial review of such dispute shall not be based on the

administrative record.

74.     The invocation of dispute resolution procedures under this Section shall not, by itself,

extend, postpone, or affect in any way the obligations of Akron with respect to the specific

matters not in dispute under this Consent Decree, unless and until a final resolution of the dispute

so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue from

the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as

provided in Paragraph 51. If Akron does not prevail on the disputed issue, stipulated penalties

shall be assessed and paid as provided in Section XI (Stipulated Penalties).


## XV. REPORTING REQUIREMENTS

75.     Semi-Annual Reporting. On  August 15, 2010, and every six (6) months thereafter until

termination of this Consent Decree, Akron shall submit to the United States and the State at the

address provided in Section XVI (Notice and Submissions) a Semi-Annual Report that contains

all information necessary to determine Akron's compliance with the requirements of this Consent

Decree.

76.     In addition to the information identified in Attachment D, the Semi-Annual Report shall

include a description of any non-compliance with the requirements of this Consent Decree and an

explanation of the violation's likely cause and duration, and of the remedial steps taken, or to be

taken, to prevent or minimize such violation. If the cause of the violation cannot be fully

explained at the time that the report is due, Akron shall so state in the report. Akron shall investigate the cause of the violation and shall then submit an amendment to the report, including a full explanation of the cause of the violation, within 30 Days of the Day Akron becomes aware of the cause of the violation. Akron shall also include the information regarding CSO discharges described in Attachment C. Nothing in this paragraph or the following paragraph relieves Akron of its obligation to provide the notice required by Sections XII and XIII of this Consent Decree (Force Majeure-United States and Ohio).

77.     The Semi-Annual Report shall be certified in accordance with the "Certification Language" set forth in Paragraph 84 of Section XVI (Notices and Submissions).

78.     Akron shall not object to the accuracy, authenticity, and/or admissibility into evidence of any certified Semi-Annual Report in any proceeding to enforce this Consent Decree.

79.     The reporting requirements of this Consent Decree do not relieve Akron of any reporting obligations required by the CWA or implementing regulations, or by any other federal, State, or local law, regulation, permit, or requirement.

80.     Any information provided pursuant to this Consent Decree may be used by the United States and the State in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## XVI. NOTICES AND SUBMISSIONS

81.     Unless otherwise specified herein, whenever notifications, reports, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

45

<u>To the United States</u>:

<u>To the U.S. Department of Justice</u>:

Chief, Environmental Enforcement Section
U.S. Department of Justice – DOJ No. 90-5-1-1-3144/2
P.O. Box 7611
Washington, D.C. 20044-7611

and

<u>To U.S. EPA</u>:

Director, Water Division (WD-15J)
U.S. Environmental Protection Agency, Region 5
77 West Jackson Blvd.
Chicago, IL 60604

Chief, Water Enforcement and Compliance Assurance Branch (WC-15J)
U.S. Environmental Protection Agency, Region 5
77 West Jackson Blvd.
Chicago, IL 60604

and

Regional Counsel (C–14 J)
U.S. Environmental Protection Agency, Region 5
77 West Jackson Blvd.
Chicago, IL 60604

<u>To the State</u>:

Chief, Environmental Enforcement Section
30 East Broad Street, 25th Floor
Columbus, Ohio 43215-3400

Paul Novak, or his successor
Manager Permits and Compliance
Division of Surface Water
Ohio EPA
P.O. Box 1049
Columbus, Ohio 43216-1049

Richard Blasick, or his successor

46

Ohio EPA Northeast District Office
Environmental Manager
2110 East Aurora Road
Twinsburg, Ohio 44087

To the City:

Mayor
City of Akron
166 South High Street
Room 200
Akron, OH 44308

With Copies to:
Director of Public Service
City of Akron
166 South High Street
Room 201
Akron, OH 44308

And

Director of Law
City of Akron
161 South High Street
Suite 202
Akron, OH 44308

82.     Notices and submissions provided pursuant to this Section shall be deemed submitted

upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the

Parties in writing.

83.     If Akron violates, or has reason to believe that it may violate, the deadline for any

requirement under this Consent Decree, Akron shall notify the United States and the State of such

an event and its likely duration, in writing, within 10 working Days of the Day Akron first

becomes aware of the inability to meet the deadline, with an explanation of that inability, the

likely cause and the remedial steps taken, or to be taken, to prevent or minimize such an event. If

47

the cause cannot be fully explained at the time the report is due, Akron shall so state in the report. If not identified in the initial report, Akron shall investigate the inability to meet that deadline and shall then submit an amendment to the report, including a full explanation of the cause, within 30 Days of the Day Akron becomes aware of the cause of the inability to meet the deadline. Nothing in this paragraph or the following paragraph relieves Akron of its obligation to provide the notice required by Sections XII and XIII of this Consent Decree (Force Majeure).

84.     Each notice or submission submitted by Akron under this Consent Decree shall be signed by an official of Akron and shall include the following "Certification Language:"

> I certify under penalty of law that this document and its attachments were prepared under my direction or supervision in a manner designed to ensure that qualified and knowledgeable personnel properly gather and present the information contained therein. I further certify, based on my inquiry of those individuals immediately responsible for obtaining the information, that I believe that the information is true, accurate and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fines and imprisonment.

85.     Akron shall retain all underlying documents from which it has compiled any report or other submission required by this Consent Decree until five years after termination of the Decree.

## XVII. REVIEW AND APPROVAL PROCEDURES

86.     Following receipt of any report, plan, or other submission by Akron under this Consent Decree, U.S. EPA and OEPA may do one of the following, in writing: (a) approve the submission; (b) approve the submission upon specified conditions; (c) approve part of the submission and disapprove the remainder; or (d) disapprove the submission.

87.     If the submission is approved pursuant to Paragraph 86, Akron shall take all actions required by the plan, report or other document, in accordance with the schedules and requirements of the plan, report, or other document, as approved. If the submission is conditionally approved or

approved only in part, pursuant to Paragraph 86, Akron shall, upon written direction from U.S. EPA and OEPA, take all actions required by the approved plan, report, or other item that U.S. EPA and OEPA determine are technically severable from any disapproved portions, subject to Akron's right under Section XIV of the Consent Decree (Dispute Resolution) to dispute the specified conditions, the disapproved portions and U.S. EPA/ OEPA's determination that the actions are technically severable.

88.     If the submission is disapproved in whole or in part pursuant to Paragraph 86, Akron shall, within 45 Days or such other time as the Parties agree to in writing, correct all deficiencies and resubmit the plan, report, or other item, or disapproved portions thereof, for approval, in accordance with the preceding paragraphs. If the resubmission is approved in whole or in part, Akron shall proceed in accordance with the preceding paragraph. If the resubmission is disapproved, U.S. EPA and OEPA may again require Akron to correct all deficiencies in accordance with this paragraph. U.S. EPA and OEPA also retain the right to modify or develop any disapproved or conditioned portion of the resubmitted plan or report. Akron will implement any such plan/report as modified or developed by U.S. EPA and OEPA, subject only to Akron's right to invoke the dispute resolution procedures set forth in Section XIV (Dispute Resolution).

89.     If, upon resubmission, a document is disapproved or modified in whole or in part by U.S. EPA and OEPA due to a material defect previously identified and not corrected, Akron shall be deemed to have failed to submit its plan or report timely and adequately unless Akron invokes the dispute resolution procedures set forth in Section XIV (Dispute Resolution), and (i) U.S. EPA and OEPA agree to modify their earlier position or (ii) the Court adopts Akron's position. If U.S. EPA's and OEPA's disapproval or modification is upheld by the Court, stipulated penalties shall accrue for such violation from the date on which the initial submission was originally required.

49

Whether U.S. EPA and OEPA disapprove of Akron's submissions or approve the submissions with modifications will not affect the burden of proof or the standard of review set forth in Section XIV (Dispute Resolution) of this Consent Decree.

90.     If a permitting authority receives a timely, approvable application for a permit, renewal or modification, and the permitting authority does not issue the permit, renewal or modification or take a proposed action on the application in a timely manner, Akron may seek relief under the Force majeure provisions of this Consent Decree.

## XVIII. ACCESS TO INFORMATION AND DOCUMENT RETENTION

91.     The United States, the State, and their representatives, including attorneys, contractors, and consultants, shall have the right of entry into any facility covered by this Consent Decree at all reasonable times upon presentation of credentials to allow such representatives to:

     A.     Monitor the progress of activities required under this Consent Decree;

     B.     Verify any data or information submitted to the United States or the State in accordance with the terms of this Consent Decree;

     C.     Obtain samples and, upon request, split of any samples taken by Akron or its representatives, contractors, or consultants; and

     D.     Assess Akron's compliance with this Consent Decree.

92.     Upon request, Akron shall provide the United States or the State or their authorized representatives splits of any samples taken by Akron. Upon request, the United States and the State shall provide Akron splits of any samples taken by either sovereign.

93.     Until five (5) years after the termination of this Consent Decree, Akron shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents,

records, or other information (including documents, records, or other information in electronic form) in its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relate in any manner to Akron's performance of its obligations under this Consent Decree. This information retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures. At any time during this information retention period, upon request by the United States or the State, Akron shall provide copies of any documents, records, or other information required to be maintained under this paragraph.

94.     At the conclusion of the information retention period provided in the preceding paragraph, Akron shall notify the United States and the State at least 90 Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding paragraph and, upon request by the United States or the State, Akron shall deliver any such documents, records, or other information to one or both sovereigns.

95.     Akron may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege recognized by federal law. If Akron asserts such a privilege, it shall provide the following: (a) the title of the document, record, or information; (b) the date of the document, record, or information; (c) the name and title of each author of the document, record, or information; (d) the name and title of each addressee and recipient; (e) a description of the subject of the document, record, or information; and (f) the privilege asserted by Akron. However, no documents, records, or other information created by or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

96.     Akron may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2. As to any information that Akron seeks to protect as CBI, Akron shall follow the procedures set forth in 40 C.F.R. Part 2. If no claim of confidentiality accompanies documents or information when they are submitted to U.S. EPA, the public may be given access to such documents or information without further notice, in accordance with 40 C.F.R. Part 2, Subpart B.

97.     This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Akron to maintain the documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

## XIX. FAILURE OF COMPLIANCE

98.     The United States and the State do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Akron's compliance with any aspect of this Consent Decree will result in compliance with the provisions of the Act, 33 U.S.C. § 1251 *et seq*., or with any other provisions of federal, State, or local laws, regulations, or permits.  Akron shall remain responsible for compliance with the terms of the CWA, applicable state law and regulations, its Current NPDES Permit, and this Consent Decree. The pendency or outcome of any proceeding concerning issuance, reissuance, or modification of any NPDES Permit shall neither affect nor postpone Akron's duties and obligations as set forth in this Consent Decree.

## XX. EFFECT OF SETTLEMENT AND RESERVATION OF RIGHTS

99.     This Consent Decree resolves the civil claims of the United States and the State for the

violations alleged in the Complaint filed in this action through the Date of Lodging.

100.    The United States and the State reserve all legal and equitable remedies available to

enforce the provisions of this Consent Decree, except as expressly stated in Paragraph 99. This

Consent Decree shall not be construed to limit the rights of the United States or the State to obtain

penalties or injunctive relief under the Act or implementing regulations, or under other federal or

state laws, regulations, or permit conditions, except as expressly specified in

Paragraph 99.

101.    The United States and the State further reserve all legal and equitable remedies to address

any imminent and substantial endangerment to the public health or welfare or the environment

arising at, or posed by, Akron's WPCS and Sewer System, whether related to the violations

addressed in this Consent Decree or otherwise.

102.    In any subsequent administrative or judicial proceeding initiated by the United States or

the State for injunctive relief, civil penalties, other appropriate relief relating to the WPCS or the

Sewer System or Akron's violations, Akron shall not assert, and may not maintain, any defense or

claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion,

claimed preclusion, claim-splitting, or other defenses based upon any contention that the claims

raised by the United States or the State in the subsequent proceeding were or should have been

brought in the instant case, except with respect to claims that have been specifically resolved

pursuant to Paragraph 99 of this Section.

103.    This Consent Decree is not a permit, or a modification of any permit, under any federal,

State, or local laws or regulations. Akron is responsible for achieving and maintaining complete

compliance with all applicable federal, State, and local laws, regulations, and permits, and Akron's compliance with this Consent Decree shall not be a defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. Akron shall obtain permits to install as required by R.C. Chapter 6111 and the rules promulgated thereunder. Nothing within this Consent Decree shall be deemed to be a waiver of any rights that Akron may have to challenge any terms and conditions of any future permits.

104.    Nothing in this Consent Decree shall be deemed to be a finding or admission that any specific or general water quality or technology-based effluent limitation and conditions are applicable to Akron's CSOs or secondary treatment bypasses.

105.    This Consent Decree does not limit or affect the rights of Akron or of the United States or the State against any third Parties, not party to this Consent Decree, nor does it limit the rights of third Parties, not party to this Consent Decree, against Akron, except as otherwise provided by law.

106.    The execution of this Decree by Akron shall not preclude it from asserting any position in any action it may assert against any contractor or consultant retained to fulfill Akron's responsibilities under this Consent Decree in whole or in part.

107.    This Consent Decree shall not be construed to create rights in or grant any cause of action to any third party not party to this Consent Decree, including but not limited to contractors or consultants retained to fulfill Akron's responsibilities under this Decree.

108.    Performance of the terms of this Consent Decree by Akron is not conditioned on the receipt of any federal, State or local funds. Application for construction grants, State revolving loan funds, or any other grants or loans, or delays caused by inadequate facility planning or plans

and specifications on the part of Akron shall not be cause for extension of any required

compliance date in this Consent Decree.

## XXI. <u>COSTS</u>

109.    The Parties shall each bear their own costs of litigation of this action, including attorneys'

fees, except those incurred in any action necessary to collect any portion of the civil penalty or

any stipulated penalties due but not paid by Akron.

