**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CASE NO.:  5:09CV272 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN ADAMS |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| CITY OF AKRON, et al. | ) | |
| | ) | |
| | ) | (Resolves Docs. 53, 104, 105) |
| | ) | |
| Defendants. | ) | |

This matter appears before the Court on the Government's unopposed motion for entry of the proposed consent decree ("the Decree").  The motion is DENIED.

## I.  Combined Sewers Explained

Generally, there are two types of water collection systems: combined sewer systems and separate sanitary sewer systems.  For decades, separate sanitary sewer systems have been the exclusive systems constructed in the United States.  As a result, combined sewers are "artifacts of an earlier way of collecting sewage and storm water."  Doc 68-1 at 3.  Mark Klingenstein, a licensed professional engineer, described the two types of sewer systems as follows:

> In combined sewer systems, one set of pipes is used to collect and transport both wastewater and storm water. During dry weather, only wastewater flows through the pipes; this wastewater flows to the treatment plant to be treated prior to release to the river or ocean. During wet weather, storm water also flows into these same pipes. During very small storms, all of the storm water will also flow to the treatment plant for processing; however, during larger storms too much storm water will be collected for the treatment plant to handle. Under these circumstances, overflows to the river, lake or ocean take place from structures designed and constructed to discharge combined sewage under these higher flow conditions. These structures are known as Combined Sewer Overflows ("CSOs") and are typically located throughout the combined system. The discharges from

1

these structures consist of a mixture of untreated sanitary sewage and industrial wastewater, groundwater infiltration and storm water.

In separate sewer systems, sanitary sewage is collected in one set of pipes, and storm water is collected in another. By design, only sanitary sewage should be conveyed to the wastewater treatment plant, regardless of the weather.

Doc. 68-1 at 3-4.  Combined sewer systems contain a wide range of human pathogens including bacteria, viruses, and parasites.  "When CSOs result in the discharge of raw sewage into surface waters which are used for contact recreation or as drinking water sources, they represent a significant pathway for the possible spread of numerous diseases."  Doc. 68-1 at 4.  This fact is particularly poignant when the Court takes into account that Akron's annual discharges of untreated or partially treated sewage exceed two billion gallons per year.[1]  Moreover, the risks accompanying these pathogens are exacerbated by the relatively small size of the waterways receiving the discharges:

The Cuyahoga at less than 500 [cubic feet per second] as a mean flow, is not a very large river. It doesn't provide very much assimilative capacity. There isn't very much river to disperse and dilute CSO discharge into.

Doc. 87 at 34.

In the case of the Ohio Canal, given its characteristics, it's sort of like a bathtub with an opening at the end. And when you discharge the CSOs into it, it will increase its flow and then it will come back to sort of its steady state.

But a lot of what will be left in it at that point will be residual [raw sewage] from the discharge.

Doc. 87 at 36-37.

## II.  The Akron Sewer System

In the late 1800s, Akron began construction of its sewer system.  Initially, Akron utilized combined sewers.  From 1910 to 1920, Akron's sewer system was substantially expanded using combined sewers.  In 1923, Akron adopted a separate sewer system policy.  Accordingly, all

---

[1] This figure was utilized by Klingenstein, however, it is based upon data compiled by Akron itself.

construction following 1923 has involved separate systems for storm sewers and sanitary sewers. Despite this change going into effect nearly 90 years ago, Akron still maintains numerous combined sewers – those sewers currently comprise nearly 30 percent of the Akron system. These combined sewers are at the heart of this litigation.

Overall, Akron's system serves roughly 328,000 people in a service area spanning 183 square miles.  The system includes the cities of Akron, Cuyahoga Falls, Hudson, Fairlawn, Stow, Tallmadge, Lakemore, Mogadore, Munroe Falls, and Silver Lake.  The system also includes the Townships of Bath, Coventry, Copley, and Springfield.  The full system contains approximately 1,365 miles of sewer pipe.  There are 175 miles of combined sewer pipes, 690 miles of separate sanitary sewer pipes, and 369 miles of separate storm sewer pipes.  These sewers, along with 39 pump stations, transport the collected wastewater and storm water to Akron's wastewater treatment plant.

The wastewater treatment plant is an activated sludge treatment plant.  Klingenstein described the processes of the plant as follows:

> i) Wastewater entering the plant first passes through screens that remove rags and debris from the wastewater. The collected material is hauled offsite for disposal in a landfill. …
>
> ii) Degritted wastewater then passes through two channels to several pre-aeration tanks, in which air is added to raise the dissolved oxygen level in the raw sewage. One of the two aforementioned channels is equipped with a gate through which raw wastewater can be diverted to a 10 MG capacity storm retention facility. …
>
> iii) From the pre-aeration tanks, the aerated wastewater flows to 24 rectangular primary clarifiers. In these tanks, settleable solids are removed via simple gravity settling. …
>
> iv) Following primary clarification, the wastewater flows to the single-stage activated sludge system. … Air is added to the aeration tanks as well, creating conditions in which the organisms can first adsorb and then metabolize soluble pollutants in the wastewater. …

3

     v) … Following secondary treatment, the treated wastewater flows to two parallel chlorine contact basins for disinfection and dechlorination (to remove residual disinfectant) prior to discharge to the Cuyahoga River. Waste sludges are thickened and composted prior to disposal by land application.

Doc. 68-1 at 6-7.  The plant is also equipped with several bypass capabilities. Through the bypasses, wastewater can be bypassed directly to discharge prior to preliminary treatment, directly to disinfection from the stormwater retention facility, and from a point just prior to secondary treatment.

     Within the combined portion of the sewer system, there are 37 diversion structures known as "racks" and at least 35 active CSO points.  Six CSOs discharge into the Cuyahoga River, twenty-one discharge into the Little Cuyahoga River, seven discharge into the Ohio Canal, and one discharges into Camp Brook.  Ultimately, all of these discharges, whether directly or through tributaries, flow into the Cuyahoga River and the Cuyahoga Valley National Park.

     In turn, the Cuyahoga River then flows into Lake Erie, the thirteenth largest lake in the world.  While the fourth largest of the Great Lakes, Lake Erie's fish population is the largest among the five lakes and supports commercial, recreational, and sport fishing.  The following accurately indicates the precise locations Akron's discharge points:



Legend: The numbered red circles indicate CSO discharge points.

### III. Cuyahoga Valley National Park

During the 1960s and 1970s, urban expansion threatened Ohio's rural areas, especially the existing rural areas between Akron and Cleveland.  The need to protect these areas was apparent to many, but John F. Seiberling spearheaded the efforts to protect the land.  Based upon his environmental concerns, in August of 1965, Seiberling sought to arrange a meeting with then-Ohio Governor James Rhodes.  In attempting to arrange that meeting, Seiberling met with Eddie Thomas, the retired president of Goodyear Tire & Rubber and then-chair of the Akron

park board.  During the meeting, Seiberling remarked that "it would be a shame to let this beautiful Valley go down the drain."  "Thomas replied, 'Yes, and it was a shame we let the drain go down the Valley,' a reference to Akron's sewage treatment system."  Nelson, Daniel, <u>A Passion for the Land, John F. Seiberling and the Environmental Movement</u>, at 48.  Further public support for a park arose on June 22, 1969 when the Cuyahoga River caught fire.  It was at least the tenth time the River had caught on fire, but it garnered significant media attention.  The burning of the River also spurred a movement that led to the passage of the Clean Water Act in 1972.  In fact, a Time magazine article written shortly after the fire used the burning of the Cuyahoga River as an example of the plight of many American rivers.  That article included the following quote:  "If you fall in, you don't drown – you decay away."  Even that attention did not immediately lead to the creation of a park.  Rather, it was only through the continued efforts of Seiberling and others that a park finally became nationally recognized in 1974.  In fact, it was a bill sponsored by then U.S. Representative Seiberling that was signed into law by President Gerald Ford on December 27, 1974 that created the Cuyahoga Valley National Recreational Area.  The Area was established to preserve the "scenic, recreational, natural, and historic" values of undeveloped land between Cleveland and Akron.  The Area was then redesignated as Cuyahoga Valley National Park ("the Park") through legislation passed on October 11, 2000, making the Park the most recently created national park in the United States.

The Park spans over 33,000 acres including 22 miles of the Cuyahoga River, has over 104 miles of trails, and has ten working farms within its borders.  A major attraction of the Park is the towpath trail that follows the old Ohio & Erie Canal and the Cuyahoga River.  The towpath opened in 1993 and visitation to the Park doubled the next year.  In 1994, the Environmental Education Center opened and now serves over 1,800 schools within Ohio.  By the time the Park

celebrated its 20th anniversary in 1995, it had an operating budget of over $6 million and employed nearly 150 people.  By 2009, the Park had over 2.8 million annual visitors, making it the sixth most visited national park in the entire United States.

