UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CASE NO.: 5:09CV272 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN ADAMS |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| CITY OF AKRON, et al. | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

Pending before the Court is the United States' unopposed motion for entry of the parties' consent decree. Doc. 123. The Court held a renewed fairness hearing on the motion on October 16, 2012, receiving nearly six hours of testimony. The testimony presented again included a financial review, but it also added significant engineering testimony to the Court record.

**I. Standard for reviewing consent decree**

The Court must now consider that additional testimony and the finalized, agreed-upon Long Term Control Plan Update in its analysis. In that regard, the Court has previously explained what steps it must take in analyzing the Consent Decree: "The criteria to be applied when a district court decides whether to approve and enter a proposed consent decree, are whether the decree is fair, adequate, and reasonable, as well as consistent with the public interest." *United States v. Lexington-Fayette Urban County Government*, 591 F.3d 484, 489 (6th Cir. 2010) (citations and quotations omitted). In that respect, the Court should consider "the decree's likely effectiveness as a vehicle for

1

cleansing" the waters at issue. *United States v. Akzo Coatings of America, Inc.*, 949 F.2d 1408, 1437 (6th Cir. 1991). "[I]n evaluating the efforts of an agency charged with making technical judgments and weighing complex data, [this Court] must give a proper degree of deference to the agency's expertise, yet also ensure that the agency has considered all of the relevant evidence in the record and has acted in the public interest." *Id.* at 1426 (discussing standard of review under CERCLA) (citation omitted). Furthermore, this Court must be mindful that there exists a "presumption in favor of voluntary settlement" and that the "presumption is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA[,] which enjoys substantial expertise in the environmental field." *Id.* at 1436 (citation omitted).

## II. Rule 706

Based upon the current state of the record, the Court finds it necessary to utilize Federal Rule of Evidence 706 which provides as follows:

> On a party's motion or on its own, the court may order the parties to show cause why expert witnesses should not be appointed and may ask the parties to submit nominations. The court may appoint any expert that the parties agree on and any of its own choosing. But the court may only appoint someone who consents to act.

A. <u>The need for an expert</u>

Throughout this process, the Court has received voluminous filings from the parties, ranging from financial reviews to highly technical water quality surveys. The Court attempted to synthesize that data in its initial decision, rejecting the decree. However, further developments have only added to the complexity of the record before the Court.

2

The Court would note that this matter was pending on appeal for a lengthy period of time following the Court's rejection of the Decree.  The parties apparently utilized that time period to negotiate the Long Term Control Plan Update.  This negotiation began in roughly 2002 and made no progress up through this Court's rejection of the Decree.  Now for the first time in more than a decade, the parties have reached a LTCP Update, adding a significant amount of information for the Court to review.

Additionally, in rejecting the parties' proposed decree during an initial review, the Court carefully reviewed the EPA's own guidelines, including a document titled "Combined Sewer Overflows Guidance for Long-Term Control Plan."  This document includes the following:  "Permittees should give priority to environmentally sensitive areas."  Guidance at 1-4.  "If physically possible and economically achievable, existing overflows to sensitive areas should be eliminated or relocated[.]"  Guidance at 1-22.  The Court explained that it appeared from a review that while the Guidance was flexible, it did not appear that the EPA had been entirely faithful to its own internal policies.  As such, the Court was forced to examine the proper level of deference that should apply in this particular matter.  The Court's prior review noted that the Guidance provided that the EPA should "give priority to environmentally sensitive areas."  While the initial review was certainly difficult for the Court to complete, further review has only become more complex.  With respect to this Guidance issue, the Court heard more recent testimony and argument that the Decree closely parallels numerous other decrees recently entered into by the EPA.  However, the parties also conceded that this Decree was the *only* Decree that involved discharges that were **exclusively** into sensitive areas.  Accordingly, the fact that this Decree was apparently consistent with others is in fact an indication that

it is *inconsistent* with the Guidance. This is particularly troubling when one examines the nature of the sensitive areas involved herein. The overflows herein directly affect the Cuyahoga Valley National Park. The Park spans over 33,000 acres including 22 miles of the Cuyahoga River, has over 104 miles of trails, and has ten working farms within its borders. A major attraction of the Park is the towpath trail that follows the old Ohio & Erie Canal and the Cuyahoga River. The towpath opened in 1993 and visitation to the Park doubled the next year. In 1994, the Environmental Education Center opened and now serves over 1,800 schools within Ohio. By the time the Park celebrated its 20th anniversary in 1995, it had an operating budget of over $6 million and employed nearly 150 people. By 2009, the Park had over 2.8 million annual visitors, making it the sixth most visited national park in the entire United States. Moreover, all of the parties agree that during the pendency of this matter and for years prior to it, literally *billions* of gallons of partially treated sewage has flowed into the Park, making it waters unsuitable for recreational activities. Given those facts, the Court is obligated to closely scrutinize the EPA's adherence to its own Guidance

From an initial review, it certainly appears at first blush that the EPA has further strayed from its own Guidance in reaching this Decree, again causing the need to examine the appropriate amount of deference that should be given in this matter.

