UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 5:09-CV-00272 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| vs. | ) | |
| | ) | **DEFENDANT CITY OF AKRON'S** |
| CITY OF AKRON, OHIO, | ) | **POST-HEARING BRIEF** |
| | ) | |
| and | ) | |
| | ) | |
| THE STATE OF OHIO, | ) | |
| | ) | |
| Defendants. | ) | |

## I.    INTRODUCTION

On July 31, August 1, and August 2, 2019, this Court held a hearing (the "Hearing") on the United States' Unopposed Motion to Enter the Second Amendment to the Consent Decree (the "Second Amendment").  In accordance with the Court's instructions during the Hearing, and without waiving any rights, privileges or objections, the City of Akron (the "City" or "Akron") respectfully submits this Post-Hearing Brief.

The Second Amendment provides for two types of changes to the control measures in the Consent Decree.  The first type of change replaces the proposed use of BioACTIFLO to BioCEPT for treating the remaining secondary treatment bypasses at the Water Pollution Control Station ("WPCS").  The second type of change involves some of the combined sewer overflows ("CSOs") control measures.  Specifically, this second type of change replaces three planned storage basins at Racks 3, 26/28, and 27/29 with upsized underflow pipes at Racks 3, 26/28, and 27/29, green infrastructure ("GI") in the Racks 3, 26, and 28 drainage basins, and a larger basin at Rack 10 (collectively referred to as the "New Control Measures").

Consistent with the Court's instructions, this Brief is limited to the replacement of the three planned storage basins with the New Control Measures.[1]  As set forth below, the New Control Measures: (1) were developed based upon a detailed technical evaluation by the City; (2) will meet the applicable performance criteria as confirmed by Akron's enhanced stormwater model and the evaluation of an expert; (3) were approved after a thorough review by the U.S. EPA; (4) will be implemented within the same timeframe as the originally planned storage basins; (5) will provide additional environmental, economic and other benefits; and (6) are supported by stakeholders and the public.  As a result, the Second Amendment meet the standard for an unopposed motion to amend a consent decree, in that the Second Amendment is fair, reasonable, and within the public interest.[2]  More, the evidence in the record supporting entry of the Second Amendment under this standard is undisputed and uncontradicted.  There is no evidence in the record that would even suggest that the Court should deny the Second Amendment.

## II.  FACTS

The following facts are based upon the undisputed, uncontested and uncontroverted testimony and exhibits that were admitted into evidence during the Hearing.

---

[1] As set forth on pages 17-18 of the City's Status Report, Dkt. No. 201 (April 29, 2019), the change from BioACTIFLO to BioCEPT was made in accordance with Attachment A of the Consent Decree, and the change was not subject to Court approval.  This is consistent with the uncontradicted and undisputed evidence presented during the Hearing.  (*See* Testimony of Patrick Gsellman, (Tr. pp. 258-263).  Even if the change to BioCEPT was subject to Court approval, the uncontradicted and undisputed evidence clearly provides that BioCEPT is a better technology for dealing with the wet weather flows at the WPCS compared to BioACTIFLO, and the change is fair, reasonable and in the public interest.  (*See* Testimony of Dan Johnson, Tr. pp. 374-425).

[2] LTCP Exhibit 3 authorizes Akron to substitute the storage volumes in the basins and tunnels with a combination of GI and other control measures, subject to the approval of U.S. EPA and Ohio EPA. As set forth on pp 19-20 of the City's Status Report, the City has substituted the storage basins required at Rack and Rack 26/28 with GI and upsized underflow pipes. These changes meet the requirements of LTCP Exhibit 3 and were approved by U.S. EPA and Ohio EPA.  Consistent with LTCP Exhibit 3, these changes are not material modifications and are not subject to Court approval.  This is demonstrated by the uncontradicted and undisputed evidence presented during the Hearing.  *See* Testimony of Katherine Holmok, (Tr. pp. 434, 438-440).  By submitting this Brief and supporting the United States' Unopposed Motion to Enter the Second Amendment, Akron does not waive its position that Court approval is not required for these changes.

A. **Consistent With The Requirements Of The Consent Decree, The City Used A Planning Level Model To Develop The Original CSO Control Measures In The LTCP Update.**

A portion of the City's sewer system is a combined sewer system.  The City's combined system is generally located in the northeastern part of Akron. (Hearing Transcript, (Dkt. Nos. 242, 243 and 244) ("Tr.") pp. 241-242).  A combined sewer is a type of sewer that carries both sanitary and stormwater flows in the same pipe. (Tr. p. 242).  In Akron's combined system, during dry weather, the flow passes through a rack structure, to an underflow pipe and then to the interceptor sewer.  The interceptor sewers transport the flow to the WPCS for treatment.  (Tr. pp. 243-244).  The CSO locations are at the rack structures.  (Tr. p. 244). There is a separate drainage area for each CSO location.  (Tr. p. 242).  During wet weather there is a significant increase in the flow in the system.  When the capacity of the underflow pipe is exceeded, the flow is discharged as a CSO. (Tr. p. 244).

