# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.  5:09CV272 |
| Plaintiff, | JUDGE JOHN ADAMS |
| vs. | **DEFENDANT CITY OF AKRON'S RESPONSE TO THE COURT'S DECEMBER 17, 2019 SHOW CAUSE ORDER** |
| CITY OF AKRON, ET AL., | |
| Defendants. | |

Pursuant to this Court's Show Cause Order of December 17, 2019 (Dkt. No. 262) (the "Show Cause Order"), and without waiving any rights, privileges, or objections, the City of Akron ("Akron") respectfully submits this response as to why a monitor should not be appointed to oversee compliance with the Consent Decree. As set forth below, the appointment of a monitor to oversee Akron's compliance is inappropriate and unnecessary because: (1) the Court does not have the inherent authority to appoint the monitor over the objections that have been presented by Akron; (2) the appointment of the monitor would be a unilateral modification that is beyond the authority of the Court; (3) the Consent Decree already provides the United States of America (the "United States") and the State of Ohio ("Ohio") with the authority to oversee Akron's compliance; (4) the United States and Ohio have undertaken, and continue to undertake, their respective oversight responsibilities; (5) even assuming appointment of a monitor is legally permissible, appointment is unwarranted given Akron's overall compliance record with the Consent Decree; and (6) appointment of a monitor is duplicative in light of the oversight functions of the United

States and Ohio, and would only create an unnecessary and additional layer of costs to the rate payers without providing any environmental benefit.[1]

## I. THE OHIO CANAL INTERCEPTOR TUNNEL PROJECT, ITS SCOPE, AND THE DELAYS.

Within the Show Cause Order, the Court cites to the delays in completing the Ohio Canal Interceptor Tunnel ("OCIT") project, and the manner in which the United States and Ohio have conducted oversight of that project, as the reasons for the appointment of a monitor to oversee Akron's compliance with the Consent Decree. The OCIT project is neither small nor simple. It is a large-scale and complicated construction project. The OCIT project includes a 27-foot diameter tunnel that is more than a mile long, and includes five drop shafts, connector tunnels, adits, a large tunnel diversion structure ("TDS"), and four smaller diversion structures.[2] It is the single most expensive and complicated infrastructure project ever undertaken by Akron.

Delays in the completion of large and complicated construction projects, particularly a tunnel project like the OCIT, are not a rare occurrence. That being said, Akron took several steps in advance of the project to minimize the chances of delays. First, Akron's administration and City Council made the politically difficult and unpopular decision to raise sewer rates in order to pay for the OCIT project (and all of the other control measures required by the Consent Decree). Akron obtained all the necessary land for the project. Akron engaged an experienced and qualified

---

[1] The Show Cause Order expressly refers to the appointment of a "monitor" based upon the Court's "retained jurisdiction" and "inherent power." Rule 53 of the Federal Rules of Civil Procedure provides a district court with the authority to appoint a special master for limited purposes. The Court has not referred to a "special master" or Rule 53 in the Show Cause Order. Therefore, Akron's Response does not address Rule 53. Moreover, the proposed appointment of a monitor in the Show Cause Order does not comport to any of the limited purposes in Rule 53.

[2] Row 11 of the Long Term Control Plan requires a "a 28-foot internal diameter tunnel, 5,500 feet in length, *or any other combination of diameter and length that achieves the design criteria*." (Emphasis added). The design criteria requires the tunnel to have a minimum storage volume of 25.6 million gallons ("MG"). The actual tunnel is 27-foot diameter tunnel and 6,240 feet in length, with a storage volume of 26.7 MG.

2

engineering firm to design the project. Akron pre-qualified contractors to help ensure that it received competitive bids from experienced national and international tunnel contractors. Akron selected a highly experienced tunnel contractor for the project.

The delays in completing the OCIT project are **not** the result of Akron's refusal to implement the project or other similar types of recalcitrant acts. The initial delays resulted from problems with the manufacturing of the tunnel boring machine ("TBM").[3] The TBM was delivered to the construction site nine (9) months late. Problems with the TBM had to be addressed after its delivery, which resulted in an additional two (2) months of delay. There were also delays encountered during the initial part of the tunnel mining operation when the TBM was mining through mixed faced formations (a combination of rock and soil). During this part of the mining operation, the cutter heads of the TBM continued to be clogged, resulting in the need to stop mining and clean the cutter heads. Moreover, there were unexpected and significant delays encountered during the construction of the TDS.

