**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.:  5:09CV272 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN ADAMS |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| CITY OF AKRON, et al., | ) | |
| | ) | (Resolving Doc. 371) |
| | ) | |
| | ) | |
| Defendants. | ) | |

In 2023, more than 2.8 million people visited and enjoyed the amenities offered by the Cuyahoga Valley National Park making it the 12th most visited national park in the United States.  In 2024, the CVNP will celebrates its 50th anniversary and visitation will undoubtedly remain at a high level.  This 33,000-acre park protects 25 miles of the Cuyahoga River that flow into Lake Erie.  Defendant City of Akron, through its motion for judicial review of a dispute, Doc. 371, seeks permission to fundamentally alter its 2014 Consent Decree and obtain approval to dump millions of gallons of untreated sewage into the CVNP.

The Court has been advised, having reviewed the motion, pleadings, and applicable law.  For the reasons that follow, the motion is DENIED.

**I. Background**

The United States Government originally filed this action against the City of Akron and the State of Ohio on February 5, 2009.  In its complaint, the Government alleged that Akron had been discharging pollutants in violation of its National Pollutant

1

Discharge Elimination System ("NPDES") permit.  The complaint alleged that through combined sewer overflow ("CSO") discharges Akron had 1) violated its general effluent limitations, 2) allowed dry weather overflows, 3) allowed unpermitted discharges, 4) committed bypass violations, and 5) failed to monitor and report as required by its permit. After many years of back-and-forth negotiations, the parties submitted a Consent Decree ("the Decree") in an attempt to resolve the litigation.  Initially, on March 17, 2011, the Court denied entry of the Decree (Doc. 109) with an emphasis on the fact that the parties had not yet established a schedule for the completion of the projects that would be contained in the Updated Long-Term Control Plan ("LTCP").

Following further negotiations while the matter was pending on appeal, a completed LTCP was submitted for the Court to review.  The Decree and LTCP specified completion dates for each of the major projects that would be required.  Notably, the Decree's projects were required to ensure that in a typical year, Akron's system would have *zero* untreated overflows.  Based upon the specific schedule for completing projects and the level of control required by the Decree, the Court approved and entered the Decree on January 17, 2014.  Docs. 154, 155.  As a court-appointed expert described it: "the most significant virtue of the [] Decree is the substantive standard that it [] set for the control of the CSO discharges" which the expert described as "extraordinary."

Over the course of the next decade, the parties submitted three separate proposed amendments for the Court's review.  On September 20, 2016, the Court approved the First Amendment (Doc. 186) that included two modifications:  (1) the sequencing for two elements of injunctive relief measures required at Akron's Water Pollution Control Station ("WPCS") and (2) the method Akron was required to use to address potential

weaknesses in the Main Outfall Sewer.  On December 17, 2019, the Court approved the parties' second proposed amendment that allowed (1) the replacement of the requirement to install a BioActiflo facility to treat secondary bypasses at Akron's Water Pollution Control Station ("WPCS"), with a requirement to instead install a BioCEPT facility to treat secondary bypasses, along with the requirement to implement a demonstration study; and (2) the replacement of the requirement to install certain storage basins with a requirement to instead install new control measures, including green infrastructure and increased conveyance, to control combined sewer overflows ("CSOs") from Akron's combined sewer system.  Finally, on November 28, 2023, the Court's approved the parties' third proposed amendment that allowed reduction in the size of the Northside Interceptor Tunnel ("NSIT") that is contained in the LTCP and the addition of a Rack 34 combined sewer separation project.  Through these amendments, Akron claims to have reduced the overall cost of the Decree by over $200 million.  Notably, none of the amendments sought to alter the control standard set forth in the Decree.  In other words, even after three amendments, the Decree still requires Akron to achieve *zero* untreated overflows in a typical year.