## XXII. <u>EFFECTIVE DATE</u>

110.    The Date of Entry of this Consent Decree shall be the date upon which this Consent

Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever

occurs first, as recorded in the Court's docket.

## XXIII. <u>RETENTION OF JURISDICTION</u>

111.    The Court shall retain jurisdiction of this case until termination of this Consent Decree, for

the purpose of resolving disputes arising under this Decree or entering order modifying this

Decree, pursuant to Sections XIV (Dispute Resolution) and XXIV (Modifications), or

effectuating or enforcing compliance with the terms of this Decree.

## XXIV. <u>MODIFICATIONS</u>

112.    The terms of this Consent Decree, including any attached appendices, may be modified

only by a subsequent written agreement signed by all Parties. Where the modification constitutes

a material change to this Decree, it shall be effective only upon approval by the Court.

113.    Any disputes concerning modification of this Decree shall be resolved pursuant to Section

XIV of this Decree (Dispute Resolution), provided, however, that, instead of the burden of proof

provided by Paragraph 73, the Party seeking modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XXV. TERMINATION

114.    After Akron has complied with all obligations under this Consent Decree, including, but not limited to, all requirements set forth in Section V (Specific Action Projects), Section VI (CSO and WPCS Control Measures), Section VII (CMOM, Grease Control and Emergency Response Programs), and Section VIII (Mud Run Pump Station Program), has paid the civil penalty and all accrued stipulated penalties which Akron did not successfully challenge under Section XIV (Dispute Resolution), has made all payments to fund the State SEP under Section X (State Supplemental Environmental Project), and has demonstrated compliance with the requirements of this Consent Decree for a period of one year, Akron may file and serve upon the United States and the State a "Request for Termination of Consent Decree" with supporting documentation demonstrating that the conditions for termination set forth in this Section have been met.

115.    Following the United States' and the State's receipt of Akron's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Akron has satisfactorily complied with the requirements for termination of this Consent Decree. If the United States, after consultation with the State, agrees that the Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Consent Decree.

116.    If the United States after consultation with the State does not agree that the Decree may be terminated, Akron may invoke Dispute Resolution under Section XIV (Dispute Resolution) of

this Decree. However, Akron shall not seek Dispute Resolution of any dispute regarding

termination, under Paragraph 72 of Section XIV (Dispute Resolution), until 60 days after service

of its Request for Termination. Akron shall have the burden of proof that the conditions for

termination of the Decree have been satisfied. This Consent Decree shall remain in effect pending

resolution of the dispute by the Parties or the Court in accordance with Section XIV (Dispute

Resolution) of this Consent Decree.

## XXVI. PUBLIC COMMENT

117.    This Consent Decree shall be lodged with the Court for a period of not less than 60 Days

for public notice and comment in accordance with 28 C.F.R. § 50.7. The United States reserves

the right to withdraw or withhold its consent if the comments regarding the Consent Decree

disclose facts or considerations indicating that the Consent Decree is inappropriate, improper or

inadequate. Akron consents to the entry of this Consent Decree without further notice and agrees

not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any

provision of the Decree unless the United States has notified Akron in writing that it no longer

supports entry of this Consent Decree.

## XXVII. SIGNATORIES SERVICE

118.    Each undersigned representative of Akron, the United States and the State certifies that he

or she is fully authorized to enter into the terms and conditions of this Consent Decree and to

execute and legally bind the Party he or she represents to this document.

119.    This Consent Decree may be signed in counterparts, and its validity shall not be

challenged on that basis. Akron hereby agrees to accept service of process by mail with respect to

all matters arising under or relating to this Consent Decree and to waive the formal service

57

requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable Local

Rules of this Court including, but not limited to, service of a summons.

## XXVIII. INTEGRATION/ATTACHMENTS

120.    This Consent Decree, its Attachments and all other approved deliverables under this

Consent Decree constitute a final, complete, and exclusive agreement and understanding among

the Parties with respect to the settlement embodied in the Consent Decree and supersede all prior

agreements and understandings, whether oral or written. Other than the Attachments and all other

deliverables required under this Consent Decree, which are attached to and incorporated into this

Decree, no other document, nor any representation, inducement, agreement, understanding, or

promise, constitutes any part of this Consent Decree or the settlement it represents, nor shall it be

used in construing the terms of this Consent Decree.

121.    The following are attached to and incorporated into this Consent Decree:

ATTACHMENT A:  Long Term Control Plan Update Work Plan.
Appendix 1:  Adjusted 1994 Typical Year
Appendix 2:  CSO Cost/Benefit Tables
Appendix 3:  Long Term Control Plan Update
Appendix 4:  Public Participation Program

ATTACHMENT B:  Post Construction Monitoring Program

ATTACHMENT C:  Measures to Maximize Sewer System Performance and Eliminate SSOs
and CSS Releases

ATTACHMENT D:  Semi-Annual Report and Statement of Certification

ATTACHMENT E:  State Supplemental Environmental Project

## XXIX. FINAL JUDGMENT

122.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute final judgment between the United States, the State, and Akron. The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.


**SO ORDERED THIS _____DAY OF _____, 2010.**


_____
United States District Judge

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. City of Akron, et. al.*

FOR THE UNITED STATES OF AMERICA:

Date: _11-12-09_

JOHN C. CRUDEN
Acting Assistant Attorney General
Environmental and Natural Resources Division
U.S. Department of Justice

Date: _11-12-09_

ARNOLD S. ROSENTHAL
Senior Counsel
RENITA Y. FORD
BONNIE A. COSGROVE
Trial Attorneys
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044
(202) 305-0232 (voice)
(202) 514-8395 (fax)
renita.ford@usdoj.gov

STEVEN M. DETTELBACH
United States Attorney
JAMES L. BICKETT (0005598)
Assistant United States Attorney
208 Federal Building
Two South Main Street
Akron, Ohio 44308-1855
(330) 761-0523 (voice)
(330) 375-5492 (fax)
James.Bickett@usdoj.gov

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. City of Akron, et. al.*

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

Date: ___11/12/09___

CYNTHIA GILES
Assistant Administrator
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue
Washington, DC 20460

61

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. City of Akron, et. al.*

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

Date: _11-3-09_

BHARAT MATHUR
Acting Regional Administrator
U.S. Environmental Protection Agency
Region 5
77 West Jackson Boulevard
Chicago, IL 60604

62

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. City of Akron, et. al.*

FOR THE STATE OF OHIO:

RICHARD CORDRAY
Ohio Attorney General

Date: *November 10, 2009*

MARGARET A. MALONE (0021770)
Assistant Attorney General
Environmental Enforcement Section
30 E. Broad Street, 25th Fl.
Columbus, OH 43215
(614) 466-5760 (voice)
(614) 644-1926 (fax)
margaret.malone@ohioattorneygeneral.gov

63

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. City of Akron, et. al.*

FOR THE CITY OF AKRON:

Date: _____11 / 10 / 09_____    *Lawrence R. Liebesman*
Lawrence R. Liebesman (DC Bar No. 193086)
HOLLAND & KNIGHT
2099 Pennsylvania Avenue, NW
Washington, D.C. 20006
(202) 419-2477 (voice)
(202) 955-5564 (fax)
Lawrence.liebesman@hklaw.com

Date: _____11/12/09_____    *Cheri B Cunningham*
Cheri B. Cunningham (0009433)
Director of Law
Ocasek Government Building
161 South High Street, Suite 202
Akron, OH 44308
(330) 375-2030
(330) 375-2041 (fax)
Cunnich@ci.akron.oh.us

**ATTACHMENT A**

**LONG TERM CONTROL PLAN UPDATE WORK PLAN**

This Long Term Control Plan Update Work Plan describes the process and schedule that Akron shall follow, the analyses Akron shall perform, and the information Akron shall generate, obtain and provide for the No Feasible Alternatives Addendum Update, Long Term Control Plan Update and Long Term Control Plan Update Report in accordance with the Consent Decree.

I. <u>ASSESSMENTS, ANALYSIS AND UPDATES</u>

**Analysis and Update related to WPCS**

A.      Akron shall update the June 8, 2009 Addendum to the No Feasible Alternatives Analysis ("Updated NFA") to reflect the revised adjusted 1994 typical year described in paragraph I.D.4(a).  Specifically, Akron shall update the following tables in Sections 4 and 5 of the NFA Addendum using the adjusted 1994 typical year:

- The un-numbered table on Page 4-2;
- Tables 4-3, 4-8 and 4-12; and
- Tables 5-1, 5-2, 5-3 and 5-4

If some of the tables do not change (e.g., Tables 5-1 and 5-2, which present only cost data), then Akron shall note that those tables remain unchanged.

B.      Akron shall include in the Updated NFA, as a supplement, an analysis of the feasibility, costs and benefits of modifying the existing secondary treatment system to include a step feed mode.  Akron shall provide a detailed description of this option, identifying any modifications required to the existing treatment system and any new equipment, and shall include the benefits and costs of this option in the tables listed above. Akron shall include in this analysis the costs and benefits of step feed alone, and the costs and benefits of step feed and enhanced high rate treatment for any bypasses estimated to be remaining after conversion to step feed.

1

C.      Akron shall provide the information required in paragraphs I.A and I.B to the U.S. EPA and OEPA no later than November 30, 2009.

**Assessments and Analysis Related to Collection System**

D.      Assessment of CSO Controls

1.      Akron shall assess the costs and effectiveness (in terms of the number and volume of overflows) of the following control measures for eliminating or reducing and/or treating CSOs (treatment options shall include, but not be limited to, enhanced high rate treatment): ,

(a)      Ohio Canal Tunnel both with and without treatment (to control overflows from Racks 4, 16-20, 23, 24, and 37); and

(b)      North Side Tunnel both with and without treatment (to control overflows from Racks 32-35, as well as discharges from Rack 40 after the 2006 construction of the Rack 40 storage basin).

2.      Akron shall assess the costs and effectiveness (in terms of the number and volume of overflows) of the following control measures for eliminating or reducing CSOs:

Storage Basins to control overflows from Racks 3, 7/5, 10/11, 12, 14, 15, 22, 26/28, 29/27 and 36.

3.      This assessment shall use a planning-level model based on Akron's sewer system hydraulic model, relevant information and sound engineering judgment to develop reasonable, planning-level estimates of the sizes, capacities, performance in a typical year (i.e., number of activations and overflow volume) and other relevant characteristics of each of the control measures being evaluated.

2

4.      Akron's assessment shall be consistent with the CSO Control Policy, and U.S.

EPA's "Combined Sewer Overflows Guidance for Long Term Control Plan" ("Guidance

for LTCP").  In addition, this assessment shall include, at a minimum:

(a)      An evaluation of a range of "sizes" of each alternative that will reduce the

number of untreated CSOs down to a range of numbers of overflows per year per

CSO Outfall (i.e., a minimum of 0, 1, 2, 3 and 4).  This evaluation will be based

on the adjusted 1994 typical year.  The adjusted 1994 typical year is comprised of

the hourly rainfall measurements for 1994, except that four hourly data points

from the 1994 data were removed to reduce two storms that were greater than

two-year return storms, which included the final hour of the July 7, 1994 event (a

depth reduction of 0.54 inches) and three hours in an August 13th/14th event

(depth reduction of 0.49 inches).  The resulting typical year data is presented in

Appendix 1 to this Work Plan and the data points that were modified are marked

with an asterisk.  Moreover, in this analysis, Akron shall use a 12 hour inter-event

duration. This means that if a CSO Outfall stops discharging, but then begins to

discharge again before 12 hours, this is considered one overflow event.  However,

if the CSO Outfall stops discharging and resumes discharging 12 or more hours

later, these are considered separate overflow events.

(b)      An evaluation of the "Project Costs," as that term is described on pages 3-

49 through 3-51 of the Guidance for LTCP for each control measure that Akron

has evaluated.  The determination of Project Costs shall include a breakdown of

the "capital costs," "annual operations and maintenance (O&M) costs," and "total

present worth" for each control measure.  The terms "capital costs," "annual

O&M costs," and "total present worth" are described on pages 3-49 through 3-51 of the Guidance for LTCP.

E.      With respect to the information described in paragraph I.D.4, above, Akron shall present for each CSO outfall/rack, or set of outfalls/racks that share a common technical solution (e.g., a set of outfalls discharging to a proposed tunnel), alternative sizes (where appropriate, such as the size of a storage tank or capacity of a treatment system), and the costs of each alternative and the benefits in terms of the number of overflows, the volume of overflows, cost performance curves and any other benefit that Akron considered. Akron shall present alternatives that result in a minimum of 0, 1, 2, 3 and 4 overflows.  Akron shall use Tables 1-3 in Appendix 2 of this Work Plan to present this information to the U.S. EPA and OEPA and shall provide these tables to the U.S. EPA and OEPA in Microsoft Excel format as soon as possible, but no later than May 15, 2010.

F.      Cost Benefit Interim Submissions. Akron shall provide the following information to the U.S. EPA and OEPA in accordance with the following schedule:

1.      By no later than January 15, 2010, a Preliminary Report on Modeling to Predict Sizes and Number of Overflows for OCI Tunnel Facilities, NSI Tunnel Facilities (includes Rack 40 treatment) and Remote Storage Facilities ("Requested Facilities").

2.      By no later than March 15, 2010, a Preliminary Report on Cost-Benefit Comparison to Predict Sizes and Number of Overflows for Requested Facilities.

G.      Akron shall submit updated financial capability information to the U.S. EPA and OEPA by no later than May 15, 2010. The information will include but not be limited to: (i) any efforts Akron has undertaken to obtain bonding since December 2007; (ii) any efforts Akron has undertaken to obtain financing with the Ohio Water Pollution Control Loan Fund or any state

funding program relevant to the WPCS and Sewer System since December 2007; (iii) any additional financial information not previously provided to U.S. EPA and OEPA regarding the economic condition of Akron's service area; and (iv) any other information Akron believes to be relevant to the City of Akron's financial condition as it affects its compliance with the CWA.