> One website accurately portrays the Park as follows:
>
> Many visitors spend their time hiking or bicycling the parks' many trails which visit its numerous attractions, including the crushed limestone along portions of the 20 miles (32.2 km) Towpath Trail, following a former stretch of the 308 miles (495.7 km) Ohio and Erie Canal.
>
> Waterfalls, rolling hills, winding river scenery attract many park visitors. Steep narrow ravines, a rolling floodplain, and lush farmland contrast one another throughout the park. Animal life is also plentiful.
>
> The park offers an array of preserved and restored displays of 19th and early 20th century sustainable farming and pastoral or rural living, while catering to contemporary interests with art exhibits, outdoor concerts, and scenic excursion and special event railroad tours on the Cuyahoga Valley Scenic Railroad.

See http://en.wikipedia.org/wiki/Cuyahoga_Valley_National_Park (copy on file, last visited 2/17/11).  "Some 250 historic structures, including residential and farming properties, are located in the park, in addition to the nationally significant Ohio & Erie Canal and the Valley Railway." http://www.nps.gov/cuva/parknews/index.htm (copy on file, last visited 2/23/11).

The Cuyahoga River and the towpath also stand at the center of the numerous other activities offered by the Park.  There are over 104 miles of trails owned and operated by the Park. There are 35 miles of trails devoted to running, hiking, and cross country skiing.  An additional 35 miles are devoted to equestrian use, and another 34 miles are set aside for bicycling.  In fact, over 20,000 cyclists used the trails in 2009.  The ten working farms host farmers' markets throughout each year.  Ice Box Cave is an attraction that routinely draws visitors.

Additionally, the Canal Visitor Center contains a small museum and a fully restored lock. Weekend visitors can witness how the lock was previously used through employee

7

demonstrations.  Walking along the towpath, one can see families of ducks and wildflowers in full bloom.  The numerous waterways also draw in fisherman.[2]  In sum, "[t]he park is a refuge for flora and fauna, gives a sense of times past, and provides recreation and solitude for Ohio's residents and visitors."   http://www.nps.gov/cuva/ index.htm (copy on file, last visited 2/23/2011).

## IV. Litigation Background

The United States Government filed this action against the City of Akron and the State of Ohio on February 5, 2009.  In its complaint, the Government alleges that Akron has been discharging pollutants in violation of its National Pollutant Discharge Elimination System ("NPDES") permit.  The complaint alleges that through CSO discharges Akron has 1) violated its general effluent limitations, 2) allowed dry weather overflows, 3) allowed unpermitted discharges, 4) committed bypass violations, and 5) failed to monitor and report as required by its permit.

On May 20, 2009, the matter proceeded with a case management conference.  Following the conference, discovery between the parties began.  Disputes arose during discovery, resulting in a motion to compel being filed by the Government on October 13, 2009.  However, that motion to compel was not immediately resolved.  Instead, the Court held it in abeyance as on November 13, 2009, the Government filed its notice of a proposed consent decree.  On May 10, 2010, following a comment period, the Government moved for entry of the proposed decree. Thereafter, the Court solicited additional documentation to assist in its review of the proposed decree.  Furthermore, beginning on January 4, 2011, the Court held a two-day fairness hearing on the Decree. Following the hearing, the Court once again solicited additional information from the parties.  The specific documents requested by the Court were received on January 27, 2011.

---

[2] Park officials inform fishermen not to eat any of their catches made during the period of water quality advisories.

Finally, the Court received several unsolicited filings beginning on February 25, 2011 that alerted the Court to the current status of the parties' negotiations.

### A.  The Government's Claims

In Claim I of its complaint, the Government contends that Akron's CSO discharges violated the general effluent limitations contained in its NPDES permit.  In support, the Government relied upon the testimony of Mark Klingenstein, its expert in environmental engineering.  The Government asserts that Klingenstein's testimony demonstrated impairment based upon Akron's violations.  In this count, the Government alleged a total of 3,210 violations.

In Claim II, the Government contends that Akron violated its NPDES permit by allowing dry weather overflows.  The Government asserts that the permit only allows for discharge from Akron's CSOs during wet weather.  The Government alleges that dry weather overflows occurred 22 times between 2002 and 2008.

In Claim III, the Government asserts that Akron discharged untreated sewage from sources not contained within the permit.  The Government alleges that these sources included manholes, pump stations, and other pipes.  The Government believes that 52 unpermitted discharges occurred between 2002 and 2008.

In Claim IV, the Government argues that Akron allowed bypasses to occur at its wastewater treatment plant under conditions beyond those specified in the permit.  The Government alleges that Akron's own monthly operating reports demonstrate 11 improper bypasses between 2002 and 2008.

In Claim V, the Government asserts that Akron failed to monitor and report as required by its NPDES permit.  The Government alleges that Akron committed 1,700 violations of its monitoring and reporting duties between June of 2002 and June of 2010.

In Claim VI, the Government argues that relief is appropriate under section 504(A) of the Clean Water Act.  Specifically, the Government alleges that sewage backing up into homes and buildings warrants relief.  The Government believes that it could demonstrate that 467 building backups occurred between 2002 and 2008.

## B.  Akron's Responses

Initially, Akron noted that the complaint claimed a total of 4,287 violations.  Akron admitted to 94 of those violations – including 31 violations that Akron labeled as "technical" and did not believe warranted a penalty of any kind.

With respect to Claim I, Akron admits that discharges occurred on the days alleged by the Government.  Akron, however, asserts that the discharges occurred within the conditions allowed by the permit.

With respect to Claim II, Akron also admits the underlying factual basis of the claim – that dry weather overflows occurred.  Akron again, however, asserts that these overflows did not violate the Clean Water Act.  Specifically, Akron contends that these dry weather overflows resulted from exceptional circumstances due to factors beyond its control.

With respect to Claim III, Akron admits to 24 of the alleged 52 violations.  Akron admits that 24 discharges occurred at its Mud Run location.  Akron, however, asserts that 8 of these discharges occurred on sequential dates due to rain and snow melts.  Akron denies the remaining 28 violations.  Primarily, Akron asserts that only one of those 28 violations resulted in any discharge reaching navigable waters.

With respect to Claim IV, Akron again admits the underlying factual basis of the claim – that bypasses occurred at its treatment plant.  However, Akron contends that the bypasses were in compliance with the conditions set forth in its permit.

With respect to Claim V, Akron admits certain violations and denies others.  Akron's response here is broken down into numerous subparts due to the complexity of the alleged violations.  For example, Akron admits one substantive violation and 25 technical violations related to its monitoring of dissolved oxygen and flow rate.  Akron has similar responses to the remaining allegations – denying most and admitting minor technical violations on relatively few.

With respect to Claim VI, Akron admits that backups occurred 418 times.  Akron denies that the remaining 49 backups occurred.  Akron further denies that any of the backups violated its permit or the Clean Water Act.

## C.  The Consent Decree

The initial proposed Decree was lodged with this Court on November 13, 2009.  The Court notes that the Decree is a develop and implement decree.  In other words, the Decree does not contain a completed schedule for construction and upgrades.  To be clear, the Decree is not by any means a full resolution of the alleged violations.  Instead, a develop and implement decree is effectively an agreement to agree, i.e., there is currently no agreement on the full schedule of events to occur under the Decree.  For that matter, there does not appear to presently be an agreement on all of the projects that are actually necessary or required by the Decree.  Rather, the Decree requires Akron to submit an updated long-term control plan ("LTCP").  The LTCP will ultimately be the centerpiece of the Decree.  It will detail the construction schedule for nearly every project required under the Decree.  As of this date, Akron has submitted its first updated LTCP.  Under the Decree, the Government was then permitted to review the proposed LTCP and accept or reject Akron's proposal.[3]  As of the date of this order, the Government has rejected Akron's initial proposal, provided additional feedback, and received a second, modified

---

[3] Since the fairness hearing, numerous events regarding this process have occurred.  Those events and their impact on this order are discussed in detail later in this opinion.

proposal from Akron.  In sum, the Decree provides for and actually requires further *negotiations*, it does not establish a complete, agreed-upon schedule.  This is of particular interest to the Court because the fairness hearing revealed that the parties have been engaged in precisely these same negotiations since 2002 without any meaningful progress.

The parties have asserted that such a decree allows for more flexibility to enable timely remedies as technology changes over time.  The parties also suggest that such a decree allows Akron's proposed remedies to change over time to fulfill the purposes of the Clean Water Act.

Following the comment period, the Decree was slightly modified and resubmitted to the Court on May 10, 2010.  Outside of construction projects, under the Decree, Akron agreed to fund the Brecksville Dam State Supplemental Environment Project by paying a total of $900,000.  The Decree also imposed a civil penalty on Akron totaling $500,000.

While the Decree is a develop and implement decree, it provides for several so-called early-action projects.

> ● Akron must upgrade its Water Pollution Control Station to achieve a minimum secondary treatment capacity of 130 million gallons per day by no later than October 15, 2017."  Doc. 53-3 at 17.

> ● Akron must separate the sewers for the CSO outfalls at Racks 8, 13, 21, 25, and 30 within 8 years of the lodging of the decree  Doc. 53-3 at 17.