1. Engineering Testimony

Additional testimony was also provided to the Court in an attempt to eliminate concerns expressed in the Court's prior order. Specifically, engineering testimony was presented in an attempt to demonstrate that the LTCP Update has a reasonable construction schedule. In the Court's view, this testimony perhaps only scratched the

4

surface of the type of review necessary to properly evaluate the LTCP Update.  Only general conclusions about the priority, or lack thereof, of certain projects was offered, with very little background.  In the Court's view, a true understanding of the *underlying data and engineering process* must be obtained to adequately review the LTCP Update.  This type of engineering knowledge is beyond the record as it currently exists and beyond the Court's ability to obtain without expert assistance.

As just an example, civil engineer David Haywood offered testimony about the engineering involved with tunnel construction, discussing both a hydraulic analysis and a surge analysis.  Haywood also discussed tunnel alignment, discharge location, odor considerations, utility conflicts, consolidation sewer alignments, shaft siting, contractor layout area, land acquisition, permits, and field work.  Haywood indicated that these were all relevant engineering considerations.  Haywood, however, offered few or no specifics about each of these considerations, speaking only in generalities about most of them.  Haywood also offered as follows:

> In looking at the storage basins and sequencing those, what we were looking to do was to -- in a lot of ways you build these from the upstream end to the downstream end because if I build the upstream end first and I take care of the flow, then I can build the downstream. I know what the upstream contribution is because whatever I build upstream, what's coming out of there goes toward the downstream. So the upstream output is the downstream input, if you will.
>
> So the long-term control plan update requires us to build minimum sizes for the tunnels and the storage basins.  If I were to build those out of sequence, I might not achieve the requirements of the long-term control plan update of achieving zero overflows in a typical year.

Doc. 129 at 174.  While this testimony appears straightforward – build upstream to downstream – the engineering involved in the LTCP Update was not so simple.  Instead, upon questioning from the Court, Haywood indicated that the order chosen for

5

construction of the basins involved a multitude of factors, including basin size, location, and overall effects on the overflows. Each question by the Court only served to reinforce that numerous factors, many unexplained to the Court to this date, were considered when agreeing upon the schedule in the LTCP Update. Without some significant explanation of each of the factors considered for *each* project of the LTCP Update, this Court cannot possibly evaluate the overall fairness of the scheduled adopted by that agreement. Perhaps more importantly, without this information, it is once again nearly impossible to evaluate how or why the EPA strayed so far from its Guidance.

The Court is also somewhat concerned that many of the engineering issues discussed by Haywood appear to have been analyzed based upon data provided by Akron. Given that the complaint contained thousands of alleged violations for failing to properly monitor the sewer system and its discharges, it gives the Court pause that many of the engineering decisions were made based upon data that may or may not have been independently verified by the EPA. More importantly, Haywood's testimony made clear that an understanding of those factors and their importance will only be achieved through the appointment of an expert by the Court that may independently review any necessary information to give a reasoned opinion on the issues herein.

2. Financial Testimony

Much like the prior proceedings, the parties again submitted financial testimony in support of the Decree as well. This information again served to add to the need for an expert to review the totality of the Decree and the underlying decision-making that went into its formation. Time and again, the Court inquired about the efforts that were made to review funding sources *other than rate increases*. This avenue of inquiry was

particularly relevant to the Court's review because much of the argument that the Degree is proper in duration centers on the financial capability of Akron to pay for the improvements.  In turn, this financial capability is often expressed, at least in part, as the burden on the rate payers.   The testimony time and again referred to this as a medium burden.  Returning to the Guidance, this medium burden would suggest that 10 years is an appropriate time to bring Akron into compliance with the Clean Water Act.  As such, there exists yet another unexplained, substantial departure by the EPA from its Guidance.

Furthermore, during the most recent testimony, the Court heard that many alternatives were not explored, including general revenue bonds.  The witnesses appear to have testified that review of such sources was either unnecessary or would not alter the ultimate conclusions reached by the witnesses.  Neither of these responses was ever fully clarified for the Court.  Additionally, it appears that the witnesses not only failed to explore other funding alternatives, but failed to take any steps to independently verify Akron's available funds.  Thus, the Court is left to somehow review whether the finances of Akron were fully reviewed and/or vetted prior to utilizing them in the EPA's review.