Prior to the entry of the Consent Decree, Akron constructed two storage basins and implemented two sewer separation projects to address CSOs.  (Tr. p. 277).  A sewer separation project changes the combined sewer into two sewers, one for stormwater and one for sanitary flows.  As a result of the separation, the overflow structure is eliminated.   (Tr. p. 242).

Pursuant to Section V. of the Consent Decree,  Akron was required to implement five (5) additional sewer separation projects.  Akron completed those projects.  (Tr. p. 248).  Pursuant to Section V. of the Consent Decree, Akron was also required to develop the Long Term Control Plan ("LTCP") Update.  The remaining CSO control measures are identified in the LTCP Update. (Tr. pp. 248, 250).

In order to develop the CSO control measures in the LTCP Update, the Consent Decree specifically required Akron to use a planning level model. (Tr. pp. 251-252).  A model is a simplified representation of a real system. (Tr. p. 316). From 2009 until 2011, when the LTCP

Update was approved, Akron used the planning level model to develop the CSO control measures that are identified in the LTCP Update  (Tr. pp. 272-273).  The City's planning level model had limited information on the drainage areas and pipes in the City's combined sewer system. The planning level model predicted flows within the combined system using software to run the calculations on the hydraulics within the collection system and on flows in the drainage areas.  (Tr. pp. 271-274).  The planning level model used the Typical Year storm events defined in the Consent Decree.  (Tr. p. 271).

**B.    The City's Re-Evaluation Of The Control Measures In The LTCP Update And The New Control Measures.**

After the approval of the LTCP Update, the City determined that there was a need to re-evaluate the CSO control measures.  (Tr. p. 264).  There were multiple reasons why Akron decided to undertake this re-evaluation.  First, there was a significant increase in the estimated cost to implement the CSO control measures and the overall cost of the CSO program. Second, the City made significant enhancements to the model, and there were upgrades to the modeling software. (Tr. p. 265).  Finally, the City wanted to evaluate the use of green infrastructure under Exhibit 3 to the LTCP Update. (Defendant Akron's Hearing Ex. 2, p. 20).

The goal of the additional evaluation was to provide equal or better environmental benefits at a lower cost to the ratepayers.  (Tr. p. 266).  It included a re-examination of the existing combined sewer system and overall performance in order to maximize flows to the WPCS.  (Tr. p. 266). In performing the re-evaluation, the City followed the U.S. EPA's Integrated Planning Framework ("Framework") that was published in 2012. (Tr. p. 265). This Framework was later incorporated into the Clean Water Act. (Tr. p. 266).  EPA published this Framework in response to cost and scheduling concerns raised by CSO communities. (Tr. pp. 265-266). The Framework

emphasizes the use of GI. (Tr. p. 266). The re-evaluation included significant stakeholder involvement. (Tr. p. 266).

Notably, during this re-evaluation process, the City continued to complete Consent Decree projects that were already in construction.  The re-evaluation process did not result in delays with any of the pending projects.  (Tr. pp. 267-268).

The City completed an Integrated Planning Report, which was submitted to U.S. EPA and Ohio EPA in 2015.  There were several discussions and meetings with U.S. EPA and Ohio EPA prior to the submission of the Report.  The Integrated Planning Report included a recommendation for the projects that are identified in the Second Amendment.  (Tr. p. 267).

The New Control Measures were determined using the City's enhanced model.  (Tr. p. 282). Specifically, changing the Rack 3 and Rack 26/28 storage basins to GI with additional or enhanced conveyance, changing the Rack 27/29 storage basin to enhanced conveyance, and changing the Rack 10/11 basin to a larger basin (Tr. p. 281).  Enhanced conveyance results from increasing the size of the underflow pipe at the rack structure, which allows more flow to enter into the interceptor sewer. (Tr. pp. 282-283).  Nothing in the Second Amendment will alter the deadlines for bidding on the projects or achieving full operation ("AFO"), nor will there be any change in the final deadline of the Consent Decree. (Tr. p. 281).

      **C.**      **The New Control Measures Were Developed Using The City's Enhanced Model, Which Is More Accurate Than The Original Planning Level Model. The City Followed A Sound Modeling Process And The New Control Measures Will Meet The Applicable Performance Criteria Of No Overflows In The Typical Year.**

Akron's re-evaluation of control measures specifically included the use of Akron's enhanced model.  The model has been (and is) continually updated as additional information is gathered from the City's combined system and drainage basins.  As part of the Integrated Planning process, the City made several additional updates to the model.  This work included a significant

5

amount of flow monitoring.  (Tr. pp. 273-274).  The enhanced model also went through a calibration process.  (Tr. pp. 338-339).  The enhanced model is more accurate than the original planning level model.  (Tr. p. 274).