As described above, Akron diligently took all of the appropriate steps to engage qualified professionals to timely complete the OCIT project (as well as all of the other projects required under the Consent Decree). The Akron rate payers have paid, and are paying, the substantial costs (estimated to exceed $1 billion) to implement the Consent Decree, including the OCIT project. Thus, Akron is the party that is most concerned about, and has invested in, the timely completion of the Consent Decree requirements, including the OCIT project. Akron always has taken delays very seriously and has worked diligently opposite the contractor to resolve and/or minimize any delays as quickly as possible. And while there have been delays in completing the OCIT project, a substantial amount of work has been completed. The 27-foot diameter main tunnel has been

---

[3] The manufacturing of the TBM was the responsibility of the contractor for the OCIT project.

completed, along with the five drop shafts and the connector tunnels. In addition, the four small diversion structures are essentially complete and major portions of the TDS are in place. The work continues on the remaining portions of the project.[4]

## II. THE CONSENT DECREE CLEARLY PLACES THE OVERSIGHT RESPONSIBILITY INTO THE HANDS OF THE UNITED STATES AND OHIO.

The Consent Decree clearly delineates the authority of the United States and Ohio to engage in monitoring and oversight of the City's compliance with the Consent Decree. As discussed below, the United States and Ohio have been implementing their oversight roles with regard to Akron's compliance with the Consent Decree, including but not limited to, the implementation of the OCIT project. In addition, with regard to their respective oversight roles, the United States and Ohio have considerable discretion with respect to the manner and extent of their monitoring and enforcement. These parties have been continuously engaged in monitoring and oversight of the projects set forth in the Consent Decree, including but not limited to, the OCIT project. Accordingly, it would be inappropriate for the Court to undertake the monitoring function that is expressly reserved to the United States and Ohio in the Consent Decree, all of which is consistent with the general oversight and enforcement authority of the federal and state governmental agencies in this case.

### A. The Consent Decree Oversight Framework.

The oversight responsibility under the Consent Decree, as negotiated and agreed to by all parties and approved of by this Court, has been placed into the hands of the United States and Ohio. That is why the Consent Decree requires Akron to report directly to the United States and

---

[4] To further illustrate the significant scope, complexity, and progress of the OCIT project, Akron would be glad to arrange a site visit for the Court, the United States, and Ohio.

4

Ohio regarding Akron's compliance with the Consent Decree.[5] Section XV of the Consent Decree requires Akron to prepare Semi-Annual Reports documenting Akron's compliance with the Consent Decree and to submit those Reports to the United States and Ohio. Section XV includes a detailed format for the Semi-Annual Reports, including documentation and reporting of Akron's compliance with the implementation of the combined sewer overflow ("CSO") and Water Pollution Control Station ("WPCS") control measures required by Sections V and VI of the Consent Decree. To date, Akron has submitted nineteen (19) Semi-Annual Reports containing detailed documentation that allows the United States and Ohio to track Akron's compliance with the requirements of the Consent Decree. In addition, Paragraph 83 of the Consent Decree requires Akron to notify the United States and Ohio if Akron violates or has reason to believe that it may violate a deadline for a requirement in the Consent Decree.

The oversight authority designated to the United States and Ohio under the Consent Decree also includes the authority to take enforcement in the event that Akron fails to comply with the requirements of the Consent Decree. Again, this enforcement authority, like the oversight authority, was negotiated and agreed to by the parties and approved of by the Court. This includes the authority to demand significant stipulated penalties under Section XI. Finally, Paragraph 55 provides that "the stipulated penalties provided in the Consent Decree shall be in addition to any rights, remedies, or sanctions available to the *United States* and *the State* for Akron's violation of this Consent Decree, applicable laws or regulations, and applicable permits." (Emphasis added).

---

[5] Within the Show Cause Order, the Court expresses concern that the delays associated with the OCIT project were not initially reported to the Court. However, compliance reporting to the Court is not required or contemplated under the Consent Decree. To ensure the efficient use of judicial resources, the Consent Decree contemplates the Court's involvement only when necessary to resolve disputes between the parties. (*See* Consent Decree Section XIV). While the Consent Decree does not require the parties to report compliance to the Court, pursuant to the Court's May 22, 2019 Order (Dkt No. 204), Akron has filed all of its Semi-Annual Reports with the Court, along with all notices provided under Paragraph 83 of the Consent Decree.