In its current motion, Akron seeks to eliminate the Decree's requirement that it construct an enhanced high-rate treatment facility ("EHRT") to treat overflows from Ohio Canal Interceptor Tunnel ("OCIT").  Specifically, Akron seeks to allow roughly 100 million gallons of untreated sewage to flow into the CVNP on a yearly basis – sewage that includes human waste, toilet paper, and hygiene products.  Akron notes in its brief that the location of these discharges also impacts "a population that exceeds the burden threshold for asthma, diabetes, heart disease, low life expectancy, low income,

historic underinvestment, low median income and high school education indicators." In lieu of constructing the EHRT, Akron has proposed offering financial support for water projects in Lakemore, Peninsula, and Springfield Lake.[1]  Akron has also proposed to increase the dewater rate from the OCIT while installing a disinfection facility at the Cuyahoga Street Storage Facility.  Specifically, Akron would help fund a gravity collection system with a conventional extended aeration treatment facility in Peninsula, an overhaul of the sewer system in Lakemore, and a groundwater study of Springfield Lake.  Akron contends that these projects would provide substantial water quality benefits that would in some manner offset the untreated overflows from the OCIT. Notably, installation of sewer lines and a treatment plant in Peninsula and overall system improvements in Lakemore are *already required* by orders issued by the Ohio EPA. Moreover, the groundwater study may be required in the near future as the result of a verified complaint filed by an Ohio resident on April 14, 2023.  With respect to Akron's proposal to increase the dewater rate from the OCIT, Akron concedes that while it would reduce untreated overflows, more than 62 million gallons of untreated overflows would still flow into the CVNP.

### II. Standard of Review

Initially, the Court notes that the Akron's motion is effectively evaluated under Rule 60(b), which allows that a motion to vacate may be granted only for certain specified reasons: 1) mistake, inadvertence, surprise, or excusable neglect; 2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); 3) fraud, misrepresentation, or other misconduct

---

[1] While these projects are within Summit County, Ohio, none of these communities are parties to the Decree, nor are proposed upgrades part of Akron's sewer system.

4

of an adverse party; 4) the judgment is void; 5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or 6) any other reason justifying relief from the operation of the judgment. *Feathers v. Chevron U.S.A., Inc.*, 141 F.3d 264, 268 (6th Cir. 1998)(quoting Fed.R. Civ.P. 60(B)).

The Supreme Court has offered further guidance when evaluating a motion to vacate or modify filed in the context of a consent decree.

> Although we hold that a district court should exercise flexibility in considering requests for modification of an institutional reform consent decree, it does not follow that a modification will be warranted in all circumstances. Rule 60(b)(5) provides that a party may obtain relief from a court order when "it is no longer equitable that the judgment should have prospective application," not when it is no longer convenient to live with the terms of a consent decree. Accordingly, a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree. If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance.

*Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383 (1992). The moving party may meet its burden "by showing a [] significant change either in factual conditions or in law." *Id.* at 384. For example, "[m]odification of a consent decree may be warranted when changed factual conditions make compliance with the decree substantially more onerous." *Id.* A district court is also justified in granting a motion to vacate when it is shown to be "unworkable" due to "unforeseen obstacles" or when continued application of the decree without a modification would be "detrimental to the public interest." *Id.*

"Ordinarily, however, modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree." *Id.* at 385

(citing *Twelve John Does v. District of Columbia*, 861 F.2d 295, 298–299 (C.A.D.C. 1988); *Ruiz v. Lynaugh*, 811 F.2d 856, 862–863 (5th Cir. 1987)).  "If it is clear that a party anticipated changing conditions that would make performance of the decree more onerous but nevertheless agreed to the decree, that party would have to satisfy a heavy burden to convince a court that it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b)." *Rufo*, 502 U.S. at 385.