## II. PROPOSED LONG TERM CONTROL PLAN UPDATE AND REPORT

A.      Proposed Long Term Control Plan Update

1.      Akron shall consider the analysis, evaluations and information described in Paragraphs I.A. through I.G. to develop and select the Proposed Long Term Control Plan Update (Proposed LTCP Update) and shall submit the Proposed LTCP Update to the U.S. EPA and OEPA no later than August 15, 2010. In the Proposed LTCP Update, Akron shall select: (1) the proposed control measures necessary to achieve the goals of ensuring that Akron's CSOs comply with the CSO Control Policy, and with any requirements of the CWA, R.C. Chapter 6111 and the Current NPDES Permit (including any specific or general water quality or technology based effluent limitations and conditions in the Current NPDES Permit) that are applicable to Akron's CSOs, subject to the provisions of Section XX ( Effect of Settlement and Reservation of Rights); and (2) the proposed feasible control measure(s) consistent with the CSO Control Policy and 40 C.F.R. § 122.41(m) to eliminate bypasses at its WPCS or, if Akron demonstrates during the course of developing the Proposed LTCP Update that elimination of all secondary treatment bypasses is not feasible, to reduce bypasses at the WPCS to the maximum extent feasible and to provide maximum feasible treatment for any remaining bypasses.  The Parties agree that all Akron's CSOs discharge directly into sensitive areas, with the exception of

5

the CSOs that discharge into the Ohio Canal, and that Akron's CSOs that discharge into the Ohio Canal enter sensitive areas.

2.      Akron's Proposed LTCP Update shall contain criteria necessary to ensure that the control measures selected pursuant to II.A.1 are properly designed (design criteria) and to ensure that, once constructed, the control measures perform in the manner that they were expected to perform (performance criteria).

3.      Akron shall develop a schedule that is as expeditious as possible for design, construction, implementation and utilization of the control measures selected in the Proposed LTCP Update pursuant to II.A.1 above.  The schedule shall contain a deadline for Achievement of Full Operation of all control measures in a manner that is as expeditious as possible, but in no event later than October 15, 2028.  The schedule shall specify critical construction milestones for each specific control measure, including, at a minimum, deadlines for:

       (a)      Bidding of Control Measures; and
       (b)      Achievement of Full Operation.

4.      With respect to the selection of proposed control measure(s) at the WPCS for the Proposed LTCP Update pursuant to paragraph II.A.1, Akron shall consider the updated and supplemental information provided to the U.S. EPA and OEPA under paragraph I.A and I.B in selecting the proposed control measure, or combination of control measures, that will (a) eliminate or reduce, to the maximum extent feasible, bypasses of the secondary treatment system, and (b) provide maximum feasible treatment for any remaining bypasses. Akron shall also provide the proposed associated performance criteria (both in terms of secondary treatment capacity and in terms of secondary bypasses remaining in the typical year) that shall be achieved by the selected control

6

measure. Akron shall also include performance criteria for providing maximum feasible

treatment for any remaining bypasses that do not receive full secondary treatment.

5.      Akron shall provide to the U.S. EPA and OEPA the information required under

paragraphs II.A.1 through II.A.4 above using the format presented in Appendix 3 of this

Work Plan.  The information in this table shall be referred to as the Proposed LTCP

Update.

B.      Proposed Long Term Control Plan Update Report

1.      Akron shall provide the results of all analyses, evaluations and assessments it

performed under Section I of this Work Plan in a proposed written report (Proposed Long

Term Control Plan Update Report or Proposed LTCP Update Report) to the U.S. EPA

and OEPA by no later than August 15, 2010. The Proposed LTCP Update Report shall

also include:

>       (a)      A written explanation pertaining to Akron's assessment of the costs,
>
>       effectiveness and benefits of alternatives for eliminating or reducing and/or
>
>       treating CSOs and secondary treatment bypasses, including a discussion of why
>
>       Akron selected the design and performance criteria presented in the Proposed
>
>       LTCP Update.
>
>       (b)      A written explanation as to why Akron believes that the CSO Control
>
>       Measures set forth in the Proposed LTCP Update will ensure that Akron's CSOs
>
>       comply with the CSO Control Policy, and any requirements of the CWA, R.C.
>
>       Chapter 6111 and the Current NPDES Permit (including any specific or general
>
>       water quality or technology based effluent limitations and conditions in the

Current NPDES Permit) that are applicable to Akron's CSOs, subject to the provisions of Section XX (Effect of Settlement and Reservation of Rights).

(c)     If the Control Measures set forth in the Proposed LTCP Update will not result in Akron achieving zero bypasses of secondary treatment, an explanation as to why Akron believes it is either technically or financially infeasible to achieve zero bypasses of secondary treatment.

(d)     A detailed explanation as to why Akron believes the schedule for implementing the Proposed LTCP Update realizes Achievement of Full Operation of all Control Measures as expeditiously as possible.

(e)     For each control measure analyzed under paragraph I.D.1 and 2:

(i)  an analysis of the impact that each control measure will have on the peak instantaneous and sustained flows to the WPCS for the storm events occurring during the 1994 adjusted typical rainfall year; and

(ii) an analysis of the impact that an increase in the capacity of the WPCS may have on the overflow events and alternatives in the collection system.  Akron shall clearly identify assumptions regarding the WPCS performance and capacity when presenting alternatives.

(f)     A Proposed Financial Capability Assessment to cover the information set out in Section 8(c) of the CSO Control Policy, as further addressed in the Document entitled "Combined Overflows – Guidance for Financial Capability Assessment and Schedule Development" (EPA 832-B-97-004) and also including the information addressing the factors identified in section I. G above.

### III. PUBLIC PARTICIPATION

Akron shall provide the public with an opportunity to review and comment on the Proposed LTCP Update, Proposed LTCP Update Report and Proposed Financial Capability Assessment consistent with the Public Participation Plan as set forth in Appendix 4 to the Work Plan.

### IV. FINAL LTCP UPDATE AND FINAL LTCP UPDATE REPORT

A.      By no later than October 15, 2010, Akron shall submit the Final LTCP Update and Final LTCP Update Report to the U.S. EPA and OEPA. The submission shall take into account comments provided by the public pursuant to the public participation plan.

B.      The submissions in IV.A shall be in the same format and cover the same subject matters as required for the submission of the Proposed LTCP Update and Proposed LTCP Update Report provided pursuant to subparagraphs II.A.1 and II.B.1 above.

### V. WPCS CONTROL MEASURE(S)

A.      By no later than October 15, 2016, Akron shall submit to the U.S. EPA and OEPA a report identifying the results of an analysis, based upon information developed subsequent to November 30, 2009, of control measures to eliminate or reduce, to the maximum extent feasible, bypasses of the secondary treatment system (Report on Revising WPCS Control Measure(s)). However, if Akron constructs the WPCS Contingency Project pursuant to Paragraph 10(C) of the Decree, Akron shall submit the Report on Revising WPCS Control Measure(s) by no later than October 15, 2017.  The analysis shall include: an evaluation of control measures that achieve, at a minimum, the same performance criteria (as described in II.A.4) as the WPCS control measure(s) selected in the Final LTCP Update; an evaluation of control measures that will result in greater reduction in bypasses than the measures selected in the Final LTCP Update; and an

evaluation of control measures that will eliminate all secondary bypasses. The Report on

Revising WPCS Control Measures shall also include: (i) a selection of a proposed control

measure or combination of control measures at the WPCS, that will at a minimum achieve the

same performance criteria, (as described in II.A.4) as the control measure(s) selected and

identified in the Final LTCP Update or that will result in greater reduction or elimination of

secondary bypasses (Proposed Revised Control Measure(s)) and (ii) performance criteria and

dates for Bidding of Control Measures and Achievement of Full Operation of the Proposed

Revised Control Measures consistent with Appendix 3 of this Work Plan.

B.       Akron's submission shall be subject to Section XVII of the Consent Decree (Review and

Approval Procedures).  If the U.S. EPA and OEPA approve the Proposed Revised Control

Measure(s) (the Approved Revised Control Measure(s)), those measure(s) shall replace the

WPCS control measure(s) in the Final LTCP Update.  If that occurs, Akron shall construct the

Approved Revised Control Measure(s) in accordance with the description, design and

performance criteria, and dates for Bidding of Control Measures and Achievement of Full

Operation of the Approved Revised Control Measure(s) identified in the approved Report under

Section V.A., above.  In no event shall the Approved Revised Control Measure(s) at the WPCS

extend the remaining deadlines for Achievement of Full Operation of the other control measures

in the Final LTCP Update.

Appendix 1
Adjusted 1994 Design Year

| Akron 1994 Design Storm | |
| --- | --- |
| (contains four adjusted measurements from the 1994 Actual, highlighted cells) | |
| Date & Time | Rainfall (inches) |
| 1/1/94 14:00 | 0.02 |
| 1/1/94 15:00 | 0.02 |
| 1/1/94 16:00 | 0.03 |
| 1/1/94 17:00 | 0.01 |
| 1/1/94 18:00 | 0.03 |
| 1/1/94 19:00 | 0.03 |
| 1/1/94 20:00 | 0.02 |
| 1/1/94 21:00 | 0.02 |
| 1/1/94 22:00 | 0.01 |
| 1/2/94 4:00 | 0.01 |
| 1/3/94 13:00 | 0.01 |
| 1/5/94 13:00 | 0.01 |
| 1/9/94 12:00 | 0.01 |
| 1/12/94 12:00 | 0.06 |
| 1/12/94 13:00 | 0.12 |
| 1/12/94 14:00 | 0.11 |
| 1/12/94 15:00 | 0.05 |
| 1/12/94 16:00 | 0.02 |
| 1/12/94 17:00 | 0.01 |
| 1/12/94 22:00 | 0.01 |
| 1/13/94 11:00 | 0.01 |
| 1/20/94 14:00 | 0.04 |
| 1/20/94 15:00 | 0.03 |
| 1/23/94 12:00 | 0.01 |
| 1/23/94 14:00 | 0.01 |
| 1/23/94 15:00 | 0.13 |
| 1/23/94 16:00 | 0.08 |
| 1/23/94 17:00 | 0.02 |
| 1/23/94 19:00 | 0.01 |
| 1/27/94 13:00 | 0.01 |
| 1/27/94 14:00 | 0.13 |
| 1/27/94 15:00 | 0.28 |
| 1/27/94 16:00 | 0.13 |
| 1/27/94 17:00 | 0.09 |
| 1/27/94 18:00 | 0.08 |
| 1/27/94 19:00 | 0.05 |
| 1/27/94 20:00 | 0.11 |
| 1/27/94 21:00 | 0.03 |
| 1/27/94 22:00 | 0.03 |
| 1/27/94 23:00 | 0.02 |
| 1/28/94 0:00 | 0.06 |
| 1/28/94 1:00 | 0.10 |
| 1/28/94 2:00 | 0.08 |
| 1/28/94 3:00 | 0.12 |
| 1/28/94 4:00 | 0.09 |
| 1/28/94 5:00 | 0.06 |
| 1/28/94 6:00 | 0.06 |
| 1/28/94 7:00 | 0.13 |
| 1/28/94 8:00 | 0.03 |

| Akron 1994 Design Storm | |
| --- | --- |
| (contains four adjusted measurements from the 1994 Actual, highlighted cells) | |
| Date & Time | Rainfall (inches) |
| 2/3/94 13:00 | 0.01 |
| 2/4/94 13:00 | 0.01 |
| 2/10/94 11:00 | 0.01 |
| 2/10/94 12:00 | 0.01 |
| 2/10/94 14:00 | 0.01 |
| 2/11/94 14:00 | 0.05 |
| 2/11/94 15:00 | 0.03 |
| 2/12/94 11:00 | 0.02 |
| 2/12/94 12:00 | 0.05 |
| 2/12/94 13:00 | 0.01 |
| 2/12/94 19:00 | 0.01 |
| 2/12/94 21:00 | 0.01 |
| 2/13/94 2:00 | 0.01 |
| 2/13/94 4:00 | 0.01 |
| 2/14/94 11:00 | 0.01 |
| 2/14/94 12:00 | 0.02 |
| 2/23/94 10:00 | 0.09 |
| 2/23/94 11:00 | 0.11 |
| 2/23/94 12:00 | 0.03 |
| 2/23/94 13:00 | 0.01 |
| 2/23/94 16:00 | 0.27 |
| 2/23/94 17:00 | 0.02 |
| 2/23/94 23:00 | 0.01 |
| 2/26/94 13:00 | 0.01 |
| 2/27/94 12:00 | 0.01 |
| 2/27/94 13:00 | 0.02 |
| 2/27/94 14:00 | 0.03 |
| 2/27/94 15:00 | 0.02 |
| 2/28/94 11:00 | 0.01 |
| 2/28/94 12:00 | 0.01 |
| 3/3/94 12:00 | 0.01 |
| 3/4/94 14:00 | 0.01 |
| 3/7/94 11:00 | 0.02 |
| 3/7/94 14:00 | 0.02 |
| 3/7/94 15:00 | 0.03 |
| 3/7/94 16:00 | 0.06 |
| 3/7/94 17:00 | 0.02 |
| 3/7/94 18:00 | 0.01 |
| 3/7/94 20:00 | 0.01 |
| 3/10/94 11:00 | 0.01 |
| 3/10/94 12:00 | 0.03 |
| 3/10/94 13:00 | 0.02 |
| 3/10/94 18:00 | 0.01 |
| 3/11/94 11:00 | 0.01 |
| 3/11/94 13:00 | 0.04 |
| 3/11/94 14:00 | 0.22 |
| 3/11/94 15:00 | 0.12 |
| 3/13/94 10:00 | 0.04 |
| 3/13/94 11:00 | 0.03 |