Beyond these projects, the decree contained no other hard deadlines or construction schedules. Instead, Akron was required to submit a final LTCP update by October 15, 2010.  Akron was required to design a schedule for its LTCP that is

> **as expeditious as possible** for design, construction, implementation and utilization of the control measures selected in the Proposed LTCP Update pursuant to II.A.1 above. The schedule shall contain a deadline for Achievement of Full Operation of all control measures in a manner that is **as expeditious as possible**, but in no event later than October 15, 2028.

Doc. 53-3 at 73 (emphasis added).

As of the time of this Court's hearing, Akron had submitted its final LTCP update.  All indications from the parties demonstrate that they can still find no common ground on a schedule for the remainder of the projects that will ultimately be necessary under the decree.  In fact, the Government has rejected Akron's first submission.  As this disagreement was made apparent to the Court, it is important to note that the Decree contains a dispute resolution process.  The process begins informally and allows the parties 20 days to negotiate prior to the beginning of the formal process.  The formal process begins by Akron filing a position statement.  The Government then has 45 days to respond with its position statement.  Akron then has 15 days to seek judicial review.  The Government is then permitted to oppose Akron's motion, and Akron is permitted to file a reply in support of its motion.  The matter would then be ripe for consideration by the Court.  As such, any dispute would take more than three months just to reach the Court for consideration.  Furthermore, any such dispute would involve a discrete portion of the Decree.  Given the tenor of the parties' prior nearly decade-long negotiations, there is significant reason to believe that the dispute resolution process will be invoked over and again, extending this litigation and possibly completion dates in the Decree by months or even years.

### V.  Legal Standard

The Sixth Circuit has previously expressed the governing standard for reviewing the parties' proposed consent decree.  "The criteria to be applied when a district court decides whether to approve and enter a proposed consent decree, are whether the decree is fair, adequate, and reasonable, as well as consistent with the public interest."  *United States v. Lexington-Fayette Urban County Government*, 591 F.3d 484, 489 (6th Cir. 2010) (citations and quotations omitted).  In that respect, the Court should consider "the decree's likely effectiveness as a vehicle for cleansing" the waters at issue.  *United States v. Akzo Coatings of America, Inc.*, 949

F.2d 1408, 1437 (6th Cir. 1991). "[I]n evaluating the efforts of an agency charged with making technical judgments and weighing complex data, [this Court] must give a proper degree of deference to the agency's expertise, yet also ensure that the agency has considered all of the relevant evidence in the record and has acted in the public interest."  *Id.* at 1426 (discussing standard of review under CERCLA) (citation omitted).  Furthermore, this Court must be mindful that there exists a "presumption in favor of voluntary settlement" and that the "presumption is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA[,] which enjoys substantial expertise in the environmental field."  *Id.* at 1436 (citation omitted).

As the Court is required to give some degree of deference to the Government as a representative of the EPA, a brief review of the agencies own guidelines is a necessary part of the Court's analysis.  The EPA maintains a document titled "Combined Sewer Overflows Guidance for Long-Term Control Plan" ("Guidance").  The document was designed "to provide guidance to municipalities on how to develop a comprehensive long-term control plan that recognizes the site specific nature of CSOs and their impacts on receiving water bodies."  See Memorandum in preface to Guidance dated August 31, 1995.  The publication goes on to provide that "Permittees should give priority to environmentally sensitive areas."  Guidance at 1-4.  "If physically possible and economically achievable, existing overflows to sensitive areas should be eliminated or relocated[.]"  Guidance at 1-22.

Further, "the ability of the municipality to finance the final recommendations should be considered.  The CSO Control Policy 'recognizes that financial considerations are a major factor affecting the implementation of CSO controls … [and] … allows consideration of a permittee's financial capability'" in reaching an ultimate decision.  Guidance at 3-66.  In that respect, the

14

EPA also produced a document titled "Combined Sewer Overflows – Guidance for Financial Capability Assessment and Schedule Development" ("Schedule").  For municipalities facing a low financial burden, deadlines created consistent with the time necessary for normal engineering is generally sufficient.  Schedule at 46.  For municipalities facing a medium burden, an implementation schedule of 10 years is suggested, while a high burden results in a recommended implementation schedule of 15 years.  The latter schedule may be extended "up to 20 years based on negotiation with the EPA and state NPDES authorities."  Schedule at 46.  The EPA recommends that these schedules "be viewed as general boundaries to all parties in establishing reasonable and effective CSO control implementation schedules."    Schedule at 51.

## VI. Evidence Received

It is difficult, if not impossible, to neatly divide the Court's analysis into the components listed above:  fair, adequate, reasonable, and in the public interest.  As these components overlap, the Court's review of certain factors will necessarily implicate more than one on occasion.  Accordingly, the Court will review the totality of the evidence presented and then apply these factors as appropriate.

The Court notes that it solicited numerous documents and declarations after the Decree was lodged.  As a result, the parties made numerous electronic and manual filings.  On July 26, 2010, the State of Ohio filed the declaration of William Zawiski along with its attachments.  On the following day, Akron filed six CDs with financial information primarily related to the City's capital budget.  Also on July 27, 2010, Akron filed its supplemental memorandum in support of entering the Decree, along with its attachments and exhibits.  The Government also filed documents on July 27, 2010.  Those documents included the declarations of Klingenstein and Gail Coad, along with numerous exhibits.  On October 15, 19, and 29, 2010, further documents

were provided to the Court.  Finally, in addition to the hearing testimony and exhibits, numerous post-hearing documents were filed.  An affidavit and exhibits from Akron Mayor Don Plusquellic were filed on February 25, 2011.  Akron then filed an additional supplement on March 2, 2011.  The City of Fairlawn moved for leave to file an *amicus curiae* brief on March 10, 2011, and Summit County filed a similar motion on March 11, 2011.  The Court then permitted responses to Akron's supplemental filings – those responses were received on March 11, 2011.  The Court has reviewed every document submitted by the parties in considering this ruling.

### A.  Sensitive Area

The Court notes that the parties all agree that Akron's discharges affect a sensitive area, namely the Cuyahoga River and the Cuyahoga Valley National Park.  Generally, under the EPA's standards, sensitive areas include the following:

● Outstanding National Resource Waters

● National Marine Sanctuaries

● Waters with threatened or endangered species or their designated critical habitat

● Primary contact recreation waters, such as bathing beaches

● Public drinking water intakes or their designated protection areas

● Shellfish beds

Furthermore, the EPA's internal policies suggest that overflows to sensitive areas should be completely eliminated if physically and economically possible.

From the Court's perspective, it is not at all clear that any consideration was given to this factor in the proposed decree.  As the EPA's guidance suggests that sensitive areas should be

given priority in any remedy, the Court is compelled to review the nature of the sensitive area at issue herein.

There is no dispute that Akron's discharges reach the Cuyahoga River and directly affect the Cuyahoga Valley National Park.  The Court finds it particularly noteworthy that there was no substantive discussion of the Park presented by any of the parties to this litigation.  While the parties all seem to agree that the Park is a sensitive area, they seem disinclined to give any particular value to the nature of the area.  In fact, Akron was quick to point out that "the definition of sensitive waters covers primary contact recreation, irrespective of whether that goes through a National Park or not." Doc. 88 at 244. Akron's counsel continued:

> So I'm not sure there is any special, with all due respect, and believe me, I recreate in national parks and I'm very sensitive to those concerns. But I'm not sure as a matter of law and administrative interpretation that flowing through a National Park gives it any greater protection under the law.

Doc. 88 at 244-45.  The Court respectfully disagrees.

As a part of this review, the Court must determine whether the decree is in the public interest.  By utilizing only the administrative definition of "sensitive area," this Court would be required to turn a blind eye to reality.  The sensitive area at issue runs directly through Ohio's only National Park – a park that has nearly 3 million annual visitors.  As detailed above, the Park offers nearly limitless activities to its visitors and nearly every one of those activities is within the immediate vicinity of the waterways affected by Akron's CSO discharges.

There can be no argument that the public interest herein is much higher than in a situation that includes a stream that meets the definition of a sensitive area but is used by a much smaller population.  While both areas would warrant priority under the EPA's guidelines, the public interest is clearly stronger herein.  Furthermore, one could argue that the public interest herein is even higher.  The purpose in creating the Park parallels the purpose of the Clean Water Act. –

17

both were designed to preserve natural resources.  Accordingly, the public interest in this matter is extremely high and will be more fully reviewed below.

Finally, the Court notes that Loren Denton, the acting branch chief in the municipal enforcement plan in the water enforcement division of the U.S. EPA, indicated as followed in his testimony:  "I think the complication here is that *every outflow is to a sensitive area*."  Doc. 87 at 150 (emphasis added).

## B. Financial Capability Assessment

The financial capability assessment is a two-phase approach under the EPA's guidelines.

The first phase identifies the combined impact of wastewater and CSO control costs on individual households.  The second phase examines the debt, socioeconomic, and financial conditions of the permittee.  The results of the two-phase analysis are combined in a Financial Capability Matrix.

Schedule at 10.  The second phase also further breaks down the three general categories.  In reviewing debt indicators, bond ratings and overall net debt as a percent of full market property value are considered.  In reviewing socioeconomic indicators, the unemployment rate and median household income are considered.  Finally, in reviewing financial management indicators, property tax revenue collection rate and property tax revenues as a percent of full market property value are considered.  The final results are plugged into the matrix, and the matrix can then be used to recommend a reasonable schedule.