Any one of the issues described above would warrant the Court employing its own expert to review the matter.  These issues, however, must be synthesized into an overall review of the Decree and then balanced with the deference (whatever level that may ultimately be) due to the EPA.  When the Court endeavored to undertake this task initially, it resulted in a nearly 50-page opinion.  Now, the parties have included further testimony and a lengthy Long Term Control Plan Update for the Court's review, but have not significantly aided the Court to understand the full import of these items.

### III. Objections

Based upon the Court's December 7, 2012 show cause order, the U.S. Government, Akron, and Ohio each filed objections to the Court's position that an expert is necessary in this matter. The Court now reviews those objections.

1. Settlement

The parties all seem to agree than an expert is not necessary because this matter appears before the Court on a motion to approve a consent decree. The parties argue at length that the proper use of an expert is in complex matters involving *conflicting* testimony. The parties also rely upon the fact that this Court must honor the presumption in favor of settlement and grant deference to the EPA's expertise in resolving these matters.

The Court recognizes that generally Rule 706 is invoked in situations in which the evidence is conflicting. However, the Rule contains no requirement that there be conflicting evidence in order to justify the appointment of an expert. Furthermore, it is the very fact that there exists no opposing side in this litigation that has caused the need for an expert.

The Court has time and again been presented with the same arguments from all of the parties, as they all seek entry of the Decree. As such, the Court has been unable to genuinely test any of the arguments raised by the parties as there exists no filed oppositions. In short, the parties have presented a singular view. A review of the numerous proceedings before this Court has demonstrated that the Court has not acted as a rubber stamp and simply adopted that view. Instead, the Court has made every effort to examine witnesses and question counsel to resolve its existing concerns and confusion

surrounding the Decree. To date, not all of the Court's questions and confusion have been answered.

If anything, the addition of the Long Term Control Plan only served to add another layer of questions and confusion to the Court. Once again, the parties presented the matter in such a way that it is clear that they presumed that their agreement was essentially all that was necessary to gain approval. In other words, they proceeded under the assumption, "since we agree this is in the public interest, the Court must reach the same conclusion." As this Court stated in writing, the Court must review the fairness of the Consent Decree and whether it is in the public's interest. The simple fact that the Decree is in the litigants' interest does not equate to some automatic approval mechanism.

Accordingly, the parties' objections that contend that no expert is necessary because the parties have offered no conflicting evidence is OVERRULED. The lack of any genuine "adversary" in this litigation has only served to bolster the need to appoint an independent expert.

2. Delay and Expense

The parties contentions that the appointment of an expert would unduly delay this matter and add some substantial expense border on frivolous.

This matter was filed more than four years ago. Following the Court's rejection of the parties' proposed consent decree, the parties appealed. The first notice of appeal was filed on March 25, 2011. The Sixth Circuit issued its limited remand on July 24, 2012. In the sixteen months that this matter was pending on appeal, not a single brief was drafted. Instead, the parties continued to engage in what was a more-than-a-decade

long negotiation of the LTCP.  In other words, after two years before this Court, the parties spent nearly another one and a half years before the appellate court doing nothing other than "negotiating."  Accordingly, the premise that this Court's appointment of an expert would somehow "unduly" delay the matter is not well taken.

Similarly, the premise that continued delay could undermine the goals stated in the Decree is also rejected.  There is no dispute that the parties have been operating under the Decree since it was signed off on by all parties.  Despite this Court's rejection of that Decree and the then-pending appeal, the parties continued to comply with all aspects of the Decree.  There is nothing in the record before this Court that would suggest that any party would suddenly refuse to comply with the Decree while an expert reviews the matter.  Furthermore, the Court has been informed of the staggering penalties Akron would face if this matter went forward to trial and was ultimately found in violation of the Act.  These potential penalties alone provide strong motivation for continued compliance with the Decree.

Finally, the Court rejects any notion that the added expense of an expert will be overly prejudicial to the parties.  The Decree and LTCP contend that sewer updates will cost hundreds of millions of dollars.  In comparison, the fees of an expert will be nominal.  In contrast, the benefit to the Court and public of an independent expert will be substantial.  As such, the Court rejects any argument that the cost of the expert should deter appointment by the Court.

3. <u>Scope of the Expert</u>

The parties also object because the Court did not spell out in specific detail the scope of the expert's review, if appointed.  However, as the parties have pointed out time

and again, the issue before the Court is a very narrow one – whether the Decree is reasonable, adequate, fair, and in the public interest.  The expert's review, therefore, would similarly be limited scope.  The expert would review the totality of the record and opine on the timeliness and effectiveness of the proposed Consent Decree.