In its current version, the model includes over 5,000 pipes. (Tr. pp. 329-330). The model includes detailed information on these pipes, including the cross-section area of the pipes, the roughness of the pipes, and the slope between the nodes where pipes are connected. (Tr. p. 334). The model also contains information about the amount of impervious surface in sub-catchment (drainage basin) areas, including the areas' size in acres and the amount of infiltration. (Tr. p. 334).

The City's model can be run with various types of software.  This includes the most widely used modeling software, the EPA SWMM model, which stands for the "Storm Water Management Model." (Tr. p. 320). The EPA SWMM software was released in 1971 and is the most cited water modeling software for examining storm-water controls. (Tr. p. 320). The EPA SWMM software was specifically designed to perform longer-term simulations of water runoff quantity in urban areas and can be used to look at runoff over a period of two weeks to as long as a year. (Tr. p. 321). EPA SWMM can handle a drainage network of unlimited size.  (Tr. pp. 321-322).  It can also model the effect of green infrastructure, a capability added to the software in 2005. (Tr. pp. 322-323). There are 15 parameters used to describe GI in the model, all of which have been vetted through technical and peer-reviewed scientific literature. (Tr. p. 335).

While SWMM is the standard modeling software, there are other commercially available software programs, including Infoworks, PC SWMM, and Hydro CAD, all of which were used by the City for various aspects of the implementation of the Consent Decree. (Tr. p. 324). The fundamental science and engineering principles, and the calculations are the same as the SWMM

software. However, these commercial software packages incorporate additional features such as the ability to integrate a GIS system into the model and faster calculations. (Tr. pp. 324-325).

The work with the enhanced model included a modeling evaluation within each draining basin. This evaluation included the use of GI and enhanced or optimized conveyance.  (Tr. pp. 339-342). Enhanced conveyance makes effective utilization of the capacity in the interceptor sewer.  (Tr. p. 340).  The modeling work included specific locations and specific sizes of the GI controls within the applicable drainage areas. (Tr. p. 342).

The modeling at each location demonstrated that the New Control Measures would meet the no overflows in the Typical Year performance criteria, and not cause an exceedance of applicable performance criteria at downstream locations.  (Tr. pp. 343-346).

The City's modeling work was reviewed and verified by Christopher Miller, a Ph.D. and Professional Engineer with the University of Akron who is an expert in the fields of water resource engineering and water quality modeling and management.  (Tr. pp. 313-319).  Dr. Miller is very familiar with the City's model and the combined sewer system. (Tr. pp. 327-328).  Based upon his over 25 years of experience, his direct experience with the City's model, and his review of the technical memos he opined to a reasonable degree of engineering certainty that the City followed a sound modeling process, and the New Control Measures would achieve the required performance criteria of zero overflows in the typical year and not result in exceedances of the performance criteria at downstream locations.  (Tr. pp. 341-345).  In addition, Dr. Miller performed an additional analysis of the model with system-wide simulations using the original storage basins and using the New Control Measures.  The results of this analysis further supported Dr. Miller's opinions, which he holds to a reasonable degree of engineering certainty. (Tr. pp. 345-352).

**D.    The City's Technical Evaluations Of The New Control Measures Are Documented In Several Technical Reports And Were Subjected To A Thorough Review By The U.S. EPA.**

The City determined to pull the New Control Measures out of the Integrated Plan.  The City then prepared additional technical evaluations of the New Control Measures, which are documented in numerous technical reports. (Tr. p. 293).  These technical reports are listed on the City's Hearing Exhibit 3. (Tr. pp. 269-270).  The technical documents listed on Exhibit 3 included technical documents pertaining to the GI components of the New Control Measures, and those technical documents included all of the requirements under Exhibit 3 to the LTCP Update, with the exception of the specific O&M plans.  (Tr. pp. 438-440).  Prior drafts of the technical documents were submitted to the U.S. EPA and Ohio EPA, and the parties had ongoing discussions regarding the technical justifications for the New Control Measures.  (Tr. pp. 270, 294). The City characterized the U.S. EPA's review as "very thorough." (Tr. p. 294).  The U.S. EPA's review involved a robust and intense technical evaluation.  From November 2015 to February 2018, the parties engaged in approximately 40 calls and 3 in-person meetings.  (Tr. p. 38).  Subsequent to the Hearing, and in response to the Court's request, the U.S. EPA will be submitting hundreds of documents that were exchanged by the Parties as part of the U.S. EPA's review process.