The Consent Decree oversight and enforcement framework makes perfect sense when considering the governmental agencies that are involved in this case. The United States and Ohio entered into the Consent Decree on behalf of the U.S. Environmental Protection Agency ("U.S. EPA") and the Ohio Environmental Protection Agency ("Ohio EPA"), respectively. These are the regulatory agencies with the authority and responsibility for the administration, oversight, and enforcement of the specific water pollution laws that are at the heart of this case.[6] These are the administrative agencies that have the authority, along with the specific knowledge, expertise, and resources, to oversee Akron's compliance with the Consent Decree. As set forth below, there is no justification, legal or otherwise, for changing this oversight framework.

B.  **The United States And Ohio Have Been Actively Monitoring And Engaging In Oversight Consistent With The Express Terms Of The Consent Decree And Possess Discretion In Exercising Their Oversight Roles.**

In fulfilling their monitoring and oversight roles, the United States and Ohio have been actively gathering information regarding the status of the OCIT project and the associated delays. Consistent with the requirements of Paragraph 83 of the Consent Decree, Akron notified the United States and Ohio in September 2017 when Akron learned there would be a delay in meeting achievement of full operation ("AFO"). Since that time, Akron has kept the United States and Ohio informed through the submission of additional reports (over and above the reporting required under the Consent Decree) and during multiple reporting teleconferences. As the matter

---

[6] The Administrator of U.S. EPA has been given the responsibility and authority to administer the National Pollution Discharge Elimination Systems ("NPDES") permitting program under Section 402 of the Clean Water Act, along with the authority to take enforcement for non-compliance with the CWA under Section 309. The Ohio Director of Environmental Protection has been provided with the authority to administer Ohio's Water Pollution Control statute, Revised Code Chapter 6111. This authority includes, but is not limited to, the authority to establish, administer, and oversee Ohio's water quality standards and Ohio's water pollution permitting program (R.C. § 6111.03), to oversee and investigate compliance (R.C. § 6111.05), and the authority to take an enforcement action for non-compliance (R.C.§§ 6111.03, 6111.07, and 6111.09.).

6

progressed, the United States and Ohio continued to ask for updated and additional information, of which Akron continued to provide.

At the bottom of page 4 and the top of page 5 of the Show Cause Order, the Court is critical with regard to the timing of Akron's response to questions originally posed by the United States on August 21, 2019. There is an explanation regarding the timing of the overall response. The parties had subsequent calls to discuss the information requested in the United States' letter and the timing of Akron's response. Akron needed the additional time to respond to some of the questions in the August 21, 2019 letter, because Akron was in a critical point of the negotiations with the OCIT contractor. By providing Akron with the time to complete those negotiations, Akron was able to obtain the necessary commitments from the contractor to provide a revised schedule with an OCIT operation date of June 30, 2020, which is six (6) months earlier than the contractor's last schedule. The United States sent Akron an additional letter on October 28, 2019, which included numerous additional questions and requests for documents regarding the OCIT project. Akron provided a detailed response to the United States on December 3, 2019.

The United States and Ohio have not "abdicated their roles." On the contrary, these parties, through the U.S. EPA and Ohio EPA, have acted as responsible regulators by gathering information and relevant facts, such as the total length of the delay, the causes for the delay, and if any steps can or will be taken to put the OCIT into operation earlier in time. The United States and Ohio have made it clear that each has reserved its respective rights to take enforcement for the delay in placing the OCIT into operation. The United States and Ohio need to assess fully the facts regarding the delay before an appropriate decision can be made regarding enforcement and any stipulated penalties. Therefore, the United States and Ohio have taken the appropriate steps to address the delay.

Notably, the United States and Ohio possess discretion with respect to enforcement, which is consistent with the enforcement discretion afforded to government agencies. While the Consent Decree provides the United States and Ohio with the right to obtain stipulated penalties for such delays, neither party is required to seek stipulated penalties. Paragraph 49 provides that stipulated penalties are due and owning upon demand by the United States and/or Ohio, but may also be waived by both entities. Thus, the United States and Ohio have the complete discretion to waive stipulated penalties (again, a term negotiated and agreed to by the parties and approved of by this Court). Paragraph 49 further provides that a decision by the United States and/or Ohio to waive stipulated penalties is **not** subject to judicial review.