The Sixth Circuit has noted that "[t]he modification of a consent decree by a court without the consent of all parties to the agreement is indeed a signal event," *United States. v. Wayne Cnty.*, 369 F.3d 508, 511 (6th Cir. 2004). As such, "the standard for justifying the modification of a decree is a strict one and a consent decree is, after all, a judgment entitled to a presumption of finality." *Id*. at 511-512 (quotation omitted). Furthermore, relief may be granted only when it is no longer equitable that the judgment should have prospective application, "not when it is no longer convenient to live with the terms of a consent decree." *Rufo*, 502 U.S. at 383.

Akron argues that two unforeseen circumstances warrant a revision to the Decree. First, Akron asserts that the existing upgrades to its sewer system have been more effective than originally anticipated.  As a result, Akron contends that even without the EHRT facility, it would be in full compliance with the EPA's CSO policy.  In other words, Akron contends that it could achieve the *minimal* benchmarks in EPA's published policies while not taking into account its own prior agreement to achieve more than the minimum.  Akron also contends that based upon an unforeseen increase in the cost of

6

constructing the EHRT facility, it is no longer a cost-effective measure.  The Court will review each contention below.

### III. Compliance with CSO Policy

Akron first asserts that updated modeling that includes all of the control measures that have been implemented to date reveals that its system is more efficient than anticipated.  Specifically, Akron alleges that now it only anticipates three overflow events resulting in overflows of roughly 100 million gallons of untreated waste.  At the time the Decree was entered, Akron anticipated seven overflow events that would result in the discharge of just under 200 million gallons of untreated waste.  Akron's argument, however, is self-defeating.

Akron contends that "based upon the three CSOs and relatively low associated overflow volumes, the EHRT's intended water quality benefits are merely *de minimis* at best."  As a result of this assertion, on one hand, Akron urges that a reduction in anticipated overflows of roughly 91 million gallons is a significant change in circumstances.  On the other hand, Akron asserts that treatment of the remaining 100 million gallons of overflows would have a *de minimis* impact on water quality.  Both of these assertions cannot be true.  If Akron is accurate that treatment of those 100 million gallons is *de minimis*, then it follows that treatment of the originally-anticipated 191 million gallons would also have minimal impact.  Akron, however, voluntarily agreed to construct the EHRT to treat the 191 million gallons at a cost of roughly $56 million dollars.  In other words, if the treatment of 100 million gallons of raw sewage that would

7

otherwise flow into a national park is properly categorized as having a *de minimus* impact as Akron asserts, then the *reduction* of overflows by a lesser amount, 91 million gallons, cannot be categorized as a significant change in circumstances.

Akron continues, however, by arguing that the reduction from seven anticipated overflows to three overflows would place Akron in compliance with the EPA's CSO policy.[2]  Akron effectively argues that had it known it could achieve this alleged minimum level compliance without the EHRT, it would not have agreed to the project. Framed differently, Akron contends that because its completed projects have been more efficient than anticipated, such a fact qualifies as a significant change in circumstances.

Akron's argument here ignores the central component of the Decree that this Court relied upon when it approved the Decree – it allows for *zero* overflows in a typical year.  In fact, prior to the adoption of the Long-Term Control Plan ("LTCP") that this Court reviewed prior to approval of the Decree, the Court detailed the parties' negotiations regarding overflows:

> This filing demonstrates that on January 14, 2011, the Government rejected Akron's initial final LTCP update that was submitted on October 15, 2010. The October 15, 2010 LTCP provided for a total of 12 overflows annually or roughly 1.3 million gallons of overflows. The Government formally disapproved of the update in that same letter. On February 15, 2011, the Government then provided further guidance to Akron for revising its LTCP. The February letter provided that the Government believed that for Akron to comply with the Clean Water Act and the Decree that the LTCP needed to provide for zero discharges from the basins, zero discharges from the Ohio Canal Tunnel, 2 discharges from the Northside Tunnel that were treated, and a maximum of 6 bypasses from the treatment plant that were also treated.