| Akron 1994 Design Storm | |
| --- | --- |
| (contains four adjusted measurements from the 1994 Actual, highlighted cells) | |
| Date & Time | Rainfall (Inches) |
| 3/13/94 12:00 | 0.01 |
| 3/13/94 13:00 | 0.03 |
| 3/13/94 14:00 | 0.05 |
| 3/13/94 15:00 | 0.03 |
| 3/13/94 16:00 | 0.02 |
| 3/13/94 17:00 | 0.02 |
| 3/13/94 18:00 | 0.01 |
| 3/13/94 19:00 | 0.01 |
| 3/16/94 11:00 | 0.01 |
| 3/18/94 11:00 | 0.01 |
| 3/18/94 13:00 | 0.04 |
| 3/18/94 16:00 | 0.01 |
| 3/19/94 9:00 | 0.02 |
| 3/19/94 10:00 | 0.02 |
| 3/21/94 2:00 | 0.06 |
| 3/21/94 3:00 | 0.04 |
| 3/21/94 5:00 | 0.04 |
| 3/21/94 6:00 | 0.04 |
| 3/21/94 7:00 | 0.03 |
| 3/21/94 8:00 | 0.14 |
| 3/21/94 10:00 | 0.01 |
| 3/21/94 11:00 | 0.07 |
| 3/21/94 12:00 | 0.13 |
| 3/21/94 13:00 | 0.02 |
| 3/21/94 14:00 | 0.01 |
| 3/21/94 15:00 | 0.01 |
| 3/21/94 16:00 | 0.03 |
| 3/21/94 17:00 | 0.02 |
| 3/24/94 1:00 | 0.02 |
| 3/24/94 3:00 | 0.03 |
| 3/24/94 4:00 | 0.17 |
| 3/24/94 5:00 | 0.01 |
| 3/25/94 11:00 | 0.13 |
| 3/26/94 23:00 | 0.03 |
| 3/27/94 0:00 | 0.02 |
| 3/27/94 1:00 | 0.05 |
| 3/27/94 2:00 | 0.04 |
| 3/27/94 3:00 | 0.04 |
| 3/27/94 4:00 | 0.02 |
| 3/27/94 5:00 | 0.02 |
| 3/27/94 19:00 | 0.02 |
| 3/28/94 0:00 | 0.02 |
| 3/28/94 3:00 | 0.05 |
| 3/29/94 2:00 | 0.04 |
| 3/29/94 3:00 | 0.04 |
| 3/29/94 4:00 | 0.02 |
| 3/29/94 5:00 | 0.01 |
| 3/29/94 9:00 | 0.01 |
| 3/29/94 17:00 | 0.01 |

| Akron 1994 Design Storm | |
|---|---|
| (contains four adjusted measurements from the 1994 Actual, highlighted cells) | |
| Date & Time | Rainfall (Inches) |
| 3/29/94 18:00 | 0.01 |
| 3/29/94 22:00 | 0.01 |
| 3/29/94 23:00 | 0.01 |
| 4/3/94 6:00 | 0.04 |
| 4/3/94 7:00 | 0.23 |
| 4/3/94 8:00 | 0.07 |
| 4/3/94 9:00 | 0.06 |
| 4/3/94 10:00 | 0.02 |
| 4/3/94 11:00 | 0.01 |
| 4/3/94 16:00 | 0.01 |
| 4/3/94 17:00 | 0.04 |
| 4/3/94 18:00 | 0.01 |
| 4/4/94 9:00 | 0.01 |
| 4/4/94 10:00 | 0.12 |
| 4/4/94 11:00 | 0.02 |
| 4/5/94 16:00 | 0.03 |
| 4/5/94 17:00 | 0.05 |
| 4/5/94 20:00 | 0.01 |
| 4/6/94 0:00 | 0.01 |
| 4/6/94 4:00 | 0.01 |
| 4/6/94 5:00 | 0.07 |
| 4/6/94 6:00 | 0.06 |
| 4/6/94 7:00 | 0.07 |
| 4/6/94 8:00 | 0.06 |
| 4/6/94 9:00 | 0.02 |
| 4/6/94 10:00 | 0.01 |
| 4/6/94 13:00 | 0.01 |
| 4/6/94 14:00 | 0.03 |
| 4/6/94 15:00 | 0.10 |
| 4/6/94 16:00 | 0.03 |
| 4/6/94 17:00 | 0.18 |
| 4/6/94 18:00 | 0.10 |
| 4/6/94 19:00 | 0.09 |
| 4/6/94 21:00 | 0.03 |
| 4/7/94 9:00 | 0.03 |
| 4/7/94 10:00 | 0.09 |
| 4/9/94 20:00 | 0.01 |
| 4/9/94 21:00 | 0.01 |
| 4/9/94 22:00 | 0.08 |
| 4/9/94 23:00 | 0.10 |
| 4/10/94 0:00 | 0.03 |
| 4/10/94 1:00 | 0.14 |
| 4/10/94 2:00 | 0.24 |
| 4/10/94 3:00 | 0.19 |
| 4/10/94 4:00 | 0.06 |
| 4/10/94 5:00 | 0.08 |
| 4/10/94 6:00 | 0.03 |
| 4/10/94 7:00 | 0.02 |
| 4/10/94 8:00 | 0.01 |

| Akron 1994 Design Storm | |
|---|---|
| (contains four adjusted measurements from the 1994 Actual, highlighted cells) | |
| Date & Time | Rainfall (inches) |
| 4/10/94 9:00 | 0.03 |
| 4/10/94 10:00 | 0.02 |
| 4/10/94 11:00 | 0.02 |
| 4/11/94 18:00 | 0.02 |
| 4/11/94 19:00 | 0.04 |
| 4/11/94 20:00 | 0.02 |
| 4/12/94 1:00 | 0.03 |
| 4/12/94 2:00 | 0.23 |
| 4/12/94 3:00 | 0.35 |
| 4/12/94 4:00 | 0.51 |
| 4/12/94 5:00 | 0.10 |
| 4/12/94 6:00 | 0.12 |
| 4/12/94 7:00 | 0.17 |
| 4/12/94 8:00 | 0.08 |
| 4/12/94 14:00 | 0.01 |
| 4/13/94 2:00 | 0.05 |
| 4/13/94 3:00 | 0.54 |
| 4/13/94 4:00 | 0.01 |
| 4/13/94 7:00 | 0.06 |
| 4/13/94 12:00 | 0.10 |
| 4/13/94 13:00 | 0.02 |
| 4/15/94 14:00 | 0.14 |
| 4/15/94 15:00 | 0.05 |
| 4/15/94 16:00 | 0.13 |
| 4/16/94 2:00 | 0.01 |
| 4/18/94 15:00 | 0.02 |
| 4/26/94 17:00 | 0.02 |
| 4/27/94 7:00 | 0.03 |
| 4/27/94 10:00 | 0.01 |
| 4/29/94 3:00 | 0.08 |
| 4/29/94 4:00 | 0.01 |
| 4/29/94 7:00 | 0.23 |
| 4/30/94 14:00 | 0.05 |
| 4/30/94 15:00 | 0.01 |
| 4/30/94 18:00 | 0.01 |
| 4/30/94 19:00 | 0.01 |
| 4/30/94 20:00 | 0.01 |
| 4/30/94 21:00 | 0.06 |
| 4/30/94 23:00 | 0.07 |
| 5/1/94 0:00 | 0.01 |
| 5/4/94 7:00 | 0.01 |
| 5/6/94 2:00 | 0.01 |
| 5/6/94 3:00 | 0.02 |
| 5/6/94 4:00 | 0.02 |
| 5/7/94 14:00 | 0.02 |
| 5/7/94 15:00 | 0.03 |
| 5/7/94 17:00 | 0.04 |
| 5/7/94 18:00 | 0.05 |
| 5/7/94 23:00 | 0.08 |

| Akron 1994 Design Storm (contains four adjusted measurements from the 1994 Actual, highlighted cells) ||
|---|---|
| Date & Time | Rainfall (Inches) |
| 5/8/94 0:00 | 0.01 |
| 5/8/94 4:00 | 0.01 |
| 5/8/94 5:00 | 0.01 |
| 5/8/94 6:00 | 0.01 |
| 5/11/94 20:00 | 0.02 |
| 5/11/94 23:00 | 0.03 |
| 5/12/94 0:00 | 0.03 |
| 5/12/94 2:00 | 0.01 |
| 5/15/94 5:00 | 0.02 |
| 5/15/94 6:00 | 0.02 |
| 5/15/94 7:00 | 0.03 |
| 5/15/94 8:00 | 0.02 |
| 5/15/94 9:00 | 0.08 |
| 5/15/94 12:00 | 0.01 |
| 5/15/94 13:00 | 0.04 |
| 5/15/94 14:00 | 0.01 |
| 5/15/94 19:00 | 0.26 |
| 5/16/94 18:00 | 0.05 |
| 5/16/94 19:00 | 0.01 |
| 5/24/94 16:00 | 0.04 |
| 5/24/94 17:00 | 0.02 |
| 5/24/94 20:00 | 0.08 |
| 5/25/94 0:00 | 0.11 |
| 5/25/94 1:00 | 0.03 |
| 5/25/94 16:00 | 0.32 |
| 5/25/94 17:00 | 0.01 |
| 5/25/94 18:00 | 0.01 |
| 5/26/94 6:00 | 0.13 |
| 5/26/94 22:00 | 0.01 |
| 5/31/94 21:00 | 0.09 |
| 5/31/94 22:00 | 0.06 |
| 5/31/94 23:00 | 0.11 |
| 6/6/94 6:00 | 0.02 |
| 6/6/94 7:00 | 0.13 |
| 8/15/94 15:00 | 0.01 |
| 6/16/94 16:00 | 0.12 |
| 6/20/94 19:00 | 0.01 |
| 6/20/94 20:00 | 0.17 |
| 6/20/94 21:00 | 0.03 |
| 6/23/94 21:00 | 0.01 |
| 6/23/94 23:00 | 0.04 |
| 6/24/94 0:00 | 0.05 |
| 6/24/94 1:00 | 0.08 |
| 6/24/94 4:00 | 0.05 |
| 6/24/94 5:00 | 0.06 |
| 6/24/94 13:00 | 0.14 |
| 6/24/94 14:00 | 0.07 |
| 6/24/94 17:00 | 0.02 |
| 6/24/94 18:00 | 0.01 |

| Akron 1994 Design Storm (contains four adjusted measurements from the 1994 Actual, highlighted cells) | |
|---|---|
| Date & Time | Rainfall (inches) |
| 6/24/94 19:00 | 0.01 |
| 6/24/94 20:00 | 0.10 |
| 6/24/94 21:00 | 0.21 |
| 6/24/94 22:00 | 0.01 |
| 6/25/94 14:00 | 0.01 |
| 6/26/94 14:00 | 0.01 |
| 6/26/94 15:00 | 0.01 |
| 6/26/94 17:00 | 0.04 |
| 6/26/94 18:00 | 0.01 |
| 6/26/94 19:00 | 0.06 |
| 6/26/94 20:00 | 0.04 |
| 6/26/94 21:00 | 0.02 |
| 6/26/94 22:00 | 0.01 |
| 6/27/94 2:00 | 0.01 |
| 6/27/94 14:00 | 0.02 |
| 6/29/94 2:00 | 0.11 |
| 6/29/94 3:00 | 0.34 |
| 6/29/94 4:00 | 0.04 |
| 6/29/94 15:00 | 0.04 |
| 6/29/94 18:00 | 0.11 |
| 6/29/94 19:00 | 0.25 |
| 6/29/94 20:00 | 0.02 |
| 6/30/94 13:00 | 0.02 |
| 7/2/94 14:00 | 0.91 |
| 7/2/94 15:00 | 0.01 |
| 7/2/94 17:00 | 0.06 |
| 7/3/94 12:00 | 0.01 |
| 7/3/94 14:00 | 0.01 |
| 7/3/94 18:00 | 0.01 |
| 7/5/94 14:00 | 0.12 |
| 7/6/94 21:00 | 0.01 |
| 7/7/94 3:00 | 0.03 |
| 7/7/94 4:00 | 0.01 |
| 7/7/94 16:00 | 0.12 |
| 7/7/94 17:00 | 0.97 |
| 7/7/94 18:00 | 0.23 |
| 7/7/94 19:00 | 0.00 |
| 7/8/94 2:00 | 0.01 |
| 7/8/94 3:00 | 0.01 |
| 7/9/94 3:00 | 0.01 |
| 7/9/94 4:00 | 0.01 |
| 7/14/94 5:00 | 0.01 |
| 7/14/94 7:00 | 0.05 |
| 7/14/94 8:00 | 0.03 |
| 7/21/94 1:00 | 0.02 |
| 7/21/94 17:00 | 0.51 |
| 7/21/94 18:00 | 0.13 |
| 7/21/94 19:00 | 0.06 |
| 7/22/94 20:00 | 0.15 |