The parties differ over the burden imposed on Akron by the decree.  The EPA's expert, Gail Coad, concluded as follows:

And what we conclude with the mid range financial capability indicator and a mid range residential indicator, that for this example situation, Akron is a medium-burdened community. And that would, according to the guidance – the guidance would suggest that a time period of somewhere around ten years is appropriate for completing a program of this size.

…

18

> As based on financial capability, but obviously a lot of other considerations need to be taken into account.

Doc. 87 at 97-98.  There is no dispute that Coad's conclusion is a correct application of the

EPA's policies for conducting a financial capability assessment.

In contrast, Akron's expert, Bernie Bouman, concluded as follows:

> In the top, you have the residential indicator as I said before. We take up with a number that puts the City of Akron in the mid range. On the permittee financial capability score, it puts us in the weak when you take the matrix together. It puts the City of Akron in a high burden.

Doc. 88 at 44-45.  It is undisputed that Bouman's conclusion is different because he included

local income tax as a burden when performing his calculations.

In evaluating these competing experts, the Court finds that Coad's testimony should be

given more weight for several reasons.  With respect to Coad, there was no challenge to her

calculations or methodology.  She presented her analysis in a straightforward manner and relied

nearly exclusively on data provided by Akron.  The Court had the opportunity to view her

testimony and her work product and finds her very credible.

The Court cannot reach the same conclusion with respect to Bouman's testimony.  First,

Bouman's testimony relied on a significant amount of work from Mr. Rexhausen, an assistant

director of the economic center at the University of Cincinnati.  As this Court questioned during

the hearing:

> So this witness is testifying about information, opinions, views, expressed by or at least others, we're not going to have someone else here to come forward and testify about the basis of all of this information, these conclusions?

Doc. 88 at 32.  Mr. Rexhausen was never offered as a witness and therefore never subject to

cross-examination.  The inability to question Rexhausen's methods and conclusions undermines

the foundation of Bouman's testimony.

19

Beyond the foundational problems with Bouman's conclusion, there is a more fundamental problem with accepting his methodology. The financial capability matrix discussed in the EPA's guidance contains two components: a permittee financial capability indicators score and a residential indicator. The permittee financial capability indicators score includes socioeconomic, debt, and financial indicators. A weak score for this factor is below 1.5, a mid-range score is between 1.5 and 2.5, and a strong score is above 2.5. These ranges were created without any consideration being given to local income tax. Accordingly, Bouman's methodology of including local income tax could have no effect other than decreasing the permittee financial capability indicator score. In other words, Bouman's methodology could do nothing other than slant his result toward that favored by Akron.

Bouman may indeed be correct that somehow considering these taxes leads to a more complete picture of the debt burden of the local community. However, adding this factor to the existing formula and maintaining the same ranges does not appear proper to the Court. Bouman is effectively trying to fit a square peg into a round hole. Bouman would like to modify the input into the EPA's formula, but maintain its end ranges. Given that income tax was quite clearly never contemplated with the guidance, the Court does not believe it can simply be added in to a calculation and that *every other* part of the guidance should remain unaltered.

A common sense review of Bouman's proposal also lessens the weight to be given to his testimony. Bouman indicated that Akron's local income tax was a debt burden on the community and therefore had to be taken into consideration. When questioned about the ability of Akron to turn around and use that very same income tax to fund sewer repairs, Bouman only indicated that those taxes were not a "common" source for funding these types of projects. However, there is nothing in place that prohibits Akron from using these funds. As a result,

20

under Bouman's methodology, Akron may tax its citizens and then turn around and claim that because it taxes its citizens more than other cities, its citizens have a lesser ability to fund repairs. At the same time, Akron has never explained why those same taxes could not be applied to remedy the sewer issues.

With respect to the ability to fund the decree, Bouman also offered no admissible evidence about Akron's ability to incur additional debt.  On this issue, Bouman relied nearly exclusively on hearsay from Akron's officials.  He performed no independent study of Akron's finances.  Bouman admitted that he never examined the declaration provided by Akron to the Court that listed various special obligation debt issues, nontax revenue, and economic development bonds.  Further, the Court inquired as follows:

> Have you done any analysis whatsoever as to their ability to borrow monies, etcetera, to borrow [for] necessary projects from 2000 forward?

Doc. 88 at 333.  Bouman responded, "No."  Thus, while encouraging a broader approach than the guidance, Bouman stopped short of fully evaluating Akron's finances.  As such, a lingering question is left as to why Bouman seemed to pick and choose only financial information that supported his conclusion of a high burden under the guidance.

Furthermore, when questioned about Akron's debt, Bouman indicated that he had relied upon numerous newspaper articles about Akron's finances.  This is troubling for several reasons.  First, the Court does not find newspaper articles to form an appropriate foundation for expert financial review.  Second, it became clear during the hearing that Bouman had chosen only newspaper articles that supported his views.  When the Court presented an article that presented Akron in a different financial light, Bouman admitted he had never seen the article or taken it into consideration.  Bouman could not explain why only certain articles -- all articles that supported his conclusions -- were found during his search.

Based upon all of the above, the Court has given greater weight to Coad's conclusion with respect to financial capability. The Court, however, notes that it taken into consideration Bouman's opinion that local income taxes should be taken into account in the overall determination made by this Court.

In taking Bouman's opinion regarding taxes into account, the Court must make note of the fact that Bouman's opinion on the issue is one-sided. Throughout his testimony, Bouman indicated that local income tax was a burden on Akron beyond that contemplated by the Guidance and therefore should be considered. Bouman, however, included no discussion of the economic benefit the City of Akron and its surrounding communities would receive from a river that is safe for recreational activities such as boating and fishing. As such, Bouman's discussion of the tax burden is entitled to even less weight.

## C. Implementation

While several witnesses and counsel spoke in broad strokes about the implementation of corrective measures, only one witness sought to provide hard dates. Paul Novak, the manager of the permitting and compliance program in division of surface water in the Ohio EPA, spoke to the specific projects contained in the consent decree. Novak began by describing the major projects laid out in the consent decree. "[I]n essence, what we're looking at is two tunnels, a north side interceptor tunnel, and an Ohio Canal interceptor tunnel." Doc. 87 at 188-89. "[T]hen there are the next batch of projects [which] would be ten storage basins, I'll call them surface storage basins because they will store combined sewer overflow." Doc. 87 at 189. "And in the final major … control project is upgrades at the wastewater treatment plant." Doc. 87 at 189.

With respect to the time frame for completing these projects, Novak noted as follows:

And when I look at what Columbus and Regional Sewer District has proposed and said is reasonable time frames for both design and construction of such tunnel

> complexes, you're looking at a period of time of approximately seven to ten years to do that.
>
> And that includes both design and construction.
>
> The surface storage basins and the separation projects could also be done in a period of approximately ten years, as well as upgrades to the wastewater treatment plant.

Doc. 87 at 190.   Novak continued on and indicated that he did not believe that it was unreasonable to give Akron until 2028 to finish its upgrades.  In so doing, Novak testified:

> But I will say that, you know, if I look at the projects based on my best professional judgment, you know, taking aside the affordability issue, you could probably finish those in 10 to 11 years total.

Doc. 87 at 191.   Other than Novak, no witness offered specific testimony about the time frame for fulfilling the projects detailed in the consent decree.

Of all of the witnesses offered to the Court over two full days, Novak was the most credible and had the broadest knowledge base with respect to this matter.  Novak was involved as early as 2002 when Akron first sought to update its LTCP.  For that entire time, Novak has been the lead negotiator for the Ohio EPA.  Novak informed the Court that many of the projects now suggested in the LTCP were suggested well prior to the Decree. During the prior negotiations, the Ohio EPA

> wanted them to construct the storage basins. We wanted them to install additional treatment at the wastewater treatment plant. We wanted -- going by memory now. I'm going to say we pushed very hard to try to get them started on construction [of the] Ohio Canal interceptor tunnel.

Doc. 87 at 196.  Novak's ability to review the history of the matter stood in stark contrast to the testimony of Loren Denton.  Denton, the acting branch chief in the municipal enforcement plan in the water enforcement division of the U.S. EPA, candidly admitted that he joined the process

very late and could offer little to no detail about the past history of negotiations between the parties.

In stressing the need for Akron to start its projects as soon as possible, Novak also offered the Court the fact that while the City of Columbus was given 19 years under its decree, more than two-thirds of the overflows from Columbus will be eliminated in only 9 years.

## VII.    Analysis

The Court begins its analysis by accepting that deference is appropriate in areas in which the EPA has demonstrated its expertise.  However, given the record herein, the effect of that deference is unclear.

For example, the EPA's financial expert has concluded that the decree would impose a medium burden on Akron's taxpayers.  If the Court were to give deference to that conclusion, the EPA's guidance would suggest that 10 years is appropriate for the decree.  Furthermore, if the Court were to defer to Novak's expertise, the evidence would suggest that 10 to 11 years is an appropriate length of time to complete construction of the major elements of the decree.  The parties, however, do not request that the Court give deference to those elements.  Instead, it appears to this Court that the parties seek deference only for their overall conclusion, regardless of whether the evidence supports such a conclusion.