Additionally, the Court has no intention of deferring to the expert or affording the expert more weight than the evidence and testimony provided by the parties.  Instead, the Court is hopeful that an independent expert will be able to supply answers to the Court that the parties have been unable or unwilling to provide to date.

Moreover, the Court's concerns about the parties' presentation at the renewed fairness hearing are apparent on the record.  Once again, the Court attempted to evaluate the engineering data and the financial data supplied by the parties.  With substantially more difficulty, the Court tried to understand the interplay between those sets of data.  To date, the Court has been unable to do so based upon the information supplied by the parties.  The engineering data is simply incomplete, at best.  The financial data was presented in a vacuum with little to no reference of how it impacted the engineering decisions.

As the Court's concerns have been readily apparent to the parties since the renewed fairness hearing, it should not be difficult for the parties to ascertain the scope of the expert's review.  The expert will review both the financial information and the engineering data.  The Court will then expect the expert to report to the Court on that information.  It is the Court's hope that its expert will be substantially more informative than the parties' were during their presentations.  With that said, any objection to the scope of the expert's duties is OVERRULED.

11

4. Process

Akron also appears to take issue with the fact that the Court nominated its proposed expert within the show cause order. "Here, the Court conflated the first two steps of the process – the decision of whether an expert is needed, and, if so, who that expert should be." In short, Akron is wrong. Nothing in Rule 706 requires the proposed two-step process that Akron purports is the proper standard. In fact, the Court's decision to name its nominee simply expedited this process, allowing for general objections to an appointment and specific objections to the Court's nominee.

Furthermore, Akron appears to contend that the Court must hold a hearing on this issue. Once again, there is no binding precedent that requires a Court hearing. The parties have been given the opportunity to be heard, and the Court has reviewed their objections. Nothing in Rule 706 requires further proceedings before the appointment of an expert.

5. The Court's nominee

Akron also raises the disingenuous argument that it had insufficient information to determine whether the Court's nominee was qualified. Specifically, Akron contends that it did not have Professor Johnston's curriculum vitae at the time it filed its objections. The Court would note that a simple internet search for Professor Johnston immediately leads to his faculty page at Lewis & Clark Law School. Johnston's curriculum vitae is publicly posted on that site (http://law.lclark.edu/faculty/craig _johnston).

Furthermore, any contention that Akron was deprived of information is directly contradicted by the *very next sentence* in Akron's brief, contending that a review of

12

"publicly available" information suggests that Professor Johnston may be biased. This claim of bias is premised on the fact that Professor Johnston once opposed a consent decree in another matter involving combined sewer overflows. It is nothing more than conjecture that would support Akron's claim of a possible bias.

Furthermore, the Court has reviewed Professor Johnston's credentials. He has been an expert in more than ten environmental cases, focused primarily on CERCLA. He was the Founder and Director of the Pacific Environmental Advocacy Center from 1996 through 2001. He was an associate and of counsel for more than six years with Perkins Coie, focusing on environmental litigation. He was also Assistance Regional Counsel for the EPA from 1985 to 1988. He has written numerous books and articles on environmental law and is a tenured professor specializing in environmental law. Moreover, the Court would note that it became aware of Professor Johnston because he has been asked and has presented at numerous judicial conferences on issues surrounding environmental litigation. In short, the Court finds it difficult to conceive of any valid challenge to Professor Johnston's qualifications to assist the Court in this matter.

**IV. Expert's Duties**

The expert will be charged with reviewing the totality of the evidence presented to the Court in this matter. The Court will then require the expert to produce a report to the Court, relying on a framework similar to the Court's initial analysis of the Consent Decree. Following consultation with the parties and expert, the Court will set the expert's compensation and deadlines for the completion of his work. Further, following completion of the report, the Court will consult with the parties to determine whether

they seek to depose the expert as they are entitled to under Rule 706, and whether the Court will call the expert to testify.

Professor Craig Johnston, Professor of Law and Clinical Director, Earthrise Law Center, Lewis & Clark Law School is hereby appointed as the Court's expert in this matter under Federal Rule of Evidence 706.

In summary, there is an overriding interest in preserving the Cuyahoga Valley National Park for generations to come.  The interest in protecting this sensitive area substantially overwhelms any alleged delay or expense related to appointment of an expert.  As the Court cannot adequately review the Decree absent an expert, the appointment is necessary and reasonable.  The pending objections are overruled.

IT IS SO ORDERED

March 13, 2013                             /s/ John R. Adams
                                                       JUDGE JOHN R. ADAMS
                                                       UNITED STATES DISTRICT COURT