**E.    The GI Components Of The New Control Measures Are Proven And Established Technologies For Managing Stormwater, The City's Calculation On Volumes Of Stormwater Controlled Is Conservative, And The City Has Avoided The Typical Problems Associated With GI.**

Dr. Ryan Winston is a Ph.D. and Professional Engineer with The Ohio State University and is an expert in the area of GI and the use of GI to manage storm water.  (Tr. pp. 537-546).  Dr. Winston performed an extensive review of the relevant documents, including the design documents for the GI control measures, and personally inspected the constructed GI measures in the Rack 26/28 drainage basin and the locations for the GI measures to be constructed in the Rack

8

3 drainage basin.  (Tr. pp. 547-549). It is Dr. Winston's expert opinion, held to a reasonable degree of engineering certainty that the GI measures for the Racks 3 and 26/28 drainage basins are all proven and established technologies for controlling stormwater. (Tr. pp. 551-553).

The sizing and design of the GI control measures in the Racks 26/28 and Rack 3 drainage basins included an evaluation of available areas and stormwater runoff within those drainage basins. (Tr. pp. 442-443, 471-472).   When the City determined the locations of the GI components in the Rack 3 drainage basin the City also considered the East Akron Revitalization Plan, which includes provisions for open space, GI, trees and redevelopment.  (Tr. pp. 472-474).  Pursuant to this Court's Order, Akron recently filed with the Court the East Akron Revitalization Plan (Dkt. No. 246).

The storage volumes of the constructed GI components in the Rack 26/28 drainage basin, and the storage volumes of the designed GI components for the Rack 3 drainage basin exceed the minimum volumes to be controlled by GI as required in the Second Amendment.  (Tr. pp. 459-462, 486-489).  The calculated volumes are based upon geometry and the sizes of the individual GI measures.  (Tr. p. 489).   Dr. Winston opined, to a reasonable degree of engineering certainty, that the City's calculations on the volume of stormwater that will be controlled is conservative because the City only accounted for the volume of stormwater that will be stored by the GI.  It is Dr. Winston's opinion, held to a reasonable degree of engineering certainty, that both infiltration and evapotranspiration will also occur at both Racks 26/28 and Rack 3 GI measures.  (Tr. p. 558). These are benefits that would not be realized with gray infrastructure.

In response to the Court's previous request to identify problems with GI, Dr. Winston stated that problems with GI can occur either in the engineering phase, construction phase, or during operation and maintenance. (Tr. p. 568). Dr. Winston explained that these types of problems

are not exclusive to GI – that is, Dr. Winston explained how all of these problems can and do occur with gray infrastructure, including the original storage basins.  Dr. Winston also provided opinions, held to a reasonable degree of engineering certainty, that the City has taken adequate steps to avoid each identified potential problem.  These opinions were based upon an in-depth review of the applicable documents, including the O&M plans, Dr. Winston's personal observations, his experience as an expert in GI, and his review and analysis of numerous studies. (Tr. pp. 567-575).

Dr. Winston also provided an expert opinions on the O&M plan for the Rack 28 GI control measures, also held to a reasonable degree of engineering certainty. "The operation and maintenance plan as written will ensure the functionality of GI, both immediately after construction and in the long-term."  (Tr. p. 563).  The performance thresholds within the O&M plan are "conservative."  (Tr. pp. 564-565).

## F.    The New Control Measures Will Result In Additional Benefits Compared To The Original Storage Basins.

The New Control Measures will result in an estimated savings to ratepayers of $35,432,905.00 as compared to the original storage basins. This savings includes the costs associated with operation and maintenance. (Tr. p. 283).  The estimated cost of the Consent Decree projects completed or under construction by the City is $692 million and the total cost of implementing the Consent Decree was estimated to be over one billion dollars. (Tr. p. 245).[3]

Dr. Winston provided expert opinions of the additional benefits of the GI components of the New Control Measures, which includes: runoff volume reduction; water quality treatment of the stormwater; carbon sequestration in the soil; urban heat island mitigation; avoidance of costs

---

[3] The one-billion-dollar estimate does not include the asset management costs, the costs for operation and maintenance, the costs for the Capacity, Management, Operation, and Maintenance ("CMOM") program, or related projects such as the Headworks Project at the WPCS. (Tr. pp. 245-246).

in purchase of property by making use the existing right-of-way; and, avoiding the basins negative impacts on property values.  (Tr. pp. 565-568).  Moreover, Dr, Winston opined that the GI measures would not be a breeding ground for mosquitoes.  (Tr. p. 566).  All of these opinions were held and presented at the Hearing to a reasonable degree of engineering certainty.