This discretion afforded to the United States and Ohio to wave stipulated penalties is consistent with the discretion afforded to administrative agencies as to whether or not to take enforcement in any given matter. In *City of Olmstead Falls v. U.S. E.P.A.*, 233 F.Supp.2d 890 (N.D.Ohio 2002), the Northern District of Ohio specifically ruled upon the issue of the U.S. EPA's enforcement discretion under the Clean Water Act:

> [T]his Court finds that well established case law dictates that the decision not to take enforcement action pursuant to Section 309 is discretionary. Where the agency action complained of is discretionary, the waiver of sovereign immunity in the Administrative Procedure Act is inapplicable. Accordingly, this Court finds that the Administrative Procedure Act does not waive sovereign immunity with respect to plaintiffs' Clean Water Act claims.
>
> [A]gency decisions not to take enforcement actions are presumptively unreviewable.

*Id*. at 901, 904 (citing *Heckler v. Chaney*, 470 U.S. 821, 831, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985)).

Thus, the United States and Ohio are implementing their oversight and enforcement roles regarding the OCIT project. There is no need or justification for the appointment of a monitor to replace or duplicate the United States' and Ohio's oversight and enforcement roles.

8

**III. THE COURT DOES NOT HAVE THE INHERENT AUTHORITY TO APPOINT A MONITOR OVER THE OBJECTIONS THAT HAVE BEEN PRESENTED BY AKRON.**

In *Cobell v. Norton*, 334 F.3d 1128 (D.C.Cir.2003), the D.C. Circuit Court of Appeals was faced with the same issue that is presented in this Court's Show Cause Order, i.e. whether or not a district court has the inherent authority to appoint a monitor without the consent of the party to be monitored. The court held that a district court does not have such inherent authority:

> A judicial claim to an "inherent power" is not to be indulged lightly, lest it excuse overreaching "[t]he judicial Power" actually granted to federal courts by Article III of the Constitution of the United States, and the customs and usages that inform the meaning of that phase. Such a claim, therefore, must either be documented by historical practice, . . . or supported by an irrefutable showing that the exercise of an undoubted authority would otherwise be set to naught.
>
> In this case, however, we find nothing but the district court's assertion it has inherent power to appoint, which can hardly be self-supporting. Therefore, we hold the district court does not have inherent power to appoint a monitor – at least not a monitor with the extensive duties the court assigned to Kieffer – over a party's substantial objection, here the Government's objection that the appointment violated the separation of powers.

*Id.* at 1141.

In *Cobell*, the Department of the Interior ("DOI") originally consented to the appointment of a monitor and then later objected when the court re-appointed a monitor. The monitor was tasked with the review and monitoring of DOI matters regarding compliance with a decree. While DOI's objections were based upon a separation of powers argument, the Court did not address the merits of those arguments when reaching its decision. Rather, it was sufficient that the objections were colorable. *Id.* at 1142. ("We need not decide, however, whether the Department's objection was meritorious; it is enough for present purposes that the objection was colorable.").

As set forth above, Akron objects to the proposed appointment of a monitor in this case. The proposed appointment is inconsistent with the oversight framework that was negotiated by the parties in the Consent Decree (and approved by this Court), in which the oversight role has been

9

placed with the United States and Ohio. The agencies involved in oversight on behalf of the United States and Ohio have the authority, expertise, and resources to deal adequately with the specific compliance matters that are required by the Consent Decree, and are the agencies charged with the administration of the underlying water pollution laws that are at the heart of this case. These agencies are implementing their respective oversight roles. The proposed appointment of a monitor would either duplicate or replace these functions of the United States and Ohio, but the monitor would be reporting to the Court. This is the very type of oversight that the Court of Appeals overturned in *Cobell* – "[i]n short, the Monitor acted as an internal investigator, not unlike a departmental Inspector General except that he reported not to the Secretary but to the district court." *Id.* at 1141.

Akron's objection to the appointment of the monitor is further supported by the fact that, when considering all of the requirements of Consent Decree, Akron has demonstrated a strong record of materially complying with those requirements since the lodging of the Consent Decree in 2009.[7] While there has been a delay in completing one control measure – the OCIT project – that delay was not the result of Akron's recalcitrance, but was due to multiple events that were outside of Akron's control. Substantial portions of the project have been completed and the OCIT is currently scheduled to go into operation at the end of June 2020.

Therefore, based upon Akron's objections (which objections are far greater than the mere colorable standard), this Court does not have the authority to appoint a monitor to oversee Akron's compliance.

---

[7] Akron's compliance is discussed in Section V, below.