Doc. 109 at 32.  Thus, as far back as 2011, the EPA consistently took the stance that Akron's Decree would be required to result in zero untreated overflows.  As a result, the

---

[2] The EPA vehemently disputes Akron's contention that permitting these overflows would still result in compliance with its CSO policy.

alleged increased efficiency of several components cannot be seen as a significant change in circumstances when the end result would still allow for untreated overflows.  In other words, Akron cannot achieve a result through its 60(b) motion that it could not have achieved through litigating the underlying matter to conclusion.[3]

To reiterate, the overflows that would result from Akron's proposed modification would *all* flow to a national park.  A park that is described as follow:

> Cuyahoga Valley features natural, man-made, and private attractions, which is unusual for an American national park. The park includes compatible-use sites not owned by the federal government, such as regional parks of the Cleveland Metroparks and Summit Metro Parks systems.

> The natural areas include forests, rolling hills, narrow ravines, wetlands, rivers, and waterfalls. About 100 waterfalls are located in the Cuyahoga Valley, with the most popular being the 65-foot (20 m) tall Brandywine Falls—the tallest waterfall in the park and the tallest in Northeast Ohio. The Ledges are a rock outcropping that provides a westward view across the valley's wooded areas. Talus caves are located among the boulders in the forest around the Ledges.

> The park has many trails, most notably the 20-mile (32 km) Towpath Trail, which follows a former stretch of the 308-mile (496 km) Ohio and Erie Canal and is popular for hiking, bicycling, and running. Skiing and sled-riding are available during the winter at Kendall Hills. Visitors can play golf or take scenic excursions and railroad tours on the Cuyahoga Valley Scenic Railroad during special events.

> The park also features preserved and restored displays of 19th and early 20th century sustainable farming and rural living, most notably the Hale Farm and Village, while catering to contemporary cultural interests with art exhibits, outdoor concerts, and theater performances in venues such as Blossom Music Center and Kent State University's Porthouse Theatre. In the mid-1980s, the park hosted the National Folk Festival.

https://en.wikipedia.org/wiki/Cuyahoga_Valley_National_Park (last visited 2/27/2024).

It is these very features that led both the Court and the EPA to require the stringent

---

[3] Notably, the Court also made clear throughout its written orders that because *every* overflow reached a sensitive area that all led to the CVNP, a zero-overflow result was necessary to satisfy the Court's standard for approval.

standard of zero untreated overflows more than a decade ago.  Rather than attempt to meet that standard through its proposed modification, Akron now seeks to meet a much lower threshold by claiming compliance with the baseline of EPA's CSO policy.[4]  A 60(b) motion, however, is not a proper mechanism to effectively revisit Akron's decision to agree to a more stringent standard long ago.

### IV. Unforeseen Cost Increase

Akron also argues that the unforeseen cost increase to construct the EHRT renders it no longer cost effective when compared to its alleged minimal environment benefit.  Specifically, Akron contends that it estimated the cost of the EHRT at $56 million in 2010 dollars and that the cost has now increased to $209 million.  Akron asserts that this unexpected substantial increase presents a significant change in circumstances that warrants revisiting the Decree's EHRT requirement.  Upon review, the Court finds Akron's arguments less than compelling.

Initially, the Court reiterates that Akron bears the burden of demonstrating a change in circumstances.  Akron's filings fall short for several reasons.  First, while Akron has provided the alleged raw number increase in construction cost, it has failed in any  meaningful way to *explain* the cost increase.  As a result, the Court cannot ascertain what costs increases were foreseeable as opposed to unforeseeable.  As noted above, Akron's original estimate of $56 million was calculated in 2010 dollars. Akron has not offered any information about normal inflation in the industry to explain what the cost would be by virtue of nothing beyond the passage of time.  As such, while Akron

---

[4] While the Court will not evaluate the issue in depth, it finds itself in agreement with the EPA's analysis that demonstrates that Akron would *not* in fact be in compliance with the CSO policy absent construction of the EHRT facility.

contends that there has been a $153 million increase, it has failed to show what portion of that increase could properly be deemed as unforeseen.