| Akron 1994 Design Storm | |
|---|---|
| (contains four adjusted measurements from the 1994 Actual, highlighted cells) | |
| Date & Time | Rainfall (Inches) |
| 7/22/94 21:00 | 0.09 |
| 7/24/94 16:00 | 0.17 |
| 7/24/94 17:00 | 0.02 |
| 7/24/94 18:00 | 0.02 |
| 7/24/94 20:00 | 0.01 |
| 7/25/94 18:00 | 0.01 |
| 7/25/94 22:00 | 0.04 |
| 7/27/94 15:00 | 0.05 |
| 7/27/94 16:00 | 0.02 |
| 7/27/94 21:00 | 0.01 |
| 7/27/94 22:00 | 0.01 |
| 7/28/94 14:00 | 0.51 |
| 7/28/94 15:00 | 0.02 |
| 7/28/94 16:00 | 0.04 |
| 7/28/94 19:00 | 0.04 |
| 7/28/94 20:00 | 0.01 |
| 7/28/94 23:00 | 0.01 |
| 7/29/94 7:00 | 0.01 |
| 7/29/94 22:00 | 0.23 |
| 7/29/94 23:00 | 0.11 |
| 7/30/94 4:00 | 0.03 |
| 7/30/94 5:00 | 0.02 |
| 7/30/94 8:00 | 0.01 |
| 8/2/94 1:00 | 0.09 |
| 8/4/94 15:00 | 0.09 |
| 8/4/94 16:00 | 0.20 |
| 8/4/94 17:00 | 0.03 |
| 8/4/94 19:00 | 0.01 |
| 8/4/94 21:00 | 0.01 |
| 8/4/94 22:00 | 0.01 |
| 8/5/94 2:00 | 0.18 |
| 8/5/94 3:00 | 0.01 |
| 8/5/94 4:00 | 0.06 |
| 8/5/94 5:00 | 0.01 |
| 8/11/94 10:00 | 0.01 |
| 8/11/94 11:00 | 0.08 |
| 8/11/94 12:00 | 0.04 |
| 8/11/94 13:00 | 0.37 |
| 8/13/94 7:00 | 0.15 |
| 8/13/94 10:00 | 0.01 |
| 8/13/94 11:00 | 0.83 |
| 8/13/94 12:00 | 0.17 |
| 8/13/94 13:00 | 0.12 |
| 8/13/94 14:00 | 0.08 |
| 8/13/94 15:00 | 0.02 |
| 8/13/94 20:00 | 0.04 |
| 8/13/94 21:00 | 0.33 |
| 8/13/94 22:00 | 0.19 |
| 8/14/94 1:00 | 0.01 |

| Akron 1994 Design Storm | |
| (contains four adjusted measurements from the 1994 Actual, highlighted cells) | |
| Date & Time | Rainfall (Inches) |
|---|---|
| 8/14/94 3:00 | 0.07 |
| 8/14/94 4:00 | 0.00 |
| 8/14/94 5:00 | 0.00 |
| 8/14/94 6:00 | 0.00 |
| 8/14/94 7:00 | 0.02 |
| 8/20/94 21:00 | 0.73 |
| 8/20/94 22:00 | 0.18 |
| 8/20/94 23:00 | 0.05 |
| 8/21/94 0:00 | 0.06 |
| 8/21/94 1:00 | 0.06 |
| 8/21/94 2:00 | 0.01 |
| 8/21/94 7:00 | 0.01 |
| 8/21/94 8:00 | 0.01 |
| 8/21/94 13:00 | 0.01 |
| 8/21/94 15:00 | 0.01 |
| 8/28/94 18:00 | 0.01 |
| 8/28/94 23:00 | 0.02 |
| 8/31/94 2:00 | 0.05 |
| 8/31/94 8:00 | 0.02 |
| 9/9/94 2:00 | 0.12 |
| 9/9/94 3:00 | 0.44 |
| 9/9/94 4:00 | 0.01 |
| 9/9/94 7:00 | 0.02 |
| 9/9/94 8:00 | 0.06 |
| 9/14/94 21:00 | 0.03 |
| 9/14/94 23:00 | 0.14 |
| 9/15/94 3:00 | 0.01 |
| 9/17/94 7:00 | 0.05 |
| 9/17/94 8:00 | 0.03 |
| 9/17/94 10:00 | 0.05 |
| 9/17/94 11:00 | 0.16 |
| 9/17/94 12:00 | 0.13 |
| 9/17/94 13:00 | 0.02 |
| 9/17/94 14:00 | 0.04 |
| 9/25/94 18:00 | 0.02 |
| 9/25/94 19:00 | 0.01 |
| 9/25/94 20:00 | 0.17 |
| 9/25/94 21:00 | 0.01 |
| 9/25/94 22:00 | 0.01 |
| 9/26/94 0:00 | 0.05 |
| 9/26/94 1:00 | 0.16 |
| 9/26/94 2:00 | 0.01 |
| 9/27/94 5:00 | 0.01 |
| 9/27/94 6:00 | 0.04 |
| 9/27/94 7:00 | 0.03 |
| 9/27/94 8:00 | 0.03 |
| 9/27/94 9:00 | 0.06 |
| 9/27/94 10:00 | 0.01 |
| 9/27/94 15:00 | 0.05 |

| Akron 1994 Design Storm (contains four adjusted measurements from the 1994 Actual, highlighted cells) | |
| --- | --- |
| Date & Time | Rainfall (Inches) |
| 9/27/94 16:00 | 0.01 |
| 9/28/94 10:00 | 0.01 |
| 9/28/94 22:00 | 0.02 |
| 9/28/94 23:00 | 0.01 |
| 9/29/94 0:00 | 0.01 |
| 9/29/94 1:00 | 0.01 |
| 9/29/94 2:00 | 0.01 |
| 9/29/94 3:00 | 0.02 |
| 9/29/94 5:00 | 0.01 |
| 9/29/94 7:00 | 0.01 |
| 10/1/94 2:00 | 0.02 |
| 10/1/94 5:00 | 0.03 |
| 10/1/94 16:00 | 0.04 |
| 10/1/94 17:00 | 0.02 |
| 10/9/94 7:00 | 0.05 |
| 10/9/94 8:00 | 0.06 |
| 10/9/94 9:00 | 0.04 |
| 10/19/94 5:00 | 0.01 |
| 10/19/94 6:00 | 0.09 |
| 10/19/94 7:00 | 0.17 |
| 10/19/94 8:00 | 0.03 |
| 10/19/94 9:00 | 0.01 |
| 10/19/94 13:00 | 0.02 |
| 10/20/94 2:00 | 0.25 |
| 10/24/94 18:00 | 0.01 |
| 10/24/94 19:00 | 0.04 |
| 10/24/94 20:00 | 0.05 |
| 10/24/94 21:00 | 0.01 |
| 10/26/94 15:00 | 0.01 |
| 10/31/94 14:00 | 0.01 |
| 10/31/94 18:00 | 0.02 |
| 11/1/94 4:00 | 0.16 |
| 11/1/94 5:00 | 0.13 |
| 11/1/94 16:00 | 0.02 |
| 11/1/94 17:00 | 0.01 |
| 11/1/94 18:00 | 0.01 |
| 11/1/94 19:00 | 0.02 |
| 11/1/94 20:00 | 0.04 |
| 11/1/94 21:00 | 0.03 |
| 11/1/94 22:00 | 0.03 |
| 11/5/94 5:00 | 0.01 |
| 11/5/94 6:00 | 0.01 |
| 11/5/94 7:00 | 0.01 |
| 11/5/94 9:00 | 0.02 |
| 11/5/94 10:00 | 0.01 |
| 11/6/94 0:00 | 0.18 |
| 11/6/94 1:00 | 0.05 |
| 11/9/94 9:00 | 0.01 |
| 11/9/94 10:00 | 0.01 |

| Akron 1994 Design Storm (contains four adjusted measurements from the 1994 Actual, highlighted cells) ||
|---|---|
| Date & Time | Rainfall (Inches) |
| 11/9/94 11:00 | 0.08 |
| 11/9/94 12:00 | 0.14 |
| 11/9/94 13:00 | 0.06 |
| 11/9/94 14:00 | 0.05 |
| 11/9/94 15:00 | 0.09 |
| 11/9/94 16:00 | 0.08 |
| 11/9/94 17:00 | 0.07 |
| 11/9/94 18:00 | 0.07 |
| 11/9/94 19:00 | 0.04 |
| 11/9/94 20:00 | 0.05 |
| 11/9/94 21:00 | 0.07 |
| 11/9/94 22:00 | 0.05 |
| 11/9/94 23:00 | 0.03 |
| 11/10/94 0:00 | 0.02 |
| 11/10/94 1:00 | 0.04 |
| 11/21/94 5:00 | 0.06 |
| 11/21/94 6:00 | 0.02 |
| 11/21/94 11:00 | 0.05 |
| 11/27/94 16:00 | 0.05 |
| 11/27/94 17:00 | 0.08 |
| 11/27/94 18:00 | 0.05 |
| 11/27/94 19:00 | 0.14 |
| 11/27/94 20:00 | 0.02 |
| 11/27/94 21:00 | 0.09 |
| 11/27/94 22:00 | 0.01 |
| 11/28/94 0:00 | 0.01 |
| 11/28/94 2:00 | 0.02 |
| 11/28/94 3:00 | 0.01 |
| 11/28/94 6:00 | 0.02 |
| 12/4/94 21:00 | 0.01 |
| 12/4/94 22:00 | 0.03 |
| 12/4/94 23:00 | 0.06 |
| 12/5/94 0:00 | 0.05 |
| 12/5/94 1:00 | 0.12 |
| 12/5/94 2:00 | 0.08 |
| 12/5/94 3:00 | 0.09 |
| 12/5/94 4:00 | 0.05 |
| 12/5/94 5:00 | 0.07 |
| 12/5/94 6:00 | 0.04 |
| 12/5/94 8:00 | 0.01 |
| 12/6/94 11:00 | 0.01 |
| 12/6/94 12:00 | 0.02 |
| 12/6/94 18:00 | 0.01 |
| 12/6/94 19:00 | 0.04 |
| 12/6/94 20:00 | 0.02 |
| 12/6/94 21:00 | 0.01 |
| 12/7/94 0:00 | 0.01 |
| 12/7/94 1:00 | 0.02 |
| 12/7/94 2:00 | 0.01 |

| Akron 1994 Design Storm (contains four adjusted measurements from the 1994 Actual, highlighted cells) ||
| Date & Time | Rainfall (Inches) |
|---|---|
| 12/7/94 4:00 | 0.01 |
| 12/7/94 5:00 | 0.20 |
| 12/7/94 6:00 | 0.08 |
| 12/7/94 9:00 | 0.01 |
| 12/7/94 10:00 | 0.01 |
| 12/7/94 11:00 | 0.02 |
| 12/7/94 12:00 | 0.03 |
| 12/7/94 13:00 | 0.04 |
| 12/7/94 14:00 | 0.05 |
| 12/7/94 15:00 | 0.01 |
| 12/8/94 11:00 | 0.01 |
| 12/9/94 9:00 | 0.02 |
| 12/9/94 10:00 | 0.06 |
| 12/9/94 11:00 | 0.12 |
| 12/9/94 12:00 | 0.08 |
| 12/9/94 13:00 | 0.07 |
| 12/9/94 14:00 | 0.05 |
| 12/9/94 15:00 | 0.02 |
| 12/9/94 16:00 | 0.01 |
| 12/10/94 12:00 | 0.03 |
| 12/10/94 13:00 | 0.04 |
| 12/10/94 14:00 | 0.05 |
| 12/10/94 15:00 | 0.05 |
| 12/10/94 16:00 | 0.05 |
| 12/10/94 17:00 | 0.05 |
| 12/10/94 18:00 | 0.03 |
| 12/10/94 19:00 | 0.06 |
| 12/10/94 20:00 | 0.08 |
| 12/10/94 22:00 | 0.01 |
| 12/13/94 13:00 | 0.04 |
| 12/13/94 14:00 | 0.05 |
| 12/13/94 15:00 | 0.01 |
| 12/14/94 12:00 | 0.01 |
| 12/16/94 9:00 | 0.01 |
| 12/16/94 17:00 | 0.03 |
| 12/16/94 18:00 | 0.09 |
| 12/16/94 19:00 | 0.13 |
| 12/16/94 20:00 | 0.09 |
| 12/16/94 21:00 | 0.08 |
| 12/16/94 22:00 | 0.05 |
| 12/16/94 23:00 | 0.02 |
| 12/17/94 2:00 | 0.01 |
| 12/17/94 3:00 | 0.02 |
| 12/17/94 5:00 | 0.01 |
| 12/18/94 9:00 | 0.01 |
| 12/18/94 10:00 | 0.02 |
| 12/18/94 11:00 | 0.02 |
| 12/18/94 12:00 | 0.01 |
| 12/18/94 14:00 | 0.01 |

| Akron 1994 Design Storm | |
|---|---|
| (contains four adjusted measurements from the 1994 Actual, highlighted cells) | |
| Date & Time | Rainfall (Inches) |
| 12/18/94 15:00 | 0.02 |
| 12/18/94 16:00 | 0.01 |
| 12/18/94 17:00 | 0.01 |
| 12/18/94 18:00 | 0.01 |
| 12/18/94 19:00 | 0.01 |
| 12/18/94 21:00 | 0.01 |
| 12/31/94 1:00 | 0.02 |
| 12/31/94 9:00 | 0.02 |
| 12/31/94 16:00 | 0.01 |
| 12/31/94 17:00 | 0.01 |

**APPENDIX 2 TO ATTACHMENT A**

**Table 1 - Cost Benefit Presentation Table for Storage Basins**
**(Total of Ten Tables; One Table Each for Racks 3, 7/5, 10/11, 12, 14, 15, 22, 26/28, 29/27, 36)**

| Alternative description, Rack X (e.g., Rack 3) | Benefits | | Size of Storage Basin (gallons) | Cost (dollars) |
|---|---|---|---|---|
| | Number of overflows in a typical year | Volume of overflows (gallons) | | |
| Storage Basin – Opt 0 | 0 | 0 | Y0 | $Z0 |
| Storage Basin – Opt 1 | 1 | X1 | Y1 | $Z1 |
| Storage Basin – Opt 2 | 2 | X2 | Y2 | $Z2 |
| Storage Basin – Opt 3 | 3 | X3 | Y3 | $Z3 |
| Storage Basin – Opt 4 | 4 | X4 | Y4 | $Z4 |