The Court heard over and again that the EPA's guidance is flexible to allow the particular facts for each community to be taken into account.  The Court has fully accepted that view.  However, not one witness offered facts that would support the length of the Decree.  As indicated above, the quantifiable factors set forth in the EPA guidance all suggest a decree of roughly 10 years.  For that matter, it was only through manipulation of the financial guidelines

that Akron's expert was able to reach a result that suggested 15 years was appropriate.  The Decree, however, provides for nearly 19 years.

Neither the evidence, nor counsel, has demonstrated that such an increase in time beyond the guidance is appropriate.  The Court has heard numerous arguments about why the decree is "fair, adequate, and reasonable, as well as consistent with the public interest."  However, those arguments all boil down to one:  "This is the best we can do."  For example, no one has put forth evidence that 19 years is needed due to the Akron's finances.  The Court gave Akron every opportunity to present such evidence.  In fact, the Court was hopeful that the testimony of City Treasurer Steve Fricker would shed light on this topic.  It did not.  Instead, the Court learned through Fricker's testimony that Akron had increased its debt from $750 million around the time the Decree was entered to $832 million at the time of the hearing.  No meaningful portion of this $82 million in new debt went toward the early action projects in the decree.

Furthermore, Fricker's testimony on this point also offers insight into the financial capability assessment.  As at least a portion of the matrix relies upon the net debt of Akron, the continued spending during this litigation could serve to support a finding of a higher burden on Akron.  However, given that no significant amount of this debt went to remedying the CSO issues, the Court is not inclined to afford Akron a substantial benefit from its own decision to accrue substantial additional debt in the face of this litigation and its possible consequences.

Fricker's testimony effectively summed up the underlying financial documents provided to the Court.  Prior to this litigation, remedying its combined sewer overflows was not a priority for Akron.  Since Akron began negotiating with the EPA in 2002, it has completed one major capital project addressing the issue – the construction of a rack to help hold overflow.  In contrast, only since lodging the decree in 2009, Akron has incurred additional debt of more than

$80 million.  While it is not the Court's place to dictate Akron's priorities, these facts clearly demonstrate that Akron has not to date placed a priority on remedying its CSOs.

Akron's recent expenditures are aligned with its prior capital expenditures.  From 1993 through most of 2010, Akron had total capital expenditures of over $1.6 billion.  Less than three percent of those expenditures, roughly $41 million over 18 years, involved combined sewers.  Furthermore, many of the costs placed into the combined sewer category were not designed to directly remedy the CSOs.  On a nearly yearly basis, Akron paid for studies of the Ohio Canal, Little Cuyahoga River, and Cuyahoga River.  Further, a portion of Akron's capital expenditures include the cost of the efforts to update the Long Term Control Plan.  The LTCP remains the centerpiece of the pending Decree, encompassing the schedules for nearly all of the major projects necessary to fulfill the purposes of the Decree.  As the parties have made essentially zero progress on such an update in the last 9 years, those costs seem to have accomplished very little.

While over the course of 18 years the City has invested only $41 million in remedying its sewer problems, it has had no shortage of other expenditures.  In 1996, Akron constructed Canal Park Stadium for its minor league baseball team at a cost of nearly $29 million.  The next year, Akron renovated a former O'Neil's department store at a cost of $35 million.  In 2004, Akron issued income tax revenue bonds totaling $215 million for city projects.  In 2005, nearly $32 million was spent to make improvements to parking decks.  In 2007, another $19.5 million was spent to improve parking decks.

To put things in perspective, from 1993 to 2010, Akron spent over $10 million *more* on repairing parking decks than it did on remedying its CSOs.  While it is not the Court's role to

pass judgment on the other expenditures, these facts support a strong argument that Akron has consistently ignored its sewer problems for the better part of the last two decades.

During this same time period, there were large stretches of no improvement in the water quality in the Cuyahoga River. Akron's lack of spending is particularly troubling given the results of studies performed throughout that time frame.

● "Results from the 1991 Cuyahoga River survey implicated the Akron sewer system (WWTP, CSOs, SSOs) as a significant source of pollutant loadings and chemical and biological impacts."  Doc. 62-3 at 21.

● "Given the relatively unchanged state of discharges in Akron and Cleveland, the lack of difference between 1991 and 1996 surveys was not particularly surprising."  Doc. 62-3 at 22.

● "The general assessment of the situation in the 1998 Study was that the impact in the Little Cuyahoga watershed from the combined sewer overflows was so pervasive that until the impact was mitigated by improvements to the sewer system, biological and chemical water quality improvement could not occur." Doc. 62 at 6.

● The 1998 Study also indicated "dramatic increases in the amount of bacteria" during wet weather sampling and "high bacteria levels even during dry weather." Doc. 62 at 6.

The parties have also argued that a longer decree is necessary because this is a develop and implement decree and not an implement-only decree.  The Court would be more inclined to accept this argument without the undisputed history of this matter.  The parties began negotiating as early as 2002.  While Novak gave this Court background on these negotiations, Akron offered nothing specific about these negotiations until a supplemental filing by Akron nearly 7 weeks after the fairness hearing in this matter.  While the Court did not solicit this filing, the nature of the filing compels a review by the Court.

27

**A.  Akron's Supplemental Filings and the Government's Responses**

Akron's first supplemental filing included the affidavit of its mayor, Donald Plusquellic. Initially, the Court questions whether Mayor Plusquellic's affidavit is valid.  Unlike most affidavits, the affidavit is not made upon "personal knowledge."  Instead, the affiant simply claims to "have knowledge regarding the facts" within the affidavit.  A review of the document reveals why the affidavit reads in this manner.  The document is rife with hearsay, unsupported factual allegations, and expert opinions well outside of the knowledge and expertise of affiant. The Court will explain those deficiencies, and will also fully review the document despite those deficiencies.

If anything, Mayor Plusquellic's declaration supports the Court's determination that the Decree should be rejected.  The declaration indicates that Akron was aware of the issues with its CSOs in 1993 when it began to work on a LTCP.  Thus, negotiations over an effective LTCP have been ongoing for nearly 18 years.  Those negotiations have never led to a schedule that would quickly and efficiently eliminate overflows to sensitive areas.  Moreover, the tenor of Mayor Plusquellic's declaration, detailed below, demonstrates how unlikely it will be that an agreement will ever be reached in the future.

It is clear that the declaration seeks to lay the blame for Akron's problems at the feet of the Ohio EPA and the U.S. EPA.  According to the declaration, Akron reached an agreement with the director of the Ohio EPA in 2002 for implementation of Akron's LTCP.  Of course, even the documentation relied upon in the declaration only indicates a "tentative agreement" between Akron and the Ohio EPA.  Doc. 101-2 at 1.  The document also makes clear that the U.S. EPA had not been consulted about the supposed "tentative agreement."  This "tentative

agreement" apparently gave Akron 30 years to implement its LTCP.  The declaration then squarely places blame for Akron's failures on the U.S. EPA.  According to Mayor Plusquellic,

> The City's consultant was informed by Ohio EPA that U.S. EPA instructed Ohio EPA it could not issue any more permits to the City without an approved LTCP. Despite numerous inquiries, Ohio EPA has refused to reveal the identity of the person at U.S. EPA who instructed Ohio EPA it could not issue any permits to Akron. Likewise, U.S. EPA refuses to divulge the name of that individual. The name of that person must be released, as it is that individual who bears the responsibility for the failure of other LTCP projects to be constructed by the City.

Doc. 101-1 at 5.  The Decree was entered well after a motion to compel was filed by the Government.  In contrast, no motion to compel was ever filed by Akron.  The fact that these highly relevant individuals were never disclosed during discovery and that Akron never brought that issue to the Court's attention calls into question the accuracy of the factual allegations in the declaration.  The Government has also quite properly observed that these comments are irrelevant to the Court's analysis and that this is not the proper forum for Mayor Plusquellic's accusations.[4]

The declaration also indicates that Mayor Plusquellic "devoted a significant amount of time toward those negotiations. This included several trips to Washington D.C. to meet with officials of the Department of Justice and U.S. EPA." Doc. 101-1 at 5.  It is unclear whether any of these discussions included counsel in this matter for either the U.S. EPA or the Ohio EPA or whether Mayor Plusquellic sought to bypass counsel to reach a political conclusion to this matter.

Mayor Plusquellic also again invokes rate hikes as a defense to any shorter decree.  "In order to accomplish a 10 year schedule, the average Akron sewer rate payer in 10 years will pay nearly double the rates than under a 19 year schedule."  Doc. 101-1 at 8.  These statements about

---

[4] While indicating that this is not the proper forum for Mayor Plusquellic's accusations, the Government has indicated that it would strenuously disagree with the facts alleged in the declaration were this the correct forum.

rate hikes are simply disingenuous.  Akron has chosen time again to assert that rate hikes are the only manner in which to pay for the improvements to its sewer system.  However, this decision is not compelled by Akron's charter, any other law, or other litigation.  There are numerous methods for funding these upgrades.  Moreover, as detailed above, Akron has always been able to find a source of funding for the projects of its choice.  It is clear from the declaration that Akron feels that it should be entitled to 30 years to remedy its overflows.  Accordingly, when a shorter time period is proposed, Akron's funding options suddenly become limited.  This Court, however, has reviewed the totality of Akron's finances and therefore rejects its argument that rate hikes are the only method for funding improvements.