In addition, replacing the three concrete basins with the New Control Measures eliminates and reduces long-term impact on nearby recreational resources and minimizes the impacts on residential areas, while providing additional aesthetic and environmental benefits. (Tr. p. 284). Two of these storage basins would need to be sited along the Ohio & Erie Canal Towpath Trail. (Tr. pp. 286-287).  A third would need to be sited in the middle of an area that has recently undergone significant redevelopment, and in close proximity to a recently restored section of the Little Cuyahoga River.  (Tr. pp. 285-286).  In addition, replacing one of the underflow drains as part of the New Control Measures will also eliminate a dam on the Little Cuyahoga River.  This dam would not be eliminated if the City built the Rack 27/29 storage basin, and it would remain as an obstruction in the river causing water quality issues.  However, as part of upsizing the underflow drain, the obstruction would be removed and the City would perform stream restoration. (Tr. p. 288).

Finally, if the system did not behave as expected due to a lack of attenuation, it would be far easier to upsize the GI control measures than gray infrastructure.  (Tr. p. 363). The City has additional land available if it needs to expand the GI in the Rack 26/28 and Rack 3 drainage basins. (Tr. pp. 491-492).

G.     **The New Control Measures Were Subject To An Extensive Public Outreach Process And Are Supported By Stakeholders And The Public.**

The City maintains a large list of stakeholders that are provided with updates and invited to meetings and on tours.  Many of these stakeholders actively participate in meetings and tours.

(Tr. pp. 289-290). The City also has meetings with the public as part of Council meetings, ward meetings and regional planning agencies. The City discussed the Second Amendment with the stakeholders during two stakeholder meetings, and discussed the Second Amendment during meetings with the Cuyahoga National Park, Summit Metro Parks, NEFCO and the East Akron Neighborhood Development Corporation. (Tr. pp. 291-292). Public feedback for the Second Amendment has been positive. (Tr. p. 292). There were several favorable comments supportive of the Second Amendment that were submitted by the stakeholders. (Tr. p. 289). In 2018, the City received an award from the Ohio Environment Association for the City's public outreach program implemented by the Akron Waterways Renewed. (Tr. p. 293). After the Hearing and pursuant to the Court's Order, the City filed with the Court information provided to the stakeholder during the two meetings referenced above and attendance sheets reflecting the identity of the stakeholders whom participated in the meetings. (Dkt. No. 247).

In addition to the forgoing the City also conducted meetings with residents regarding the GI components. Specifically, the City held meetings with the residents in the Racks 3, 26, and 28 drainage basins to discuss these projects. (Tr. pp. 443, 471-474).

**H.    The OCIT Project.**

Though not part of the Second Amendment before this Court, it is worth nothing that the delays with the Ohio Canal Interceptor Tunnel ("OCIT") project have not impacted any deadlines for any other projects in the system. Nor is there is any reason to believe that the OCIT project delays will result in a delay in any future projects. (Tr. p. 292). The flows that will be controlled by the OCIT are currently overflowing as CSOs, and, thus, do not impact the current predictions by the model. (Tr. pp. 299-300). The OCIT will be completed and operational when the City implements the additional calibration of the model for the post construction monitoring program,

and the OCIT's operations will be included in the post construction monitoring program.  (Tr. pp. 300, 366).

III.    **LAW & ANALYSIS**

    A.      **The New Control Measures Are Fair, Reasonable, And In The Public Interest.**

        1.      **The Standard For An Unopposed Motion To Amend A Control Decree Is Whether Or Not The Amendment Is Fair, Reasonable, And In The Public Interest.**

The criteria to be applied by a district court in determining whether or not to enter a proposed consent decree is whether or not it is "fair, adequate, and reasonable, as well as consistent with the public interest." *U.S. v. Lexington-Fayette Urban County Gov't*, 591 F.3d 484, 489 (6th Cir. 2010).  "The relevant standard, after all, is not whether the settlement is one which the court itself might have fashioned, or considers as ideal …" *U.S. v. Cannons Engineering Corp*., 899 F.2d 79, 84 (1st Cir.1990) (noting further that "the first layer of insulation implicates the trial court's deference to the agency's expertise and to the parties' agreement").  "Congress intended, first, that the judiciary take a broad view of proposed settlements, leaving highly technical issues and relatively petty inequities to the discourse between the parties." *Id.* at 85-86.  This Court has already determined that the existing Consent Decree met this standard when the Court entered the Consent Decree, Order, Dkt. No. 154 (Jan. 17, 2014). Similarly, this Court made this same determination when the Court entered the First Amendment to Consent Decree, Order, Dkt No. 186 (Sept. 20, 2016).  Other courts have applied this same standard when determining whether or not to enter an agreed to modification or amendment to a consent decree.  Within the Sixth Circuit, the Southern District of Ohio has held: "[t]he Court views its role, as it has expressed before, 'not to dictate its view about the best sort of settlement possible, or to micro-manage the settlement, but rather to view the settlement to ensure that it is fair, reasonable, and consistent with the Clean Water Act' *United States v. Bd. of Cty. Commrs. of Hamilton Cty.*, Ohio, S.D.Ohio No. 1:02-CV-

00107, 2010 WL 11538468, *5 (finding Plaintiff's Motion for Entry of First Amendment to Consent Decree was fair, reasonable, and consistent with the Clean Water Act where all of the parties have signed on to such amendment).[4]

Therefore, the Court only needs to review the specific changes to the Consent Decree presented in the Second Amendment and determine if the changes are fair, reasonable and in the public interest.  As set forth below, the changes in the Second Amendment are clearly fair, reasonable and in the public interest based upon the undisputed, uncontroverted, and uncontradicted record evidence.