## IV. THE PROPOSED APPOINTMENT OF A MONITOR WOULD BE A UNILATERAL MODIFICATION OF THE CONSENT DECREE THAT IS BEYOND THE COURT'S AUTHORITY.

On page 6 of the Show Cause Order, the Court cites to the Sixth Circuit's decision *in U.S. v. Bd. of Cty. Comm'rs of Hamilton County, Ohio*, 937 F.3d 679, 690 (6th Cir.2019), regarding a court's inherent power to enforce settlement agreements. *Hamilton County,* however, is readily distinguishable from this Court's proposal to appoint unilaterally a monitor. Unlike this Court's proposal, the district court's temporary injunction in *Hamilton County* was requested by one of the parties and "did not modify the consent decree." *Id*. at 690.

In *Hamilton County,* the Sixth Circuit made a distinction between the exercise of a court's authority to enforce a settlement and the modification of a consent decree. In that case, Cincinnati announced its intention to withdraw from a 1968 agreement with Hamilton County that governed the operation of the regional sewer system. The other parties to the consent decree, including Hamilton County, the United States, and the State of Ohio, were concerned that if Cincinnati unilaterally withdrew from the management agreement, it would impact compliance with the consent decree that was entered by the district court. Hamilton County filed a motion seeking to enjoin Cincinnati from withdrawing from the agreement, and the district court issued a temporary injunction. Cincinnati appealed, arguing that the injunction constituted a modification of the decree. The Sixth Circuit, in upholding the injunction, distinguished the district court's action from the modification of a consent decree, noting that "both of the cited cases" cited by Cincinnati "are distinguishable from this one because they involved motions for modification of a consent decree" whereas "the temporary injunction did not modify the Consent Decree." *Id.* at 690 (internal citations omitted).

Unlike the facts in *Hamilton County*, the proposed appointment of a monitor in this case would be a modification to the Consent Decree. The appointment would change the oversight

11

framework established by the parties set forth in the Consent Decree and either duplicate or replace the oversight roles of the United States and Ohio with a third-party. Moreover, Section XXIV of the Consent Decree provides that "[t]he terms of this Consent Decree . . . may be modified *only* by a subsequent written agreement signed by all of the parties." (Emphasis added). For the reasons set forth in the prior Sections of this Response, Akron does not consent to this type of modification.

In *Hamilton County*, the Sixth Circuit does cite to limited circumstances regarding a court's inherent power to make modifications to a consent decree. *Id.* However, the limited circumstances "*involve motions for modification of a consent decree*, raising questions about the extent of the district court's inherent power to make modifications." *Id.* (emphasis added). Thus, those limited circumstances are based upon a Court's inherent power to modify a consent decree when at least one of the parties has requested the modification. *Hamilton County* does not stand for the proposition that a court has inherent authority to modify a consent decree absent a request by at least one of the parties. The limited circumstances for modification identified in *Hamilton County* are **not** applicable when a court attempts to modify a consent decree *sua sponte*. In this case, the Court's authority to modify the Consent Decree is limited to a request by all of the parties under Section XXIV of the Consent Decree, or a request by at least one of the parties based upon the limited modification standard identified in *Hamilton County*.[8]

---

[8] Assuming, purely for the sake of argument, that the limited modification standards applied to a *sua sponte* modification by a court, those standards are not met with regard to the proposed appointment of a monitor in this case. The Consent Decree already has adequate and appropriate oversight and enforcement provisions and, thus, the appointment of a monitor would be contrary to each of the limited standards for modification. The United States and Ohio have oversight authority and are fulfilling their oversight roles under the Consent Decree. They are gathering and assessing the relevant facts and information regarding the delays encountered with the OCIT project before making a decision on enforcement. The United States and Ohio have made it clear that they have not waived their enforcement rights. The Consent Decree expressly provides for stipulated penalties as the enforcement tool and remedy for the non-compliance with deadlines, and the United States and Ohio have the appropriate discretion regarding stipulated penalties.

## V. AKRON'S OVERALL COMPLIANCE RECORD WITH THE REQUIREMENTS OF THE CONSENT DECREE HAS BEEN STRONG.

### A. Akron's Overall Compliance With The Consent Decree.

Within the Show Cause Order, the Court focuses on the delay in placing the OCIT into operation. As set forth above, it is Akron's position that there were events beyond Akron's control that reasonably justify significant portions, and possibly all, of the delay. Moreover, Akron's compliance record is not limited to a single project. Rather, it has a record of material compliance with the numerous other deadlines in the Consent Decree. This record of compliance confirms that there is no need or justification for the appointment of a monitor.