The Court also remains skeptical of the estimate that Akron provided in support of its motion. The estimate notes that: "Based on data provided by the Akron Hydraulic Modeling consultant in the AWR Modeling Tech Memo #5 Attachment (Appendix A), there are seven events that would require the operation of the HRT during the typical year precipitation with a cumulative overflow volume of 196 million gallons per year." However, as detailed above, Akron has contended that these numbers are no longer accurate based upon updated modeling that shows installed components are more efficient than anticipated. In other words, the estimate relies upon outdated data.

While it is conceivable that the flow rate and duration of the remaining three overflows *could* result in a similar estimate, the Court could only reach such a conclusion through speculation. It is unclear why Akron did not have its estimate updated or amended to reflect what it claims to be more accurate, up-to-date modeling results. The failure to use up-to-date information, coupled with the *complete* lack of explanation for the difference between the 2010 and current estimate, results in Akron failing to discharge its burden to show a significant change in circumstances. For example, Akron has not explained whether the increase results in some unforeseen increase in labor costs or material costs or some combination. As such, it is effectively impossible for the Court to evaluate whether the changes should have been foreseeable and the extent of any unforeseen increases.

With respect to the costs of the EHRT, the Court also must note that within the parties' decree, they negotiated a force majeure provision that includes: "Force majeure

11

does not include Akron's financial inability to perform any obligation under this Consent

Decree." Doc. 155 at 37.  While the parties have not formally relied upon this provision,

the Court finds itself in agreement with the logic espoused by the district court in the

District of Colombia:

> Defendants argue that it is inappropriate for EPA to invoke this provision
> because defendants are not contending that the decree should be modified
> on force majeure grounds. Regardless of whether defendants are relying
> on the force majeure provision, however, EPA is correct in pointing out
> that the provision clearly indicates that the parties contemplated cost
> increases. *See Harris Teeter*, 215 F.3d at 36 (noting that "self-imposed
> hurdles and hurdles inherent in a consent decree's entry" do not justify
> modification); *Thompson v. HUD*, 220 F.3d 241, 248 (4th Cir.2000)
> (finding that a circumstance could not be considered unanticipated for
> purposes of modifying a decree where a provision of the decree was
> "specifically directed" to that circumstance and would only be needed in
> that circumstance).

*United States v. Caterpillar, Inc*., 227 F. Supp. 2d 73, 83 (D.D.C. 2002).  The facts

presented by Akron present a similar scenario.  While Akron frames its argument as one

of cost-effectiveness,  its primary focus is upon the increased costs of constructing the

EHRT.  As the parties' force majeure clause clearly contemplated cost increases and

prohibited invoking the force majeure provision for financial difficulties, the Court finds

that the increased cost was considered during the negotiation of the Decree.  As such, it

cannot form the basis for modification.

Finally, the Court notes that Akron's argument also fails because it cannot

demonstrate that *any* of its alleged changes in circumstance make compliance with the

Decree more onerous.  Even if this Court were to accept the faulty evidence provided by

Akron and attribute no inflation to its original estimate, the increase in cost of the EHRT

would be roughly $153 million.  By Akron's own admission, prior amendments approved

by this Court have lowered the cost of compliance by *more than $200 million*.  As a

result, overall compliance with the Decree has become less onerous even if the Court were to include the full cost increase of the EHRT.  The Court finds that review of the totality of the Decree is the only appropriate measure as it takes into account the budgeting that Akron would have been required to engage in as early as 2011.

Based upon all of the above, Akron has failed to demonstrate a significant change in circumstances that would warrant a modification of the Decree.  However, out of an abundance of caution, the Court will evaluate whether Akron's proposals would be suitably tailored to the changed circumstances.