**Table 2 - Cost Benefit Presentation Table for Ohio Canal Tunnel**
**(One table to be prepared for the Tunnel, which addresses Racks 4, 16-20, 23, 24, and 37)**

| Alternative description | Tunnel Benefits | | Size of Tunnel | | Tunnel Cost (dollars) | | Size of EHRT to Treat Tunnel Overflow (gallons per minute) | Cost of EHRT to Treat Tunnel Overflow (dollars) | |
|---|---|---|---|---|---|---|---|---|---|
| | Number of Tunnel Overflows in a typical year | Volume of Tunnel Overflows (gallons) | Gallons | Dimensions (diameter and length) | Capital | Annual O&M | | Capital | Annual O&M |
| Tunnel/EHRT – Opt 0 | 0 | 0 | B0 | B0xB0 | $C0 | $D0 | 0 | $0 | $0 |
| Tunnel/EHRT – Opt 1 | 1 | A1 | B1 | B1xB1 | $C1 | $D1 | E1 | $F1 | $G1 |
| Tunnel/EHRT – Opt 2 | 2 | A2 | B2 | B2xB2 | $C2 | $D2 | E2 | $F2 | $G2 |
| Tunnel/EHRT – Opt 3 | 3 | A3 | B3 | B3xB3 | $C3 | $D3 | E3 | $F3 | $G3 |
| Tunnel/EHRT – Opt 4 | 4 | A4 | B4 | B4xB4 | $C4 | $D4 | E4 | $F4 | $G4 |
| Tunnel/EHRT – Opt 5 | 5 | A5 | B5 | B5xB5 | $C5 | $D5 | E5 | $F5 | $G5 |
| Tunnel/EHRT – Opt 6 | 6 | A6 | B6 | B6xB6 | $C6 | $D6 | E6 | $F6 | $G6 |
| Tunnel/EHRT – Opt 7 | 7 | A7 | B7 | B7xB7 | $C7 | $D7 | E7 | $F7 | $G7 |

**Table 3 - Cost Benefit Presentation Table for North Side Tunnel**
**(One table to be prepared for the Tunnel, which addresses Racks 32-35 and overflows remaining after the 2006 installation of the Rack 40 storage basin)**

| Alternative description | Tunnel Benefits | | Size of Tunnel | | Tunnel Cost (dollars) | | Size of EHRT to Treat Tunnel Overflow (gallons per minute) | Cost of EHRT to Treat Tunnel Overflow (dollars) | |
|---|---|---|---|---|---|---|---|---|---|
| | Number of Tunnel Overflows in a typical year | Volume of Tunnel Overflows (gallons) | Gallons | Dimensions (diameter and length) | Capital | Annual O&M | | Capital | Annual O&M |
| Tunnel/EHRT – Opt 0 | 0 | 0 | B0 | B0xB0 | $C0 | $D0 | 0 | $0 | $0 |
| Tunnel/EHRT – Opt 1 | 1 | A1 | B1 | B1xB1 | $C1 | $D1 | E1 | $F1 | $G1 |
| Tunnel/EHRT – Opt 2 | 2 | A2 | B2 | B2xB2 | $C2 | $D2 | E2 | $F2 | $G2 |
| Tunnel/EHRT – Opt 3 | 3 | A3 | B3 | B3xB3 | $C3 | $D3 | E3 | $F3 | $G3 |
| Tunnel/EHRT – Opt 4 | 4 | A4 | B4 | B4xB4 | $C4 | $D4 | E4 | $F4 | $G4 |
| Tunnel/EHRT – Opt 5 | 5 | A5 | B5 | B5xB5 | $C5 | $D5 | E5 | $F5 | $G5 |
| Tunnel/EHRT – Opt 6 | 6 | A6 | B6 | B6xB6 | $C6 | $D6 | E6 | $F6 | $G6 |
| Tunnel/EHRT – Opt 7 | 7 | A7 | B7 | B7xB7 | $C7 | $D7 | E7 | $F7 | $G7 |

3

Appendix 3

Long Term Control Plan Update

| City of Akron<br>Control Measures, Design Criteria, Performance Criteria and Critical Milestones | | | | | |
|---|---|---|---|---|---|
| CSO Control Measures* | | | | | |
| | Control Measure | Description | Design Criteria | Performance Criteria | Critical Milestones |
| 1 | | | | | Bidding of Control Measure -<br>Achievement of Full Operation– |
| 2 | | | | | Bidding of Control Measure -<br>Achievement of Full Operation– |
| 3 | | | | | Bidding of Control Measure -<br>Achievement of Full Operation– |
| WPCS Control Measures | | | | | |
| | Control Measure | Description | Design Criteria | Performance Criteria | | Critical Milestones |
| | | | | Capacity (MGD) | Number of Bypasses | |
| 1 (etc.) | | | | | | Bidding of Control Measure -<br>Achievement of Full Operation– |

* Performance Criteria for CSO Control Measures that are storage technologies will be the number of overflows remaining as the performance criteria. Performance Criteria for CSO Control Measures that are treatment technologies will include performance criteria in terms of capacity (e.g., MGD) *and* number of untreated overflows.

**Appendix 4**
**City of Akron Public Participation Program**
**CSO Long Term Control Program (LTCP)**

Section II.C.2. of the CSO Policy entitled, Public Participation,  states that in developing its long-term CSO control plan, the permittee will employ a public participation process that actively involves the affected public in the decision-making to select the long term CSO control. The affected public includes rate payers, industrial users of the sewer system, persons who reside downstream from the CSOs, persons who use and enjoy these downstream waters and any other interested persons.

The selected CSO LTPC alternative from the Facilities Plan 98 development included a public participation program consisting of a technical advisory group, public meeting and a public information distribution. The program is detailed in Long Term Control Plan 98 Update of May 2002. The Technical Advisory Group (TAG) included a cross-section of people in the planning area including local industry, municipalities, environmental groups, regulatory agencies, parks, associations and councils. Nine meetings were held over a two year period. A public meeting was held on March 26, 1998 and program information was posted on the City's website.

A summary of the program is attached.


**CSO Community Action Group (CSO CAG)**

A continuation of the previous program will allow for continued public input and comment throughout the development of the control levels, to the implementation of the projects and to the final post construction monitoring program that determines the final compliance with the performance criteria.

Public participation will be achieved with the Community Action Group (CSO CAG). The CSO CAG membership will be open to the following groups and individuals in the service area:

Akron City Council
Local Industry
Tributary Communities
Local Environmental Groups (Friends of the Crooked River)
Regulatory Agencies (Ohio EPA)
Parks (National Park Service and MetroParks Serving Summit County)
Councils (Cuyahoga Valley Community Council)
Area-Wide Planning Agencies (NEFCO)

The meetings will all be public meetings (open to the general public).

The objective of the CSO CAG will be to inform and receive input from the community on the interim and final submittals throughout the LTCP Update and its implementation. The following outlines the intent of the formation of the CSO CAG and the proposed schedule of activities:

1. Reformulate the Committee

    a. Invite Members
    b. Organization (Kick-off) Meeting

        i.  Develop Committee Objectives and Rules
        ii. Calendar of Activities and Meetings (Meeting Locations, Times (during day or evening) and Topics)

2. Milestone Meetings (prior to the 3, 5, 7, 10 month submittals)

3. Working Sessions (as needed)

4. Committee Comments and Responsiveness Summary (prior to the public meeting and final submittal at month 12)

5. Public Meeting (prior to the final submittal at month 12)

6. Public Meeting Comments and Responsiveness Summary (included with month 12 submittal)

**Attachment B**
**Post-Construction Monitoring Program**

Akron shall develop a Post-Construction Monitoring Program that will be used for several purposes:

- Support ongoing reporting of CSO activity as part of the Semi-Annual Reports under Section XV of the City's Consent Decree;
- Collect CSO outfall data to support a model-based determination of whether the City has achieved the performance criteria for CSO control measures set forth in the Long Term Control Plan Update; and
- Demonstrate compliance with the City's Current NPDES Permit requirements (including any water quality based requirements) applicable to the CSOs, subject to Section XX of the Consent Decree.

The CSO Post-Construction Monitoring Program shall include the following elements:

· A model-based mechanism, including the supporting outfall and rainfall monitoring data, to determine whether CSO control measures are meeting the Performance Criteria identified in the Long Term Control Plan Update;

· The necessary monitoring schedule, sampling locations, and monitoring procedures to collect data related to the environmental impacts from CSOs on receiving streams, and compliance with the City's Current NPDES permit requirements (including any water quality based requirements) applicable to the CSOs, subject to Section XX of the Consent Decree; and

· Evaluation and analysis of the monitoring data to assess the benefit of CSO control measures and for reporting progress to regulatory agencies and the public.

The results of the monitoring program will be reported to the USEPA and OEPA on an ongoing basis as part of Semi-Annual reporting, and as part of specific interim and final performance assessments set forth in the Post-Construction Monitoring Program.

It is anticipated that Akron's collection system projects will consist of four major components: the Ohio Canal tunnel, the North Side tunnel, ten storage basins at CSO outfalls/racks, and separation projects. The two tunnels are expected to be the largest projects, while the basins and separation projects will be performed concurrently with tunnel design and construction. To facilitate interim performance monitoring, Akron shall conduct the post-construction monitoring program in two phases. The first phase shall occur after Achievement of Full Operation of the first tunnel, and shall encompass that tunnel as well as any storage basins and separation projects completed prior to completion of the first tunnel. The second phase shall occur after Achievement of Full Operation of the CSO control measures. In its post-construction monitoring program, Akron shall develop a schedule clearly identifying when each phase will occur, and which CSO outfalls/racks will be addressed in each phase. Each post-construction monitoring phase shall encompass the full range of activities described in this attachment.

Akron shall also identify in its Semi-Annual Reports all CSO discharges from each outfall/rack, and shall provide information on the depth and duration of the rainfall event that caused the discharge.

## CSO Outfall Monitoring

Data collected through CSO outfall monitoring will be used to support ongoing reporting of CSO activity as part of the Semi-Annual Reports and support the model-based determination of whether the City has achieved the performance criteria set forth in the Long Term Control Plan Update after implementation of the planned CSO control measures. Akron shall develop a CSO Outfall Monitoring Program that identifies the specific CSO outfalls for which the City will obtain activation, duration, and overflow volume. The CSO Outfall Monitoring Program shall also identify CSO outfalls for which the City will obtain activation data only. The City shall obtain activation data for all of its outfalls, and shall obtain duration and overflow volume data at a sufficient number of CSO outfalls to evaluate the accuracy of its hydraulic model, and re-calibrate the model if necessary, as part of the model-based approach to assessing compliance described below.

## Rainfall Monitoring

Data collected through rainfall monitoring will be used to support ongoing reporting of CSO activity as part of the Semi-Annual Reports and support the model-based determination of whether the City has achieved the performance criteria set forth in the Long Term Control Plan Update after implementation of the planned CSO control measures. Specifically, the rainfall monitoring data will be used to document the rainfall events causing CSO activations as part of Semi-Annual Reporting, and to evaluate the accuracy of Akron's hydraulic model, and to re-calibrate the model if necessary, as part of the model-based approach to assessing compliance described below. Akron shall develop a Rainfall Monitoring Program to identify the specific rain gauge monitoring system that will be used for Post-Construction Monitoring. Rainfall monitoring will be continuous, and record each storm event during the post-construction monitoring period.

## Water Quality Monitoring

Water quality monitoring data will be used to assess the impacts of Akron's CSOs on water quality. Akron shall develop a Water Quality Monitoring Program that identifies the CSO and receiving stream water quality sampling and analysis that will be performed for this assessment. Akron may build on its current receiving stream water quality program as required by Akron's NPDES permit as a starting point for this program. The Water Quality Monitoring Program shall identify the specific sampling points, pollutants to be analyzed, and analysis activities required for this assessment.

## Model-Based Approach to Assessing Compliance

The City has developed a dynamic model that fully integrates the hydrology and hydraulics of the combined sewer system (collection system model). By no later than 24 months after

Achievement of Full Operation of the LTCP control measures, the City will complete steps 1 through 8 below using sound engineering judgment and best industry practices, to update and utilize the collection system model to determine whether the city has achieved compliance with the Performance Criteria set forth in Long Term Control Plan Update.  This model-based assessment of compliance will be performed at the beginning of each phase of post-construction monitoring (i.e., the first and second phases described above), and will be used to determine whether the City has achieved the Performance Criteria set forth in the Long Term Control Plan Update.

1.      Collect CSO outfall data for 12 months after completion of the construction of the CSO control measures identified in the Long Term Control Plan Update.

2.      Perform quality assurance and quality control of the data collected in Step 1.

3.      Utilize the Model (incorporating the improved sewer collection system with in-place CSO control measures) in its previously-calibrated state and the rainfall data collected during the 12-month post-construction monitoring period, to run a continuous simulation of CSO discharges for the 12-month post-construction monitoring period.

4.      Compare the continuous simulation outputs to the CSO monitoring data for the 12-month post-construction monitoring period to determine whether re-calibration of the collection system model is needed. Model re-calibration will be not be needed if the model achieves at least the same degree of calibration as was achieved for pre-CSO Long-Term Control conditions during the LTCP development process, and there is a high degree of agreement between the model output and CSO monitoring data for activation frequency for the 12-month post-construction monitoring period. Otherwise, model re-calibration will be needed in accordance with Steps 5 through 7.

5.      If re-calibration is needed, select two or more appropriate rainfall events from the 12-month post-construction monitoring period for model recalibration.  The City will apply the standard of practice used in the collection system modeling industry in selecting the best candidate events for model calibration.

6.      Develop an initial data set for use with the model and perform successive applications of the model with appropriate parameter adjustment until there is a high degree of agreement between the model output and the CSO monitoring data for the selected recalibration events. In making such adjustments, the City will consider the inherent variability in both the collection system model and in flow monitoring data, and will exercise sound engineering judgment and best industry practices so as to not compromise the overall representativeness of the model.