Mayor Plusquellic's declaration also contends that Akron's sole significant capital project of the last decade related to the CSOs, a storage basin at Rack 40, "resulted in a reduction of 39% of the total CSO volume."  However, the declaration fails to note that this reduction was based solely on modeling and not on any actual measure of the overflows.  See Doc. 87 at 244-45.  In contrast, the figure of 2 billion gallons of annual discharges was determined by hard data from Akron's own monitoring.  In that same paragraph, Mayor Plusquellic asserts that "the City's water quality experts" informed him "that Ohio EPA's own studies demonstrate that the Cuyahoga River has experienced significant water quality improvements" since Rack 40 was built.  However, rather than attach these alleged studies, or even name them, the declaration then cites to two newspaper reports as support.  Citing to these articles rather than the alleged scientific data speaks directly to the credibility of the claims in the declaration.

Furthermore, as the Government highlights, Mayor Plusquellic is not an environmental expert, nor does he have specialized engineering knowledge.  Thus, to the extent that he seeks to

opine on water quality analyses or the necessity of certain control measures, he lacks the proper knowledge or expertise to offer such an opinion.

Finally, the declaration points out that other cities' consent decrees have permitted lengthier time periods for completion, namely a decree in Kansas City, Missouri and a decree with the Northeastern Ohio Regional Sewer District ("NEORSD"). No details about these decrees have been provided to the Court. However, the Court takes judicial notice of the fact that the decree with the NEORSD is an implement-only decree. As such, it is apparent that negotiations therein were successful in forming a complete plan – a fact severely lacking herein. Accordingly, these comparisons offer no value to the Court.

For similar reasons, the Government's argument that this Decree is consistent with other decrees across the country also offers little value to the Court. The EPA's own acting branch chief in the municipal enforcement plan in the water enforcement division of the U.S. EPA noted that no decree had previously addressed overflows that all went directly into sensitive areas. Accordingly, by the Government's own admission, the case before this Court presents a unique factual scenario that includes billions of gallons of discharges of partially or untreated sewage into a National Park. As such, any argument about alleged consistency with other decrees carries very little weight.

More than seven years after negotiations began, the Decree was lodged. Tellingly, at that time the Decree was lodged, there was no agreement on the schedule for the projects that would be necessary. During the hearing on January 4 and 5, 2011, it became clear that there is still no agreement on that schedule. In fact, if the Decree is approved, the parties anticipate nearly immediately making use of its dispute resolution process. As such, from a negotiating

31

standpoint, the parties are exactly where they were nearly nine years ago – nowhere close to an agreement that would improve water quality.

In another effort to convince the Court that progress was being made, Akron filed a supplement on March 2, 2011.  The supplement included Akron's updated revised LTCP and argued as follows:

> Akron's submission of a revised LTCP demonstrates its willingness to compromise in preparing a plan that is consistent with U.S. EPA's CSO Policy and to address the concerns the Court raised at the Fairness Hearing with the parties' "design and implement plan" under the proposed Consent Decree. The submission of a revised LTCP puts the parties on a path toward not only implementing the terms of the proposed Consent Decree, but a final design and the construction of controls that will significantly reduce overflows from Akron's sewer system.

Doc. 102 at 2.  Standing alone, this filing would give rise to a belief that an agreement on Akron's LTCP would be not only possible, but likely in the near future.  However, the Government's response to Akron's supplemental filing, while also expressing a belief that an agreement is likely, sheds a different light on the matter.

This filing demonstrates that on January 14, 2011, the Government rejected Akron's initial final LTCP update that was submitted on October 15, 2010.  The October 15, 2010 LTCP provided for a total of 12 overflows annually or roughly 1.3 million gallons of overflows.  The Government formally disapproved of the update in that same letter.  On February 15, 2011, the Government then provided further guidance to Akron for revising its LTCP.  The February letter provided that the Government believed that for Akron to comply with the Clean Water Act and the Decree that the LTCP needed to provide for zero discharges from the basins, zero discharges from the Ohio Canal Tunnel, 2 discharges from the Northside Tunnel that were treated, and a maximum of 6 bypasses from the treatment plant that were also treated.

32

The February 15, 2011 letter also sets forth a construction schedule that would achieve full operation of all the CSO control measures by October 15, 2022.  The letter also provides:

> The Guidance also recognizes that some communities may not have the financial capability to fund the costs of implementing a LTCP in accordance with a schedule based solely on normal engineering and construction practices, in which case a longer schedule may be warranted.  *EPA and OEPA are not aware of any information that demonstrates that Akron does not have the financial capability to complete implementation of the LTCP described in this letter by October 15, 2022.*

Doc. 106-3 at 2 (emphasis added).  The letter also addresses Akron's self-imposed "2.1% cap" as it relates to sewer rates.  The letter includes an attachment demonstrating that Akron could remain below this cap and still comply with the construction schedule proposed by the Government.

The Government's response is illuminating for several reasons.  First, the February letter expresses a belief that all of the information received by the Government justifies a completion date of October 15, 2022.  Yet, the Government continues to urge the Court to approve a consent decree that allows for overflows until nearly 6 years beyond that date.  It is particularly important to the Court that the Government reached its October 15, 2022 date through the use of its Guidance and the particular facts presented throughout this litigation.  As Loren Denton himself testified during the fairness hearing:  "[T]o be honest, when the settlement[] was lodged, we didn't have all the information.  So some [of] that wasn't considered then, but is being considered now."  Doc. 87 at 163-64.  Thus, from the Court's perspective, it certainly appears that once Akron provided full information to the Court, the Government became convinced that a shorter decree was appropriate.

In addition to demonstrating this fact, the Government's attached construction schedule is also of interest to the Court.  Within that schedule, the Government indicated the design criteria

for the control measures needed under the decree.  This schedule was similar in layout to the schedules previously used by Akron.  In response to the February letter, Akron then supplied its revised LTCP which resulted in its March 2, 2011 supplemental filing.  A comparison of Akron's February 28, 2011 LTCP update and the Government's February 15, 2011 letter demonstrate just how far apart the parties remain at this date.

| Control Measure Location | Akron Design Criteria (in gallons) | Government Design Criteria |
|---|---|---|
| Rack 3 | 1,227,000 | 1,865,006 |
| Racks 5 & 7 | 553,000 | 1,105,920 |
| Racks 10 & 11 | 1,259,000 | 2,518,616 |
| Rack 12 | 3,211,000 | 6,004,454 |
| Rack 14 | 1,203,000 | 1,927,842 |
| Rack 15 | 846,000 | 1,446,246 |
| Rack 22 | 1,167,000 | 2,424,446 |
| Rack 26 & 28 | 1,335,000 | 2,296,669 |
| Rack 27 & 29 | 1,237,000 | 1,290,276 |
| Rack 36 | 606,000 | 1,133,074 |
| Ohio Canal Tunnel | 24,500,000 | 74,100,000 |
| Northside Tunnel | 20,800,000 | 33,200,000 |
| | | |
| TOTALS | 57,944,000 | 129,312,549 |

For clarity, the parties appear to agree that storage basins are necessary at each of the locations detailed above, along with the construction of the Northside Tunnel and the Ohio Canal Tunnel.  The remaining two columns demonstrate that the parties do not remotely agree on the necessary size of the storage basins or the tunnels.  Akron proposes to build storage basins and tunnels that would allow for the storage of 57,944,000 gallons.  In contrast, the Government's proposal would allow for the storage of more than double that amount at over 129 million gallons.

While the Government proposes 223% more storage capacity, it also proposes a schedule six years shorter than the schedule proposed by Akron.  Particularly telling are the parties' stances on the construction of the Ohio Canal and Northside Tunnels.  Akron proposes a Northside tunnel with a capacity of roughly 21 million gallons that would be fully operational by

July 7, 2028.  The Government proposes a Northside tunnel that stores over 33 million gallons with construction completed by the end of 2021.  Similarly, Akron proposes an Ohio Canal Tunnel that has a capacity nearly 50 million gallons smaller or roughly one-third the size of the tunnel proposed by the Government.  Akron seeks to have its smaller tunnel fully operational by 2020, while the Government would have construction completed by the end of 2017.

In summary, Akron seeks to build significant smaller tunnels while taking longer to make both tunnels fully operational.  While the Government's latest stance would result in storage in the tunnels of over 107 million gallons by 2022, Akron's plan would not complete both tunnels until 2028 and even then the tunnels would only hold 45 million gallons.