2.        The Second Amendment Is Fair.

In determining whether or not a decree is "fair," courts look to "the strength of plaintiff's case, the good faith efforts of the negotiators, the opinions of counsel, and the possible risks involved in the litigation if the settlement is not approved."  *U.S. v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1435 (6th Cir.1991).[5]  In this regard, "fairness … has both procedural and substantive components."  *Cannons Engineering Corp.*, 899 F.2d at 86.[6]  "To measure procedural fairness, a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance."  *Id.* (finding a proposed decree "to possess the requisite

---

[4] District courts outside of the Sixth Circuit have taken a similar approach. In the Southern District of West Virginia, the court found that while "Federal Rule of Civil Procedure 60(b) generally governs the standard by which a party may be granted relief from a final judgment, order, or proceeding[.] [b]ecause both parties have agreed to the proposed Modified Consent Decree … Rule 60(b) is inapplicable…." *Ohio Valley Environmental Coalition, Inc. v. Hobet Mining, LLC*, S.D. Va. Nos. 3:09-1167, 3:11-0115, 2013 WL 12284418, *3 (Jan. 9, 2013). (entering a modified consent decree because it was fair, reasonable, and consistent with the Clean Water Act's goal of restoring and maintaining the chemical, physical, and biological integrity of the Nation's waters.)

[5] With respect to the possible risk of litigation, the Consent Decree permits the City to request unilateral modifications to the Consent Decree if the Parties are unable to agree upon proposed changes.  *See* Sections XXIV. and XIV. of the Consent Decree.  By agreeing to the proposed changes in the Second Amendment, the Parties have avoided a potential litigation involving a request for a unilateral modification and the risks associated with such a litigation.

[6] The Court made this ruling based upon a consent decree under CERCLA.  Both CERCLA and the Clean Water Act have similar remedial objectives.

procedural integrity" where "the district court believed that the government conducted negotiations forthrightly and in good faith, and the record [was] replete with indications to that effect."). "Substantive fairness introduces into the equation concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible."  "The chosen measure of comparative fault should be upheld unless it is arbitrary, capricious, and devoid of a rational basis."  *Id*. at 87.

The Second Amendment is procedurally fair in that it is a settlement negotiated at arm's length between experienced environmental counsel.  Moreover, each proposed modification contained within the Second Amendment was supported by detailed technical documentation and subject to a thorough review process by the U.S. EPA.  The parties engaged in 40 calls, 3 in-person meetings, and exchanged hundreds of  documents.  The Second Amendment resulted from this arm's length process.

In terms of substantive fairness, the modifications proposed in the Second Amendment will meet or exceed the original performance criteria identified in the LTCP Update.  In developing the New Control Measures the City followed a similar modeling process, but used a more accurate model. As required by the Consent Decree, the City used a planning level model to determine the CSO control measures in the original LTCP Update.  However, the City used an enhanced model that was more accurate than the original planning level model to determine the New Control Measures.  The enhanced model demonstrates that  the New Control Measures will not result in any overflows in the Typical Year at the Racks 3, 10, 26, 28, 27 and 29 locations and will not cause any exceedance at any of the downstream locations.  Moreover, the City retained an additional expert, Dr. Miller to evaluate the modeling work.  Dr. Miller provided an expert opinion that the City followed a sound modeling process, and that the New Control Measures will meet or

15

exceed the original performance criteria, and will not cause an exceedance of the performance criteria at downstream locations.

Moreover, the modifications will also result in greater overall benefits, at a lower cost to the ratepayers, when compared to the originally required projects.  Specifically, this includes the following benefits at lower costs:

> (1)  The elimination of the three storage basins will avoid impacts to the Towpath Trail, residential neighborhoods and an area undergoing redevelopment, and will result in the removal of a dam obstruction in the Little Cuyahoga River.

> (2) The GI control measures will provide several additional benefits, including runoff volume reduction, water quality treatment of the stormwater, carbon sequestration in the soil, urban heat island mitigation, avoidance of costs in the purchase of property by making use the existing right-of-way, and, avoiding negative impact to property values.

> (3) The GI projects also add to the aesthetics of  the respective neighborhoods. In addition, New Control Measures provide  the City with the flexibility of expanding the use of GI in the unlikely event the City will need to add more storage capacity.