The Consent Decree imposed numerous requirements upon Akron. As set forth below, Akron's overall compliance with those requirements has been strong. This compliance record is documented in Akron's nineteen (19) Semi-Annual Reports. Akron has also summarized its compliance in Akron's April 29, 2019 Status Report (Dkt No. 201), and during the testimony provided by Patrick Gsellman at the hearing on the Second Amendment to the Consent Decree (Hearing Transcript, Dkt Nos. 242, 243 and 244). This record includes the construction of numerous control measures throughout the system and at the WPCS.

To date, Akron has constructed the following control measures required by the Consent Decree:

- Five sewer separation projects;

- Two green sewer separation projects (i.e. sewer separation with green infrastructure on the storm water component);

- Four storage basins;

- Rehabilitation and capping on the Main Outfall Interceptor ("MOI");

- Mud Run Pump Station and Storage Basin upgrades;

- WPCS upgrades that expanded the secondary treatment capacity from 110 million gallons per day ("MGD") to 220 MGD;

- Upsizing under flow drains and associated work for Racks 27 and 29; and

- Green infrastructure control measures on Aqueduct Street (part of the Racks 26 and 28 project).

Akron has placed all of these control measures into operation by the applicable Consent Decree AFO deadlines. In fact, Akron placed the majority of these control measures into operation prior to the applicable AFO deadline. Finally, with the exception of the OCIT project, Akron is on schedule to comply with all the remaining Consent Decree project deadlines.

Akron's compliance has come at significant cost and expense to the rate payers of the system. The estimated cost of the Consent Decree projects completed or under construction by Akron is $692 million, and the total costs of implementing the Consent Decree is estimated to be well over $1 billion. (Hearing Transcript, p. 245). This more than $1 billion estimate does not include the asset management costs, the costs for operation and maintenance, the costs for the Capacity, Management, Operation, and Maintenance ("CMOM") program, or related infrastructure projects, such as the head work project at the WPCS. (Hearing Transcript, pp. 244-246).

In consideration of Akron's overall record of compliance with the deadlines within the Consent Decree, an additional layer of oversight through the appointment of a monitor is completely unnecessary. This additional layer of oversight will not provide any additional environmental benefit, but will result in additional and unnecessary cost and expense to the parties.

> **B.      Akron Has Exceeded The Requirements Of The Consent Decree By Controlling More Than 800 Million Gallons Of Flow Over And Above The Standards Set In The Consent Decree.**

Finally, the Court expresses its concern regarding the additional volume of overflows that have and will occur as a result of the delays in putting the OCIT into operation. However, in considering the potential harm, it is only fair to take into consideration the additional flows that have been addressed by Akron over and above the requirements of the Consent Decree. Akron's April 29, 2019 Status Report documents several projects that have been completed in advance of the applicable AFO deadline in the Consent Decree. By placing such projects into operation in advance of the AFO deadline, Akron has treated additional overflow volumes above and beyond what is required under the Consent Decree. These additional overflow volumes offset the volumes of additional overflows resulting from a delay in completing the OCIT project. Most notable are the volumes of secondary treatment bypasses treated above the minimum 130 MGD flow rate between June 1, 2013 and April 30, 2019 (which is the AFO date for the Step Feed Phase II Project). Specifically, **Akron treated over 863 million gallons of additional flow during this time frame that Akron was not required to treat under the Consent Decree**.

## VI.    CONCLUSION

For the reasons set forth herein, Akron respectively requests that the Court not appoint a monitor to oversee compliance with this Consent Decree.

Respectfully submitted,

*/s/ Terrence S. Finn*
Terrence S. Finn (39391)
tfinn@ralaw.com
Jessica A. Lopez (0090508)
jlopez@ralaw.com
Roetzel & Andress, LPA
222 South Main Street
Akron, OH  44308
330.376.2700

Thomas L. Rosenberg (24898)
trosenberg@ralaw.com
Roetzel & Andress, LPA
41 South High Street
Huntington Center, 21st Floor
Columbus, OH  43215
614.463.9770

*Attorneys for Defendant City of Akron*

## PROOF OF SERVICE

I hereby certify that on January 10, 2020 a copy of *Defendant City of Akron's Response to the Court's December 17, 2019 Show Cause Order* was filed electronically. Notice of this filing will be sent to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

*/s/ Terrence S. Finn*
Terrence S. Finn

14600210 _1 016756.0003