### V. Suitably Tailored

From the outset, the Court notes that modifications to the Decree are not suitably tailored if they "would fundamentally alter the bargain reached by the parties."  *Ne. Ohio Coal. for the Homeless v. Husted*, No. 2:06-CV-896, 2013 WL 4008758, at *11 (S.D. Ohio Aug. 5, 2013).  Herein, Akron's proposals *would* fundamentally alter the bargain reached by the parties.

Consistent with its argument regarding the alleged change in circumstances, Akron focuses much of its argument upon the premise that a certain number of untreated overflows can occur without running afoul of the CSO policy set forth by the EPA.  However, even if the Court were to assume that to be true, it would have undoubtedly been true at the time Akron bound itself to the Decree.  As such, adopting *any* of the measures proposed by Akron that would allow for untreated overflows would fundamentally alter the bargain reached by the parties.  In essence, thirteen years after the Decree was entered by this Court, Akron wants to return to the bargaining table and

13

obtain a Decree that requires less than the original.  The Court cannot approve of such an approach.

Moreover, the Court finds itself in agreement with the EPA in that "Akron [] cannot avoid addressing its own sewage overflows and contributions to impairment of water quality standards by offering to assist another community."  Doc. 374 at 37.  None of the projects proposed by Akron will impact the untreated overflows that will result if the Court eliminates the requirement to construct the EHRT.  Moreover, many of these projects are at a stage where Akron's commitment is, at best, vague and unenforceable by the Court.  Unlike the LTCP, these proposed alternatives do not have specific criteria that must be fulfilled, do not have any set timeline, and require cooperation from parties not subject to the Decree.  As such, the projects would not be subject to Court oversight or enforcement mechanisms.  As a result, it is unclear how the Court could substitute these alternatives within the confines of the Decree.  As such, they cannot be seen as suitably tailored alternatives.

In closing, the Court notes that Akron has suggested that the public interest would be served because a modification would lessen the burden on its ratepayers.  However, as detailed above, the overall cost of the Decree is actually less than was anticipated at its outset because of the three amendments.  Furthermore, the Court takes notice that the average total bill for Akron residents for both water and sewer remains comparable to other municipalities in Ohio.  In fact, as recently as November of 2023, Akron announced an increase in its water rates that still left the totals comparable to or below other municipalities.



See https://www.akronohio.gov/news_detail_T17_R46.php (last visited on February 23, 2024).  As can be seen above, even with further increases over time to fund the EHRT, Akron's ratepayers will not have burdens any greater than surrounding municipalities. As such, the alleged burden on the ratepayers does not support Akron's argument to eliminate construction of the EHRT.

**VI. Conclusion**

The Court is mindful of Akron's desire to reduce the overall cost of the Decree. In fact, the Court has approved three separate Amendments that reduced Akron's costs by more than $200 million.  Those Amendments had a common component – namely, they never altered the parties' agreement to eliminate *all* untreated overflows.  Akron's current position seeks to undercut that core component of the Decree and allow for, at a minimum,  roughly 62 million gallons of untreated sewage to flow yearly into the CVNP. Fortunately for the environment, the Decree cannot be revisited and modified simply because Akron would like to renegotiate the obligations that it freely assumed in 2011

15

when the Decree was entered.  That day and through to the present day, those obligations are necessary to protect the sensitive areas that *all* of Akron's sewer outflows would impact if permitted.  As detailed back in 2011, the acting branch chief in the municipal enforcement plan in the water enforcement division of the U.S. EPA, indicated: "I think the complication here is that *every outflow is to a sensitive area*." Doc. 87 at 150 (emphasis added).  As the need to protect those areas has never changed, Akron's request to modify the Decree to allow them to be polluted is DENIED.

      Akron's motion for relief from judgment is DENIED.

      IT IS SO ORDERED.


<u>March 1, 2024</u>                        <u>   /s/ Judge John R. Adams    </u>
                                          JUDGE JOHN R. ADAMS
                                          UNITED STATES DISTRICT COURT