7.      Once the model has been re-calibrated in accordance with Step 6, the City will verify the re-calibrated model by again utilizing the model and the rainfall data collected during the 12-month post-construction monitoring period, to run another continuous simulation for the 12-month post-construction monitoring period. The City will again compare the continuous simulation outputs to the CSO monitoring data for the 12-month post-construction monitoring period as described in Step 4, to determine whether additional re-calibration of the collection

system model is needed. Re-calibration will be determined to be adequate if the model achieves at least the same degree of calibration as was achieved for pre-CSO Long-Term Control conditions during the LTCP development process, and there is a high degree of agreement between the model output and CSO monitoring data for activation frequency for the 12-month post-construction monitoring period. Otherwise, further re-calibration will be needed in accordance with these Steps 5 through 7 until the model achieves at least the same degree of calibration as was achieved for pre-CSO Long-Term Control conditions during the LTCP development process, and there is a high degree of agreement between the model output and CSO monitoring data for activation frequency for the 12-month post-construction monitoring period.

8.  Akron shall prepare and submit to the U.S. EPA and OEPA, for review and approval, a report ("Post-Construction Monitoring Report") that summarizes the changes made to the hydraulic model as a result of the post-construction monitoring program, presents the calibration and verification data used to update the model, discusses why the updated model achieves at least the same degree of calibration as was achieved for pre-CSO Long-Term Control conditions during the LTCP development process, and compares the model output and CSO monitoring data for activation frequency for the 12-month post-construction monitoring period. In developing the Post-Construction Monitoring Report, the City shall utilize the original or re-calibrated model to run a continuous simulation for the adjusted 1994 typical year that was agreed on between Akron, U.S. EPA, and OEPA. The City shall use this simulation to determine whether the City has achieved the Performance Criteria set forth in the Long Term Control Plan Update, and shall include the results of the simulation in the Post-Construction Monitoring Report.

**Supplemental Compliance Plan**

If the modeled overflow frequency based on the typical year simulation does not achieve the Performance Criteria set forth in the Long Term Control Plan Update, Akron shall prepare and submit to U.S. EPA and OEPA, for review and approval, a Supplemental Compliance Plan in accordance with Paragraph 20 of the Consent Decree, that may include some or all of the following: (1) the volume, frequency and factors causing the additional overflow frequency, (2) any impact on water quality, including designated uses, from the additional overflow frequency, (3) control options to reduce the CSO frequency to achieve the Performance Criteria, (4) associated costs for any additional control options, (5) a schedule to implement additional control options, (6) expected benefits from such control options, and (7) a recommendation as to whether additional control measures are necessary to protect designated uses.

**Alternate Compliance Assessment Approach**

The City may propose an alternate compliance assessment approach other than the Model-Based Approach described above.  Such an alternate compliance assessment approach may be implemented by the City, in lieu of the Model-Based Approach, if approved by U.S. EPA and OEPA.  In order to provide sufficient time for agency review and approval to allow timely implementation, any proposal by the City for use of an alternate compliance assessment approach should be submitted to U.S. EPA and Ohio EPA no later than two years prior to the Achievement of Full Operation of the first tunnel.

**ATTACHMENT C**

**MEASURES TO MAXIMIZE SEWER SYSTEM PERFORMANCE AND ELIMINATE SSOs AND CSS RELEASES**

REPORTING

1.      All SSOs and Combined Sewer System (CSS) Releases, as those terms are defined under this Consent Decree, are prohibited. If an SSO or CSS Release occurs, Akron shall report the occurrence and location to OEPA orally within twenty-four (24) hours, and the following information in writing to both U.S. EPA and OEPA within five (5) business days, from the time Akron discovers the occurrence of an SSO or CSS Release:

A.      The date, location, duration, volume, and cause(s), if known, of each SSO or CSS Release;

B.      The street address (or location) at which the SSO or CSS Release occurred;

C.      Identification of the sewershed and the sewer segment in which the SSO or CSS Release occurred, if known;

D.      An indication of whether a SSO or CSS Release has previously occurred at or near the same address (or location) since the Date of Entry of the Consent Decree and, if so, a list of the earlier date(s) on which a SSO or CSS Release occurred;

E.      A list of those SSOs or CSS Releases that have resulted in a Discharge, if known, and the name of the waterbody that received any Discharge and the location of such Discharge to that waterbody; and

F.      All remedial actions undertaken or to be undertaken to mitigate the effects of the SSO or CSS Release and to prevent the recurrence of the SSO or CSS Release.

1

CAPACITY, MANAGEMENT, OPERATION, AND MAINTENANCE PROGRAM

2.     No later than 180 days from the Date of Lodging, Akron shall submit to U.S. EPA and

OEPA for review and approval, in accordance with the requirements of Section XVII, a

comprehensive Collection System Capacity, Management, Operation, and Maintenance (CMOM)

Program.  This Program shall be limited to, and only include, Akron-owned separate and

combined portions of its Sewer System.  The Collection System CMOM Program shall include, at

a minimum, the following elements:

     A.     Maintaining a complete Sewer System component and equipment inventory;

     B.     A daily CSO Rack inspection and cleaning program;

     C.     A condition assessment consisting of routine proactive inspection of the Sewer

     System including: (i) inspection of  each gravity sewer pipe in high-maintenance areas,

     and each gravity sewer pipe that experiences a blockage leading to an SSO, using CCTV

     or other appropriate inspection methods (excluding lamping) as soon as is practicable but

     no later than two (2) weeks following the SSO; (ii) CCTV inspection leading up to at least

     20% of all gravity sewer pipe each year, starting with 10% in Year 1, 15% in Year 2, and

     20% in subsequent years, with CCTV inspection of all gravity sewer pipe in the Sewer

     System, which shall include CCTV'ing performed by Akron during calendar year 2008

     through the date of U.S. EPA approval of the Collection System CMOM Program, not

     later than December 31, 2014; (iii) inspection of all manholes in the Sewer System every

     five (5) years, which shall include manhole inspections performed by Akron during

     calendar year 2008 through the date of U.S. EPA approval of the Collection System

2

CMOM Program, not later than December 31, 2014; and (iv) preparation of condition assessment reports following CCTV inspections that, at a minimum, document the following:

      (i)     Defects that materially threaten the structural integrity of the pipe or structure;

      (ii)    Defects that allow infiltration, inflow, or exfiltration;

      (iii)   Pipe defects, including but not limited to, cracks, holes, corrosion, misaligned joints, root intrusion, sags, improper lateral taps, or other  defects that make the pipe or structure prone to grease, root, or debris blockages;

      (iv)   A rank or score of the condition of each inspected pipe or structure on a sliding scale that indicates the severity of any defects found;

      (v)    Whether the pipe or structure requires either short or long-term repair;

      (vi)   Changes to cleaning frequency as a result of the assessment; and

      (vii)  An estimate of the expected remaining service life of the pipe or structure.

D.     Cleaning gravity sewer lines as necessary  Additionally, Akron shall: (i)  complete one (1) cleaning of each gravity sewer pipe in the City's Sewer System by December 31, 2014, which shall include gravity sewer line cleaning performed by Akron during calendar year, 2008; and (ii)  continue with ongoing cleaning of each gravity sewer pipe in the City's Sewer System on a minimum five (5) year frequency;

E.     Routine annual preventative maintenance of Pumping Stations and Force Mains;

F.     Sealing (where appropriate) and maintenance of manholes;

G.    Identification and remediation of poor construction;

3

H.     Procedures for ensuring that new sewers and connections are properly designed and constructed (including testing of new sewer installations) to prevent overflows and to ensure that new connections of inflow sources are prohibited;

I.      Procedures for ensuring that repair, rehabilitation and replacement projects are properly designed and constructed (including testing of rehabilitation installations) to prevent overflows, including; (i) repair of all acute defects (i.e., those defects that have caused or substantially increase the probability of an SSO or CSS Release, including conditions leading to imminent structural collapse or that would create repeated blockages) within one (1) year of discovery of the defect. Akron shall maintain a log listing all sewer line acute defects in need of expeditious repair or replacement, the date the City discovered the acute defect, an estimated schedule for performing the repair or replacement, and the date of project completion; (ii) a schedule to address defective pipes that is based on the results of the condition assessment required under Paragraph 2 (B) and a schedule under which Akron shall replace, rehabilitate, or permanently repair any other pipes necessary to reduce the risks of SSOs and CSS Releases and ensure the long-term sustainable renewal of the City's infrastructure. Permanent repair means the correction of a structural defect in a manhole to manhole pipe segment such that the repair has the same life expectancy as a rehabilitated pipe; and (iii) maintenance of a log listing each sewer pipe and structure project completed during the previous year and the date the project was completed;

J.      A grease control program that, at a minimum, includes the following:

(i)     Procedures for identifying and mitigating fats, oil, and grease (FOG)

4

trouble spots throughout the collection system. Akron shall prepare and maintain a list of FOG trouble spots in the collection system, identifying the specific pipe segments where FOG trouble spots are found. This list shall include an accelerated inspection and cleaning program for these trouble spots. Akron shall develop a methodology to categorize and prioritize the FOG trouble spots and develop inspection and cleaning schedules for these trouble spots. Akron shall use this methodology to update annually its list of FOG trouble spots, including the inspection and cleaning schedules.

(ii)     Procedures for coordinating with the Akron Health Department and the Summit County Health Department to conduct inspections and take follow-up actions for FOG trouble spots that are determined to be caused by Food Establishments. When trouble spots are identified to be caused by a Food Establishment, Akron shall follow these procedures to ensure that the Food Establishment installs proper FOG control devices to prevent excess FOG discharges to the Sewer System. For these Food Establishments, Akron shall also ensure onsite record keeping at the Establishments, including but not limited records of the dates of grease removal, the amount of grease removed, and the location where the Food Establishment disposed of the grease and the name, address, and phone number of the hauling or recycling service used to transport the grease. Akron shall maintain a list of all Food Establishments determined to be the cause of FOG trouble spots and the specific actions taken to ensure that those Food Establishments install proper FOG control devices.

5

(iii)   Educational efforts aimed at FOG sources and, if appropriate, residential

users, and recommendations for changes to public education, outreach and

compliance efforts to inform commercial, institutional and residential property

owners and tenants about the need to minimize the introduction of grease into the

Sewer System.

K.      A root control program that addresses, at a minimum, scheduling and performing

corrective measures including both short-term mitigation of root intrusion (i.e., routine

maintenance) and rehabilitation of the areas in which root intrusion has caused recurring

blockages (i.e., sewer replacement or relining), and a proposal that includes scheduled

inspection of known problem areas;

L.      Description of a method for documenting complaints, work orders, updates to

equipment inventory, and changes to Sewer System components, as well as entry of such

data into a data management system that allows ready use of the information including the

capability of scheduling and tracking both preventative and reactive maintenance

activities;

M.      Corrective maintenance response and reporting procedures;

N.      Adequate training of staff and adequate equipment to ensure that Akron promptly

identifies and addresses problems in its Sewer System that lead to SSOs and CSS

Releases.  Within two (2) Years following the Date of Lodging of this Consent Decree,

Akron shall ensure that at least one member of each CCTV crew has attained Pipe

Assessment Certification Program (PACP) certification;

6

O.      Description of a "root cause analysis" process for situations in which the City's

Sewer System failed to perform as designed or resulted in an SSO or CSS Release.  This

process shall include the documentation of all the known operational variables that lead to

the failure in performance of the Sewer System  or the SSO or CSS Release event; and

P.      An annual update of the operation and maintenance manuals.

3.      Akron shall implement the Collection System CMOM Program upon approval by EPA.

Akron shall annually review the program and update the program as necessary to ensure that the

program is consistent with accepted industry practices to properly manage, operate and maintain

sewer systems, identify and inventory areas within sewer systems with capacity constraints,

implement measures to ensure adequate capacity throughout their sewer system, and respond to

SSOs and CSS releases.


EMERGENCY RESPONSE PLAN

4.      Within ninety (90) Days of the Date of Lodging, Akron shall develop a comprehensive

Emergency Response Plan for its WPCS and Sewer System and submit the Plan to U.S. EPA and

OEPA for review and approval pursuant to Section XVII of this Consent Decree (Review and

Approval Procedures). The Plan shall require Akron to:  (i) promptly respond to and resolve all

SSOs and CSS Releases; (ii) mitigate the SSOs and CSS Releases through specific measures; and

(iii) take appropriate steps to prevent the immediate recurrence of the SSO or CSS Release.

5.      The Emergency Response Plan shall provide procedures for promptly responding to SSOs

and CSS Releases and to minimize the environmental impact and potential human health risk

posed by such events.  The Emergency Response Plan shall include:

A.      A requirement that Akron provide immediate notice to the public (through the local news media or other means, including signs or barricades to restrict access) of an SSO or CSS Release, and a detailed description of the actions Akron will undertake to immediately provide such notice;

B.      A detailed description of the actions Akron will undertake to provide notice of an SSO or CSS Release to appropriate federal, state, or local agencies/authorities, including but not limited to the requirements contained in Part II of the NPDES Permit;

C.      A detailed plan to minimize overflow volumes by limiting the volume of untreated wastewater transmitted to the portion of the Sewer System impacted by the events causing the SSO and/or CSS Release;

D.      For Building/Property Backups, a detailed plan describing the standard operating procedures to be followed by Akron personnel in responding to an SSO or CSS Release that is a Building/Property Backup, including:

(i)      A description of methods for communicating with customers about how to report Building/Property Backups, and how to obtain clean-up; and

(ii)      A description of Akron's procedures for responding to Building/Property Backups, including the timeframe for responses; the measures for cleanup of Building/Property Backups found to be caused by conditions in Akron's Sewer System (such as procedures to ensure disinfection or removal of items potentially contaminated by Building/Property Backups); and the measures taken to correct or repair conditions in the Sewer System causing or contributing to Building/Property Backups;

8

E.      A description of the resources to be used to correct or repair the condition causing

or contributing to the SSO and/or CSS Release;

F.      A plan to ensure the preparedness of Akron employees, contractors, and personnel

of other affected agencies necessary to implement the Emergency Response Plan,

including but not limited to responsiveness training; and

G.      Identification of locations in the Sewer System at which an SSO and/or CSS

Release is likely to first occur in the event of Pump Station failure or Force Main failure.