Finally, while Akron's newest proposal has reduced its goal of 12 annual overflows to 3 annual overflows, there is nothing to suggest that this lower number will be approved.  In fact, in its February 14, 2011 letter, the Government expressly indicated that if Akron was not in agreement with the proposed construction schedule that reduced overflows to zero and provided a deadline of October 15, 2022, "Akron will need to provide a thorough explanation as to why it believes that the proposed deadline is as soon as possible as required by Paragraph 12 of the Consent Decree."  Doc. 106-3 at 3.  Despite all of the supplemental filings in this matter, there is nothing to suggest that Akron provided such an explanation in its February 25, 2011 updated LTCP.

Even with all of the supplemental filings in this matter, there is nothing to suggest that the parties are close to agreement on the measures necessary under the Decree or the appropriate schedule to implement those measures.  The parties seek to spin this fact by asserting that they would have a formal dispute resolution process if the Court entered the Decree.  In so doing, they return to their "this is the best we could do" mantra.  On numerous occasions, counsel asked this

Court to look at its alternative.  Counsel argued that if the Decree is rejected, litigation will follow.  The litigation would be lengthy, costly, and contested.  Accordingly, the argument went, everyone would be better off if the Decree were simply entered now.  In that argument, counsel turns a blind eye to the fact that the parties have not (and as it appears, simply cannot) agree on a schedule.  Due to that fact, there is no doubt that this Court will be called upon to conduct numerous "mini-trials" utilizing the Decree's administrative dispute resolution process.  The proposed benefit of entering the Decree – limiting litigation – is simply nonexistent under the facts known to the Court.

As noted above, negotiations between the parties began as early as 2002.  The Decree allows for Akron to complete its obligations as late as 2028.  While the parties have argued that such a time frame is now roughly 17.5 years, the facts indicate that Akron has effectively been given 26 years to remedy its alleged violations.  Furthermore, as Mayor Plusquellic has admitted that Akron sought to address its overflows as early as 1993, one could conclude that Akron has been given 35 years to remedy its alleged violations.  From the evidence and argument presented, there is no question that Akron will seek to utilize the full time frame in the decree to comply.  Mayor Plusquellic himself asserted that "the citizens and businesses of Akron should be given a longer period of time to implement its LTCP, not a shorter one."  Doc. 101-1 at 8.  This comment stands in stark contrast to the requirement of the Decree that Akron remedy its CSOs in "a manner that is as expeditious as possible."   In fact, such a statement gives the Court grave doubts about whether Akron will even attempt in good faith to fulfill such an obligation.

With the above-commentary in mind, the Court evaluates the factors as required by law.

## A. Fair

The Sixth Circuit has explained the "fair" prong of the Court's review as follows:

> In determining whether a decree is fair, courts have considered the following: the strength of plaintiff's case, the good faith efforts of the negotiators, the opinions of counsel, and the possible risks involved in the litigation if the settlement is not approved.  Fairness should be evaluated from the standpoint of signatories and nonparties to the decree.

*Azko Coatings*, 949 F.2d at 1435 (citations and quotations omitted).

Here, there is no question that the Government has a strong case.  While Akron has denied a bulk of the alleged violations, it has at the same time admitted numerous violations.  Further, Akron has admitted the factual basis of nearly every violation, challenging only the application of its permit to those facts.  From the Court's review of the docket and the hearing, the Government presents a strong case.

There is also no question that the parties engaged in lengthy negotiations that culminated in the Decree.  However, the Court gives little weight to that fact because the parties have done little more than agreed to agree.  The Decree contains only one drop-dead end date and provides no detailed schedule for the major early-action projects that will ultimately be required.  As such, the core of the negotiations in this matter has yet to occur.   To the extent that the parties have begun to negotiate the LTCP, the Court's above analysis has made clear that those negotiations are likely to continue to be unsuccessful.

Counsel seem to agree that the decree should be entered.  However, as detailed above, none could express a reason why the length of the decree is appropriate.  Furthermore, more recent correspondence from the Government to Akron seems to indicate that a date in 2022 is more appropriate that the date contained in the Decree.  The only argument heard from counsel was that this Decree is better than no decree at all.  As such, the Court has also afforded lesser weight to counsel's opinion.

There are significant risks if this matter moves forward with litigation.  If Akron is successful, the public runs the risk of continued CSOs into the Cuyahoga River.  If the Government is successful, Akron runs the risk of the imposition of massive fine, along with a requirement of expeditiously implementing costly remedial measures.  As such, all parties have an incentive to reach a meaningful settlement.

On the whole, the factors weigh against a finding that the Decree is fair.  The Government has a very strong case.  In fact, Akron has admitted to numerous violations.  The Decree does next to nothing to resolve the parties' differences over the need for immediate action by Akron.  Further, no counsel was able to articulate why the Decree needed to be the length that is proposed.  As such, the "fair" prong of the Court's review weighs against entering the Decree.

## B.  Reasonable and Adequate

The Sixth Circuit has also explained the Court's role in reviewing the "reasonable" prong:

> In determining whether a consent decree is "reasonable" courts have considered the following: the nature/extent of hazards; the degree to which the remedy will adequately address the hazards; possible alternatives for remedying hazards; and the extent to which the decree furthers the goals of the statute.  These criteria reflect the court's "limited duty" to inquire into the technical aspects of the cleanup program proposed by a consent decree in order to ensure that the proposed settlement adequately addresses environmental and public health concerns.

> The most important of these "reasonableness" factors [is] the decree's likely effectiveness as a vehicle for cleansing the [environment].

*Azko Coatings*, 949 F.2d at 1436-37.

There is no way of knowing whether the Decree will be an effective tool for cleansing the environment.  As noted throughout this opinion, the cornerstone of the Decree, the LTCP, has

not been formalized. While the Government's stated goal is to eliminate all overflows from Akron's CSOs, the parties' fruitless negotiations have shown that Akron has never been willing to share in this goal. Furthermore, the Court has expressed on more than one occasion that it does not agree that the outlier date contained in the Decree is reasonable given the complete lack of evidence offered in support of that date. Accordingly, the reasonable-and-adequate prong also disfavors entering the Decree.

### C. Public Interest

The Court has made no secret of its belief that the public interest is very high in this matter. In its argument, the Government has focused upon the flexibility of this inquiry, citing *United States v. Microsoft Corp.*, 56 F.3d 1448, 1460 (D.C.Cir. 1995).

> The court should also bear in mind the *flexibility* of the public interest inquiry: the court's function is not to determine whether the resulting array of rights and liabilities is the one that will *best* serve society, but only to confirm that the resulting settlement is within the *reaches* of the public interest.

*Id.* (quotations and citations omitted; emphasis in original).

There is little doubt in the Court's mind that the Decree will not *best* serve society and the affected waterways. Furthermore, based upon the evidence presented to this Court, it cannot say that the Decree is even within the *reaches* of the public interest. The Government appears to contend that because the Decree may ultimately bring Akron into compliance with the Clean Water Act and may enhance water quality at some time in the future, it easily meets this threshold. If the Court were to accept that view, *every* decree would be in the public interest. Such a limited review would turn this Court into the "rubber stamp" that the Sixth Circuit has expressly dictated against. *Azko Coatings*, 949 F.2d at 1435 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)). Accordingly, the Court declines to accept such a limited review of the public interest.

In evaluating this prong, the Court has continued to give deference to the expertise of the EPA.  In that regard, the EPA has mandated that priority be given to sensitive areas.  As Denton indicated during his testimony, "*every outflow* is to a sensitive area."  Doc. 87 at 150 (emphasis added).  Moreover, the EPA's guidance makes clear that that overflows to sensitive areas should be *completely eliminated* if physically and economically possible.  That requirement is put in place even without the specific consideration present in this case – the impairment of Ohio's only National Park.  Despite that fact, the Decree makes no effort to give priority to sensitive areas.  Instead, the parties have negotiated a Decree that reaches near the outer limits of the EPA's Guidance, 20 years, for any decree, let alone a decree that involves sensitive areas.

The length of the Decree becomes even more troubling once one examines the annual discharge of untreated or partially treated sewage.  Data from Akron's own Water Pollution Control Station was retrieved on November 25, 2009.  The data indicated annual bypass discharges of 1.2 billion gallons.  An additional 824 million gallons were annually discharged through CSOs.  Accordingly, over 2 billions of partially or untreated sewage is annually discharged into sensitive areas.

Upgrades to the Water Pollution Control Station have a hard deadline in the decree of October 2017.  However, those upgrades are only expected to reduce overflows by 418 million gallons per year.  Further, the sewer separation projects also have a hard deadline of 8 years after the lodging of the decree.  Those improvements are expected to eliminate only 10 million gallons of overflows per year.  In other words, the improvements with hard deadlines in the decree will only eliminate one-quarter of the total overflows.  The more significant improvements have no agreed upon deadlines.  In stark contrast, Novak indicated that Columbus will eliminate nearly two-thirds of its overflows in only 9 years.

Finally, the Court pauses to reject Akron's arguments that reducing these overflows will have no tangible effect on the water quality.  In part of its argument, Akron asserted that other sources of pollution are significant enough that Akron's contributions to the water quality are overstated.  The Court disagrees.