> (4) Finally, replacing three storage basins with the New Control Measures will also provide for a significant savings to the ratepayers, who are burdened with the over $1 billion cost of the overall program.

### 3.    The Second Amendment Is Reasonable And Adequate.

The Second Amendment is reasonable and adequate.  "One of the most important considerations when evaluating whether a proposed consent decree is reasonable is 'the decree's likely effectiveness as a vehicle for cleansing' the environment." *Lexington-Fayette Urban County Gov't*, 591 F.3d at 489 (citing *Akzo Coatings of Am., Inc.*, *supra*, 949 F.2d at 1437). The reasonableness of a consent decree "will be basically a question of technical adequacy, primarily concerned with the probably effectiveness of proposed remedial responses." *Cannons Engineering Corp.*, 899 F.2d at 89-90.  Reasonableness also "will depend upon whether the settlement satisfactorily compensates the public for the actual (and anticipated) costs of remedial and response measures … the agency cannot realistically be held to a standard of mathematical precision.  If the

figures relied upon derive in a sensible way from a plausible interpretation of the record, the court should normally defer to the agency's expertise." *Id.* at 90. As set forth below, the Second Amendment is reasonable for the same reason the original Consent Decree was determined to be reasonable when it was entered by the Court.

The Second Amendment involves the replacement of three storage basins with the New Control Measures. The record demonstrates that the New Control Measures are technically adequate and proven and established technologies for managing stormwater. The enhanced conveyance components merely involve replacing the underflow pipes at the respective rack locations with larger pipes. The larger pipes allow more flow to enter the interceptor sewer, which has the available capacity for the additional flow. In addition, the City has provided expert testimony that the GI components of the of the New Control measures are established and proven technologies. Moreover, the GI components have been designed by an experience landscape architect.

The New Control Measures will be implemented within the same deadlines that apply to the original storage basins. Moreover, the undisputed facts from the Hearing establish that the New Control Measures will meet or exceed the same specific performance criteria of no overflows in the Typical Year that applies to the original control measures. Therefore, since the Second Amendment does not change the compliance deadlines and provides that the New Control Measures must meet the same performance criteria as the original storage basin, the Second Amendment continues to meet the same standard of being reasonable and adequate as the original storage basins. This is demonstrated through the use of the City's model.

The original storage basins were selected and sized to meet the performance criteria based upon the City's planning level model, as required by the Consent Decree. The City subsequently

developed an enhanced model by adding significantly more details from the City's combined sewer system and the associated drainage basins, further calibrating the model, and upgrading the modeling software.  This work resulted in an enhanced model that is more accurate than the planning level model that was used for the original storage basins.  The City used the enhanced model to develop and size the New Control Measures and confirm that the New Control Measures will meet or exceed the same performance criteria that applied to the original storage basins. Moreover, the City engaged Dr. Christopher Miller, a Ph.D. and Professional Engineer with the University of Akron who is an expert in the fields of water resource engineering and water quality modeling and management.  Dr. Miller reviewed and verified the City's work with the enhanced model, and he provided expert opinions to a reasonable degree of engineering certainty that the City followed sound modeling practices, that the New Control Measures will meet the performance criteria and will not cause an exceedance of the applicable performance criteria at the downstream locations.  Therefore, the record demonstrates that the New Control Measures will meet or exceed the performance standard based a model that is more accurate than the planning level model used for the original storage basins, and that modeling work was verified by an expert.  Thus, the Second Amendment does not change the decree's likely effectiveness as a vehicle for cleansing the environment but, rather, contains enhancements toward achieving that goal.

Moreover, the record demonstrates that the Second Amendment increases the Consent Decree's effectiveness for cleansing the environment. The New Control Measures will actually control greater volumes of stormwater than required to meet the performance criteria.  As explained by Dr. Miller, the sizing of the GI control measures, in combination with the upsized underflow drains, was determined through the enhanced model to achieve the performance criteria. The GI control measures in the Rack 26/28 drainage basins have been constructed, and the GI

control measures in the Rack 3 drainage basin have been designed. As explained by Ms. Holmok, the storage volumes for these GI control measures actually exceeds the minimum volumes if stormwater required to be controlled in the Second Amendment.  Moreover, as explained by Dr. Winston, Ms. Holmok's calculations are conservative in terms of the total volume of stormwater that will be controlled by the GI control measures because Ms. Holmok's calculations only take credit for the attenuation or storage of the stormwater, and do not include the infiltration or evapotranspiration component.  It is Dr. Winston's expert opinion, held to a reasonable degree of engineering certainty, that the GI control measures will control stormwater through  infiltration or evapotranspiration, in addition to attenuation.  Thus, the New Control Measures will have a greater effectiveness in cleaning the environment compared to the original storage basins.