6.      Upon approval of the Emergency Response Plan by U.S. EPA and OEPA, Akron shall

immediately implement the approved Emergency Response Plan.

**CONSENT DECREE ATTACHMENT D**

**REQUIREMENTS FOR SEMI-ANNUAL REPORT AND STATEMENT OF CERTIFICATION**

**Semi-Annual Report for _____, 20___
And Semi-Annual Statement or Certification
Regarding Compliance with Certain Consent Decree Provisions[1]**

1.   Specific Action Projects (Consent Decree Section V)

Provide the status of "Specific Action Projects," as described in Section V of the Consent Decree, including:

A.   The status of upgrading the Water Pollution Control Station (WPCS) to achieve a minimum of 130 MGD to be treated through secondary treatment as described in Section V, Paragraph 10.A of the Consent Decree.  This includes, at a minimum:

(i)   The status of work plan development, including the date of anticipated completion (if not complete) or the date submitted (if completed);

(ii)   The status of design and construction activities for the projects set forth in Section V, Paragraph 10.A;

(iii)   The status of stress test protocol development, including the date of anticipated completion (if not complete) or the date submitted (if completed);

(iv)   The status and results of stress tests undertaken after completion of construction;

(v)   The capacity achieved at the secondary treatment plant through the upgrade described in Section V, Paragraph B of the Decree; and

(vi)   The project costs incurred during the reporting period.

---

1 Reporting periods shall be January 1 through June 30 and July 1 through December 31 of each year. Reports shall be provided within 45 days of the end of each reporting period.

1

B.      The status of the design and construction of projects that will be implemented at the WPCS to achieve 130 MGD through secondary treatment as described in Section V, Paragraph 10.C of the Decree, provided the modifications identified in Section V, Paragraph 10.A do not achieve 130 MGD. This report shall also present information on the costs incurred during the reporting period and the capacity achieved at the secondary treatment plant through the projects implemented as described in Section V, Paragraph 10.C of the Decree.

C.      The status of separation of the sewers for the following CSO Outfalls: Rack 8; Rack 25; Rack 21; Rack 30; and Rack 13. This includes, at a minimum, a narrative description of activities undertaken; status of any construction; the date of anticipated completion of separation for each CSO Outfall (if not complete) or the date that separation was completed; and the project costs incurred during the reporting period.

2.      CSO and WPCS Control Measures

Provide the status of compliance with any actions taken regarding construction and completion of controls measures described in Section VI of the Consent Decree, "CSO AND WPCS CONTROL MEASURES" and Attachment A, "Long Term Control Plan Update Work Plan." This includes:

A.      The status of preparing each of the documents listed in Table 1 in Paragraph 17 of the Consent Decree, including the date of anticipated completion (if not complete) or the date submitted (if completed);

B.      A description of the progress towards completing milestones, including the status of progress toward Achievement of Full Operation, for each of the WPCS and CSO Control Measures set forth in the approved LTCP Update;

2

C.      The project costs incurred during the reporting period for each of the WPCS and CSO Control Measures set forth in the approved LTCP Update;

D.      The status and results (if applicable) of the implementation of the Post-Construction Monitoring Program, including progress towards Achievement of Performance Criteria for each of the WPCS and CSO Control Measures set forth in the approved LTCP Update;

E.      A listing of all CSO discharges from each CSO Outfall, including information on the depth and duration of the rainfall event that caused the discharge;

F.      The status of development of the Supplemental Compliance Plan (if necessary); and

G.      The status of Public Participation Plan implementation.

3.      Capacity, Management, Operation, and Maintenance (CMOM), Grease Control, and Emergency Response Programs

Provide information on the status of implementing the CMOM, Grease Control, and Emergency Response Programs, as described in Section VII of the Consent Decree, including:

A.      A list of all SSOs and CSS Releases, including Building/Property Backups, during the reporting period, and the following information:

(i)      Date, location, duration, estimated volume, and cause (if known) of the SSO or CSS Release;

(ii)     Date that Akron orally reported the release to OEPA;

(iii)    Date that Akron notified in writing U.S. EPA and OEPA of the release; and

(iv)    Description of how Akron responded to the release per Akron's Emergency Response Plan.

3

B.      The number of miles and percent of system inspected during the six-month reporting period, the previous year, and the previous five years.

C.      The number and percent of manholes inspected during the six-month reporting period, the previous year, and the previous five years.

D.      The number of miles and percent of system cleaned during the six-month reporting period, the previous year, and the previous five years.

E.      A list of defects identified in Akron's system, identifying acute defects, and a schedule to repair these defects (including date repaired if the defect has already been repaired).

F.      A description of Pump Station and Force Main maintenance activities, manhole sealing activities, sewer construction and rehabilitation projects, root control program activities, and training activities conducted during the six-month reporting period.

G.      A description of the implementation of the Grease Control program, including a list of SSOs and CSS Releases caused by fats, oils, and grease (FOG); a list of FOG trouble spots, the date of last inspection, and the expected date of next inspection; and a description of FOG educational efforts undertaken in the reporting period.

4.      Mud Run Pump Station Improvement Projects

Provide the status of the completion of the projects described in the "Mud Run Pump Station Improvements" as described in the Section VIII of the Consent Decree including:

A.      The status of the Mud Run study and Report of Findings, including a narrative description of the activities undertaken to evaluate the Mud Run pump station and the sewer system tributary to this station, and the anticipated date that the Report will be completed (if not complete) or the date the Report was submitted (if completed);

4

  B.  The status of the Mud Run Pump Station Remedial Report, including the

anticipated date that the Report will be completed (if not complete) or the date the Report

was submitted (if completed); and

  C.  The status of the design and construction of projects that will be implemented

pursuant to the approved Mud Run Pump Station Remedial Report, including the

anticipated date that the projects will be completed (if not complete) or the date that each

project was completed and the project costs incurred during the reporting period for Mud

Run Pump Station construction projects.

5.  <u>Supplemental Environmental Project</u>

  Provide the status of Akron's  timely funding of the SEP in accordance with Section X of

this Decree.

6.  <u>Any Other Necessary Information</u>

  Provide the status of any other information necessary to determine Compliance Status

with the Decree.

7.      Annual Statement of Certification

Submit the requested information with the following certification:

> I certify under penalty of law that this document and its attachments were prepared under my direction or supervision in a manner designed to ensure that qualified and knowledgeable personnel properly gather and present the information contained therein.  I further certify, based on my inquiry of those individuals immediately responsible for obtaining the information, that I believe that the information is true, accurate and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fines and imprisonment.

_____
[Signature of authorized official]

ATTACHMENT E- State Supplemental Environmental Project
Canal Diversion Dam Removal

The Brecksville Dam (also known as the Route 82, Station Road or Canal Diversion Dam) is a structure located on the Cuyahoga River at river mile 20.7.  The original dam known as the Pinery Feeder Dam was initially constructed in 1827 for the purpose of providing additional water to the Ohio and Erie Canal. The original structure was modified and parts rebuilt several times in the ensuing years.  The dam was replaced with a new dam in 1951 located approximately 120 feet downstream from the Pinery Feeder Dam.

The Ohio EPA has identified the dam as one of the causes of non attainment in this section of the Cuyahoga River.  Comprehensive survey results from 1996, 2000 and 2008, (included below), indicate that the river is currently in full attainment of Ohio biological water quality standards downstream of the dam and in non attainment upstream of the dam, within the impounded dam pool.  Physical modifications to the Cuyahoga River upstream of the dam include the creation of an impoundment and loss of riverine habitat characteristics.  Reductions in biological integrity have been identified with impounded river segments by Ohio EPA.

## 1996 Ohio EPA Survey Results

| River Mile<br>Fish/Invert. | IBI | MIwb[a] | ICI[b] | QHEI | Attainment<br>Status[b] | Comment |
|---|---|---|---|---|---|---|
| 33.3/33.3 | <u>17</u> | <u>4.8</u> | 24 | 60.5 | **NON** | Bolanz Road |
| 27.2/26.5 | 22 | <u>5.4</u> | 36 | 74.5 | **NON** | Boston Mills |
| 22.0/ – | <u>13</u> | <u>3.9</u> | – | 60.0 | **(NON)** | Ust. Brecksville Rd. dam |
| –/20.7 | – | – | 46 | – | (FULL) | Brecksville Rd. dam tailwaters |
| 15.9/15.6 | 22 | 6.4 | 44 | 69.5 | **NON** | Dst. Tinkers Creek (NAWQMS) |

## 2000 Ohio EPA Survey Results

| River Mile<br>Fish/Invert. | IBI | MIwb[a] | ICI[b] | QHEI | Attainment<br>Status[b] | Comment |
|---|---|---|---|---|---|---|
| 39.7[B]/39.7 | 33* | 8.3[ns] | 34 | 76.5 | PARTIAL | Old Portage, Dst. Little Cuy. R. |
| 33.2[B]/33.3 | <u>23</u>* | 7.7* | 42 | 81.0 | **NON** | Bolanz Rd.- Dst. Akron WWTP |
| 26.5[B]/29.2 | 30* | 7.9* | 32[ns] | 78.0 | PARTIAL | Boston Mills |
| 15.6[B]/15.6 | 38[ns] | 8.9 | 44 | 79.0 | FULL | Hillside Rd., Dst. Tinkers Creek |

**2008 Ohio EPA Survey Results**

| River Mile Fish/Invert. | IBI | MIwb[a] | ICI[b] | QHEI | Attainment Status[b] | Comment |
|---|---|---|---|---|---|---|
| 33.2/33.2 | 42 | 8.3 | 38 | 83.0 | FULL | Bolanz Road |
| 26.5/26.5 | 36 | 8.1 | 38 | 81.5 | PARTIAL | Boston Mills |
| 22.4/ – | 34 | 8.3 | – | 75.5 | (PARTIAL) | Ust. Brecksville Rd. dam |
| 20.8/20.8 | 26 | 5.9 | 24 | 56 | **NON** | Brecksville dam Pool |
| 20.6/20.7 | 46 | 10.6 | 46 | 85 | FULL | Brecksville Rd. dam tailwaters |
| 15.6/15.6 | 48 | 9.8 | 42 | 85 | FULL | Dst. Tinkers Creek (NAWQMS) |

Ecological recovery is occurring or has occurred in all sections of the river except the dam pool.

The Lower Cuyahoga River TMDL was approved by the U.S. EPA on September 26, 2003. The TMDL specifically identified removal of the Canal Diversion Dam as a project needed to implement the TMDL and restoration of the Lower Cuyahoga River. At page 87 the TMDL states:

> <u>Modification/Elimination of the Canal Diversion dam</u>
> *Initial discussions have begun on addressing the Canal Diversion dam and impacts associated with it. The dam is owned by the State of Ohio Department of Natural Resources and serves a function by providing a water source to the Ohio Canal. If removed, the Cuyahoga River would be restored to a free flowing state for its final 44 miles. This would also provide fish access to several high quality tributaries (Furnace Run, Yellow Creek) that are currently inaccessible to a majority of fish species. The only barriers to completing this project are securing a cost effective way to provide a water source to the Ohio Canal and funding for project design and construction. The Canal Diversion Dam provides water to the historic Ohio and Erie Canal. Removal of the dam will take into account the need to provide an alternate suitable water source to the canal.*

It should be noted that the Ohio and Erie Canal is a historic structure and continued provisions for maintaining water in the canal is also a project priority necessitating the design of alternate watering methods. No entity is assigned responsibility for implementing the dam removal in the TMDL.

Habitat restoration associated with this project will possibly include bank stabilization following elimination of the dam pool. Due to the relatively low height of the dam, 14 feet, habitat restoration needs are not anticipated to be extensive. Preferred methods of stabilization include natural revegetation when possible. Additional bioengineering

methods may be needed in areas of higher stream energy.  Specific methods utilized may include willow posting and/or willow mats which have been utilized at other sites within the Cuyahoga Valley National Park.

Project implementation will include completion of an Environmental Impact Statement, the design of an alternate watering mechanism for the Ohio and Erie Canal, construction of the watering method and removal of the physical dam structure.  Based on other dam removal/modification experiences on the Cuyahoga River, design and implementation is anticipated to cost approximately $1,000,000.00.  The dam is the first barrier to fish migrating from Lake Erie.  Elimination of the dam is expected to result in attainment of biological standards within the (former) dam pool and additional habitat available for spawning of migrating Lake Erie fishes.

The preferred mechanism for management of the project includes utilizing the non-profit river advocate group The Friends of the Crooked River, Inc. as a recipient of the SEP funds.  The Friends of the Crooked River is currently actively participating in the ongoing EIS evaluation of the Brecksville Dam.  The Friends of the Crooked River is currently managing funds from another source which have been used to initiate the EIS process.  This money has also been used to conduct a HEC-RAS flow survey of the project area, a historical study of the dam structure, and wetland delineation within the impounded area.  The Friends of the Crooked River has agreed to partner with other interested entities and to hold and administer funding for implementation of this removal project.

The Friends of the Crooked River has agreed to maintain any funds paid by Akron in order to accomplish this project in a separate account which will be subject to annual audits provided to Ohio EPA and to manage the accomplishment of the project, including fund expenditures.  Prior to any payment of funds by the City of Akron under the SEP provisions of the Consent Decree, Friends of the Crooked River will enter into a written agreement with Ohio EPA that acknowledges that Friends of the Crooked River will manage the Canal Diversion Dam Removal Project and manage the funds paid by Akron consistent with this Attachment E.  Acceptable fund expenditures include: EIS completion, Dam Removal, Pump Station Construction, and habitat restoration.  If any of the funds paid by Akron for the implementation of the project remain after the project has been completed, such funds will be paid to Ohio EPA for deposit into the Surface Water Improvement Fund.  Any funds paid by Akron for the implementation of this project which have not been expended to implement this project by September 30, 2015, will be paid to Ohio EPA for deposit into the Surface Water Improvement Fund.