First, Klingenstein indicated that the smaller feeder streams that led into the Cuyahoga River were not significant factors in the water quality:

> I am familiar with those streams, but the data I've seen on those streams, the available data on these streams would suggest that the peaks, the number of data points that exceed the single sample maximum, the frequency of that happening on those streams is lower than on the Cuyahoga. So to me that says that they're not the driver on the high numbers that we're seeing in the Cuyahoga, that upstream is.

Doc. 87 at 63.  Klingenstein's conclusion was supported by a supplemental filing.  Doc. 90-2. Akron has not contested this conclusion.  Instead, Akron has asserted that other sources greatly contribute to the water quality.   However, the Water Quality Analysis for the Heartland Inventory and Monitoring Network (HTLN) of the US National Park Service: CUYAHOGA VALLEY NATIONAL PARK directly refutes this point.

> Additional research has confirmed that fecal coliform numbers continue to exceed the 1000/100 mL primary contact recreation criterion between Akron and Cleveland when stream flow is elevated due to rain runoff (Ohio EPA 1999).
>
> …
>
> This study concluded that the *most significant source* of fecal coliform bacteria was from multiple bypasses of the secondary treatment process at the Akron WWTP.

Doc. 90-2 at 36 (emphasis added).  Beyond this scientific conclusion, it is simply inconceivable from a common sense perspective that removing 2 billion gallons of untreated or partially treated sewage from the Cuyahoga River will have little to no effect on its water quality.  Accordingly,

the public interest weighs strongly against a decree that does little to nothing to expedite remedies that eliminate these discharges.

Additionally, the Government has suggested that the Court take into account the finances of Akron.  The Government's expert concluded that from a financial standpoint, 10 years was the appropriate length for the Decree.  It was only through manipulation of the EPA's formula that Akron's expert could stretch that length to 15 years.

Finally, the Government has suggested that the Court take into consideration the time necessary to complete the remedies proposed in the Decree.  Novak testified that while it would be difficult from a management perspective, all of the projects necessary to substantially reduce the overflows could be completed in 10 to 11 years.

The public interest herein is not simply that a decree be entered.  If that was all that was required, the Court would need no hearing to resolve the matter.  Rather, the public interest includes a timely remedy – an interest not at all served by the Decree.  The upgrade to Akron's wastewater treatment plant need not be operational until October 15, 2017, nearly 8 years into the decree.  Similarly, full and complete separation of the sewers need not be completed for 8 years.  As noted above, these remedies will remove only one-quarter of Akron's discharges.  Beyond that, there is no hard timeline for any of Akron's major projects.  Any and all future deadlines must be arrived at through negotiations – negotiations that have been ongoing and unsuccessful for the last decade.  In the event those negotiations continue to stall, the dispute resolution process will begin.  Many months will pass and hundreds of millions of gallons of untreated and partially treated sewage will continue to flow into the Cuyahoga National Park – an event that some would classify as an environmental catastrophe.  As such, the public interest is not at all protected.  The public is given no relief in the immediate future.  Furthermore,

without some agreement on the construction schedule for the two major tunnels, the public has no protection whatsoever against substantial ongoing sewer overflows.

**VIII.   Amicus Briefs**

On March 10, 2011, the City of Fairlawn moved for leave to file an *amicus curiae* brief. Doc. 104.  The following day, Summit County made a similar request.  Doc. 105.  Both motions are GRANTED.   The parties' attached *amicus* briefs are hereby deemed filed and have been considered by the Court.

The Court notes that the Decree was lodged with the Court on November 13, 2009. Notice of the Decree was published in the Akron Beacon Journal, the Richfield Times, and the Southside News Leader.   A public comment period was open for 60 days following the publication of the notice.   During that time period, neither the City of Fairlawn nor Summit County offered feedback on the Decree.  On May 10, 2010, the Government moved for entry of the Decree.  Neither *amici* responded to that motion in any manner.  The Court then conducted a fairness hearing on January 4 and 5, 2011.  Nothing was heard from the City of Fairlawn or Summit County during that hearing.   In other words, there was a time and place to provide feedback on the Decree.   However, it was not until nearly two months after the hearing that either party sought to file a brief in support of the Decree.  As such, the briefs are woefully late under any standard.

More important to the Court, neither brief addresses the issue before the Court.  Neither brief seeks to argue that the Decree meets the legal standard necessary for entry by the Court. Instead, both briefs contend that this Court should take into consideration the fact that not entering the Decree could negatively affect rate payers in both communities.  Summit County's brief includes the following:  "There is also a credible threat that the rate increase for the County

43

will exceed the 2% of Median Household Income which is high burden on residential rate payers under" the EPA's Guidance. Doc. 105-1 at 3. Similarly, Fairlawn's brief includes: "Fairlawn respectfully suggests that the sewer rates that would be the product of a shorter compliance schedule may cause irreparable economic harm to the region." Doc. 104-1 at 3.

Neither brief contains any financial analysis. Instead, both communities seem to have simply accepted Akron's choice that a rate increase is the only method for paying for the control measures needed under the Decree. There are two faults with this premise. First, the Government's February 2011 letter indicates that a construction schedule much larger in scale and much shorter in duration would still not exceed 2% of the median household income in Akron. Such a conclusion casts great doubt on Akron's conclusion that any schedule shorter than its proposal would exceed that mark. Furthermore, as detailed above, there is simply no requirement that rate hikes form the sole or primary mechanism for raising the needed funds for the control measures. As the Government aptly stated in its last letter to Akron: "[I]t is solely within Akron's discretion to determine whether rates should be raised, bonds issued, loans secured, etc. to finance this work." Doc. 106-3 at 3. As such, it is apparent that the local communities should not simply accept without question Akron's approach that rate hikes are the only possible solution to this problem. In point of fact, if the Court were to enter the Decree, it appears that Akron would simply utilize rate hikes and both Fairlawn and Summit County would be worse off for simply accepting those increases.

## IX. Summary

The parties brought to this Court a Decree that allows Akron more than 19 years to remedy its CSOs. Those 19 years do not include the 7 years of negotiations that occurred prior to this lawsuit being filed. The EPA's financial review indicated that 10 years was appropriate.

Construction of the necessary capital projects could all be completed within 10 years.  No evidence from any party was presented to suggest that a decree of 19 years (or 26 years if one includes the prior fruitless negotiations) is reasonable or necessary due to the particular facts surrounding Akron.  In fact, the latest correspondence from the Government to Akron indicates that the totality of the evidence coupled with the EPA's Guidance suggests that compliance should be completed by October of 2022.

The fact that the Government's latest filing contains such information only serves to highlight what the Court discussed at length above.  Pending before the Court is little more than an agreement to agree.  It has now been more than 9 years since the parties set out to agree on a LTCP.  The filing of this litigation brought the parties no closer together.  The lodging of the consent decree brought the parties no closer together.  Rather, it appears that the only event that even nudged the parties closer together was this Court's fairness hearing.  However, as detailed above, there is still a significant gap between what the parties believe is an appropriate LTCP, and there is simply no doubt that future litigation before this Court would be necessary to finally reach an acceptable LTCP.  While the parties' disagreement has continued for nearly a decade, billions of gallons of partially or untreated sewage have been annually discharged into the Cuyahoga River and its tributaries.

The parties' primary selling point to the Court is that the Decree finally puts this matter squarely before the Court.  After more than nine years of negotiations that have never progressed, the parties may bring their disputes before the Court.  However, the dispute resolution process is not a quick one.  Formal dispute resolution may only be invoked after 20 days of informal dispute resolution.  After Akron initiates that process, the Government has 45 days to file its position statement.  Within 15 days after receiving the position statement, Akron

may seek judicial review.  The Government would then have the opportunity to oppose the request for judicial review and Akron would be permitted to reply in support.  It is unclear whether these deadlines take into consideration the time necessary to compile the administrative record.  It is clear that any such process would take at least 3 months before it was even *ripe* for consideration by this Court.  As such, the *first* of these disputes would not reach this Court until sometime in June of 2011.  Given the parties' history of unsuccessful negotiations dates back nearly a decade and given that any current disputes would involve only discrete portions of the Decree, there could be any number of these mini-trials before a final implementation schedule is created.  Such conduct does little to nothing to protect the public and instead simply maintains the status quo for many months to come.

In contrast to a possible continual need for Court involvement over discrete issues in the Decree, the parties and more importantly the public would be better served by a resolution before this Court that results in a full, complete, and certain resolution of this matter.  Thus, contrary to the parties' arguments, rejecting the decree will not delay resolution of this matter by any lengthy period of time.

In sum, the Court rejects the parties' view that "any decree is better than no decree at all." The Decree is not fair, reasonable, adequate, and in the public's best interest.  Giving due deference to the EPA's expertise actually compels a finding that the timeline in the Decree is too lengthy, too uncertain, and too dependent upon future agreement amongst the parties.  Based

upon the facts and law presented to the Court, a proper decree should provide full, complete, and certain relief to the public.  Accordingly, the Court declines to enter the Decree.

IT IS SO ORDERED.


March 17, 2011                                     /s/ John R. Adams_____
                                                  JUDGE JOHN R. ADAMS
                                                  UNITED STATES DISTRICT COURT