Finally, in determining the reasonableness of a consent decree a court must also consider the cost effectiveness of the proposed remedial action.  *Akzo Coatings of Am., Inc., supra*, 949 F.2d at 1438.  The record clearly establishes that the New Control Measures are far more cost effective than the original storage basins.  The New Control Measures meet or exceed the same performance criteria, but will cost at least $35 million less than the storage basins.

### 4.    The Second Amendment Is In The Public Interest.

Finally, the Second Amendment is consistent with the public interest.  "In evaluating the public interest, the district court must consider whether the Decree is 'consistent with the public objectives sought to be attained by Congress.'"  *Lexington-Fayette Urban County Gov't*, 591 F.3d at 490 (citing *Williams v. Vukovich*, 720 F.2d 909, 923 (6th Cir.1983)).  The stated objective of the federal Clean Water Act is "to restore and maintain the chemical, physical and biological integrity of the Nation's waters."  *See* 33 U.S.C. §  1251(a).  The Second Amendment is consistent with this stated objective.  The record is clear that the New Control Measures will meet or exceed

19

the same performance criteria of zero overflows in the Typical Year that applies to the original storage basins.

The Second Amendment is also in the public interest because it was negotiated by three separate units of government, the United States, the State of Ohio and the City of Akron, that are each responsible for representing the interests of the public. Indeed, the strength of the Second Amendment is self-evident by the fact that governmental actors, "committed to the protection of the public interest," have "pulled the laboring oar in constructing the" Second Amendment and all governmental actors agree that the Second Amendment is fair, adequate, and reasonable, as well as consistent with the public interest. *See Cannons Engineering Corp.*, 899 F.2d at 84. "That so many affected parties, themselves knowledgeable and represented by experienced lawyers, have hammered out an agreement at arm's length and advocate its embodiment in a judicial decree, itself deserves weight in the ensuing balance." *Id.* (noting further that "the district court must refrain from second-guessing the Executive Branch.").  In so negotiating, the United States and the State of Ohio relied upon the expertise of their respective environmental agencies and the City relied upon in-house professional engineers heavily involved in the implementation of the Consent Decree and the operation of the combined sewer system, as well as outside professional engineers and consultants who are experts in the field of water resource engineering, water quality modeling and management, and the design and use of GI to manage stormwater.  The City submits that the Second Amendment is consistent with the public interest because these three separate levels of government responsible for representing the public negotiated the Second Amendment based upon the experience and expertise of the professionals involved in the process.

Moreover, the Second Amendment is supported by stakeholders that represent a variety of interests of the public.  This support was based upon an extensive public notification and outreach

program.  For example, the City has conducted, and continues to conduct, an extensive community outreach program regarding the implementation of the Consent Decree.  This includes, but is not limited to, periodic communications and meetings with active stakeholders.  In fact, there were two separate meetings held with stakeholders in which the Second Amendment was discussed with the stakeholders. These stakeholders were very supportive of the modifications.   In addition, the City held multiple meetings with citizens in the Racks 26, 28 and 3 drainage basin areas regarding the proposed GI projects.  The Second Amendment was also the subject of a public notification issued by the Department of Justice.   In response to the public notification, nine entities submitted comments in favor of entry of the Second Amendment, and there were no unfavorable comments. The commenters included individuals, businesses, citizen groups, other units of local government, as well as the Summit Metro Parks and the Cuyahoga Valley National Park.  The numerous public commenters expressly referenced several of the same benefits described in this Post-Hearing Brief. This broad-based support, without any opposition, further demonstrates that the Second Amendment is in the public interest.

Finally, the Second Amendment is in the public interest because it involves projects that will achieve the same performance criteria as the original projects, along with additional benefits, at  substantially lower costs.  Providing some relief to overly burdened ratepayers, while achieving the same performance criteria and at the same time providing additional benefits in clearly in the public interest.

## IV.     **CONCLUSION**

Based upon the undisputed, uncontradicted and uncontroverted evidence presented at the Hearing, the Second Amendment is clearly, fair, reasonable and in the public interest.  Therefore, the City respectfully requests that the Court enter the Second Amendment.

Respectfully submitted,

*/s/ Terrence S. Finn*
Terrence S. Finn (0039391)
tfinn@ralaw.com
Jessica A. Lopez (0090508)
jlopez@ralaw.com
Roetzel & Andress, LPA
222 South Main Street
Akron, OH  44308
Telephone:  330.376.2700

*Attorneys for Defendant City of Akron*

## PROOF OF SERVICE

I hereby certify that on August 29, 2019, a copy of *Defendant City of Akron's Post-Hearing Brief* was filed electronically.  Notice of this filing will be sent to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's electronic filing system.

*/s/ Terrence S. Finn*
Terrence S. Finn

22

14166129 _1